# EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| IKB INTERNATIONAL, S.A. in Liquidation and IKB DEUTSCHE INDUSTRIEBANK A.G., <br><br> *Plaintiffs*, <br><br> -*against*- <br><br> WILMINGTON TRUST COMPANY, as Trustee (and any predecessors or successors thereto); M&T BANK CORPORATION As Successor By Merger To The WILMINGTON TRUST COMPANY, as Trustee (and any predecessors or successors thereto), <br><br> *Defendants*, <br><br> -*and*- <br><br> CWABS TRUST 2005-HYB9; IMPAC SECURED ASSETS CORP MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2004-3; IMPAC CMP TRUST SERIES 2004-5; IMPAC CMB TRUST SERIES 2005-5; IMPAC CMB TRUST SERIES 2005-6; IMPAC CMB TRUST SERIES 2005-8; RENAISSANCE HOME EQUITY LOAN TRUST 2005-1; RENAISSANCE HOME EQUITY LOAN TRUST 2005-4; RENAISSANCE HOME EQUITY LOAN TRUST 2006-1; RENAISSANCE HOME EQUITY LOAN TRUST 2006-2; RENAISSANCE HOME EQUITY LOAN TRUST 2006-3; RENAISSANCE HOME EQUITY LOAN TRUST 2006-4; RENAISSANCE HOME EQUITY LOAN TRUST 2007-1; RENAISSANCE HOME EQUITY LOAN TRUST 2007-2; SAXON ASSET SECURITIES TRUST 2006-3, <br><br> *Nominal Defendants*. | Index No. 654444/2015 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..................................................................................... i

**I.     NATURE AND SUMMARY OF THE ACTION**.......................................... 1

    A.    The Factual Basis for Plaintiffs' Claims Against Wilmington Trust. ........................ 1

    B.    The Contractual and Statutory Framework of This Action ........................................ 3

**II.    THE PARTIES**................................................................................................ 3

    A.    IKB. ............................................................................................................................ 3

    B.    The Trusts. ................................................................................................................. 4

    C.    Wilmington Trust. ..................................................................................................... 5

        1.    Wilmington Trust Company. ............................................................................ 5

        2.    M&T Bank Corporation. ................................................................................... 5

**III.   VENUE** ........................................................................................................... 5

**IV.    COMPLIANCE WITH THE NO ACTION CLAUSES IS EXCUSED**.................. 6

**V.     OVERVIEW OF THE COMPLAINT** ........................................................... 7

**VI.    RMBS SECURITIZATION** ........................................................................... 8

    A.    The Participants in the Trust. ................................................................................... 8

        1.    The Sellers. ....................................................................................................... 8

        2.    The Servicers. ................................................................................................... 9

        3.    The Loan Files. ............................................................................................... 10

        4.    The Trustees. .................................................................................................. 10

    B.    The Agreements Giving Rise to Wilmington Trust's Contractual and Statutory Duties. ..................................................................................................................... 11

**VII.   WILMINGTON TRUST'S DUTIES AND OBLIGATIONS** ................................. 13

    A.    Wilmington Trust's Contractual Obligations. ...................................................... 13

    B.    Wilmington Trust's Statutory Obligations. .......................................................... 15

i

**VIII.   THE INDENTURE TRUSTEES' DUTIES AND OBLIGATIONS UNDER THE GOVERNING AGREEMENTS** ................................................................ 16

A.   The Indenture Trustees Had a Duty to Take Physical Possession of Complete Mortgage Files and Enforce Related Repurchase Obligations. ............................... 16

B.   The Indenture Trustee Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice. ................................................ 18

C.   The Indenture Trustee Trust Had a Duty to Exercise Due Care to Enforce Repurchase Obligations and Avoid Conflicts of Interest. ....................................... 19

D.   The Indenture Trustee Had a Duty to Provide Accurate Remittance Reports and Certifications Under Regulation AB .......................................................................... 19

E.   The Indenture Trustee Had a Duty to Address the Servicers' Failure to Meet Prudent Servicing Standards. ..................................................................................... 21

**IX.   PLAINTIFFS' CLAIMS** ................................................................................. 21

A.   Wilmington Trust's Breaches of its Contractual and Statutory Duties..................... 21

B.   The Trusts' Catastrophic Performance. .................................................................... 25

**X.   WILMINGTON TRUST'S FAILURE TO PROTECT THE TRUST ESTATE** .. 26

A.   The Indenture Trustee Breached Its Duty To Take Possession Of The Loan Files And Ensure Their Completeness. ............................................................................. 26

1.   The Harm Resulting from The Indenture Trustee's Failure to Take Possession of and Ensure the Completeness of the Loan Files. ................................................. 26

2.   The Servicers' and Master Servicers' Cover-up of the Sponsors' Document Delivery Failures.............................................................................................. 28

a)   Bank of America, Countrywide Home Loans, Inc., Countrywide Home Loan Servicing, LP and Wilshire Credit Corporation.................................................... 29

b)   GMAC Mortgage Corporation, GMAC Mortgage, LLC and Residential Funding Corporation. .......................................................................................................... 33

c)   Ocwen Loan Servicing, Litton Loan Servicing LP and Fremont Investment & Loan. ..................................................................................................................... 39

d)   Midland Loan Services, Inc. and National City Home Loan Services, Inc. ......... 41

e)   Wachovia Mortgage Corporation and Wells Fargo Bank, N.A. ........................... 43

B.   Wilmington Trust's and the Indenture Trustees' Failure To Remedy The Sellers' Pervasive Breaches Of Representations And Warranties. ........................................ 46

ii

1.    The Sellers' Representation and Warranty Breaches................................ 46

2.    The Trusts' Loans Have Experienced High Delinquency, Modification, And Loss Severity Rates. ...................................................................... 47

3.    The RMBS Have Experienced Massive Credit Downgrades. ............................. 49

4.    The Systematic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period............................................................... 49

5.    The Widespread Breaches of Representations and Warranties by the Same Originators That Sold Loans to the Trusts............................................ 54

      a)    Countrywide Financial Corporation. ................................................ 55

      b)    Delta Funding Corp..................................................................... 60

      c)    Impac Funding Corp. ................................................................... 61

      d)    People's Choice Home Loan, Inc. .................................................... 64

6.    The Systematic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period. ....................................................... 67

C.    Wilmington Trust Knew That The Trusts Were Filled With Defective Loans. ....... 68

1.    Reports, Investigations and Litigation Involving the Sellers................................ 68

2.    Wilmington Trust Tracked The Trusts' Performance............................................ 68

3.    Wilmington Trust And Its Responsible Officers Were Aware of Notices Of Pervasive And Systematic Seller Breaches........................................... 69

4.    The Indenture Trustees Initiated Putback Litigation Against At Least Some of the Sellers................................................................................. 70

D.    The Trusts Also Suffered From Pervasive Servicer Violations............................... 71

1.    The Servicers. ........................................................................................ 71

2.    The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations......................... 71

3.    The Servicers Have Violated Their Prudent Servicing Obligations. ................... 75

4.    The Servicers Have Violated Their Foreclosure Obligations. ............................ 81

5.    The Servicers Have Violated Their Modification Obligations. ........................... 86

6.    The Servicers Have Abused Their Servicing Advances Obligations. .................. 87

iii

7.      The Servicers Provided Non-Conforming Certifications. ................................... 89

E.      Wilmington Trust Has Known Of Servicer Violations Plaguing The Trusts. .......... 89

1.      Wilmington Trust Had Knowledge Of The Servicers' Failures Through The
        Monthly Servicing Reports. .................................................................................... 89

2.      Wilmington Trust Knew Of Pervasive and Systematic Seller Breaches through
        Highly Publicized Investor Communications. ....................................................... 91

3.      Wilmington Trust Had Knowledge Of The Servicers' Failures Through Highly
        Publicized Government Enforcement Actions and Litigation Stemming From The
        Servicers' Violations. ............................................................................................. 92

4.      Wilmington Trust Had Knowledge Of False Master Servicer and Servicer
        Certifications. .......................................................................................................... 93

5.      Wilmington Trust, The Indenture Trustees, Servicers, and Sellers Failed To
        Discharge Their Duties Under The Governing Agreements. ............................... 93

        a)      Failure to Enforce the Trusts' Repurchase Rights. .............................. 94

        b)      Failure to Provide Notice to the Servicers of Default. .......................... 94

        c)      Failure to Provide Notice to the Certificateholders of Uncured Events of
                Default. .................................................................................................... 94

        d)      Events of Default Concerning False Servicer Certifications. ............... 95

F.      Wilmington Trust and the Indenture Trustees Failed To Protect The Trusts
        Following The Insolvency Of Certain Servicers. ................................................... 95

XI.     WILMINGTON TRUST'S FAILURE TO GIVE NOTICES OF DEFAULT ...... 96

XII.    DAMAGES ............................................................................................................... 96

XIII.   CAUSES OF ACTION ............................................................................................ 97

FIRST CAUSE OF ACTION  (Breach of Contract) ........................................................... 97

A.      Failure to Protect the Trust Estate. ........................................................................ 97

B.      Failure to Give Notice of Defaults Under the Governing Agreements. ................... 98

C.      Damages. .................................................................................................................. 98

SECOND CAUSE OF ACTION  (Bad Faith Violation Of The Implied Contractual
Covenant Of Good Faith And Fair Dealing) ....................................................................... 99

XIV.    RELIEF REQUESTED ............................................................................................. 99

iv

**XV.    JURY DEMAND**............................................................................................................ **100**

v

Plaintiffs IKB International, S.A. in Liquidation ("IKB S.A.") and IKB Deutsche

Industriebank AG ("IKB AG") (together, "IKB" or "Plaintiffs") by their undersigned counsel,

for their Complaint against Defendants Wilmington Trust Company, as Trustee (and any

predecessors or successors thereto) ("Wilmington Trust Company"); and M&T Bank

Corporation as Successor by Merger to Wilmington Trust Company, as Trustee (and any

predecessors or successors thereto) ("M&T Bank") (Defendants, collectively are "Wilmington

Trust"), allege as follows:

## I.      NATURE AND SUMMARY OF THE ACTION

### A.      The Factual Basis for Plaintiffs' Claims Against Wilmington Trust.

1.      Plaintiffs purchased $168 million of securities issued by 15 residential mortgage-

backed securities ("RMBS") trusts listed in Exhibit 1 (the "Trusts").  Wilmington Trust was the

Owner Trustee for each of the Trusts.  Today, the $168 million of securities are almost

worthless.  This massive loss was the result of Wilmington Trust's breach of its contractual

duties as Owner Trustee, and it is for this breach that Plaintiffs have brought this action.

2.      Each of the Trusts in this action is a Delaware statutory trust.  In this Complaint

they are referred to as "Indenture Trusts."

3.      While the structures and agreements governing the Trusts are complex, the central

story of this action is simple.  The Trusts were created to facilitate the securitization of

residential mortgage loans and the sale of the resulting RMBS to investors.  In general terms, the

Trusts: (1) issued the securities that investors like Plaintiffs purchased; (2) controlled the

mortgage loans and other assets that served as collateral for the RMBS; and (3) paid investors the

income generated by the Trusts' assets as provided by the terms of the Trusts.

4.      As Indenture Trusts, the Trusts have two different kinds of trustees: an Indenture

Trustee that manages the mortgage loans that collateralize the securities issued by the Trust, and

an Owner Trustee that manages the Trust in its role as an issuer of securities.  What these trustees had in common is that they were placed atop the Trusts to act as watchmen over the collateral and the other participants in the formation and operation of the Trusts.

5.      Among the Owner Trustee's duties is to be, in effect, the watchman that makes sure that the other watchman (the Indenture Trustee), along with the other parties with contractual obligations to the Trust, enforce the Trust's rights.  Thus, for example, the Owner Trustee of the Trusts is contractually obligated to:

- Protect the trust estate by, among other things, taking any action necessary or advisable to carry out the purposes of the Trusts and to ensure that the Trusts' rights were enforced and persons or entities with contractual obligations to the Trusts were not excused from performing those obligations

- Give prompt written notice of defaults under the agreements governing the Trusts, including its own failure to perform its obligations under the Trust Indenture

6.      Rather than protecting the Trusts and their rights, Wilmington Trust sat idly by while the Indenture Trustees and other participants in the Trusts engaged in egregious and pervasive defaults of their obligations to the Trusts and the trust estate that Wilmington Trust was obligated to protect rapidly deteriorated.

7.      The Indenture Trustee and others ignored pervasive and systematic deficiencies in the mortgage loans supporting the securities and in the servicing of those loans.  Wilmington Trust improperly refused to take any action despite its knowledge of that misconduct.  Wilmington Trust's refusal to act continued even as losses across the Trusts mounted to the many billions of dollars.

8.      This action seeks to recover the many millions of dollars in damages sustained by Plaintiffs in connection with the RMBS they purchased.

2

B.     **The Contractual and Statutory Framework of This Action.**

9.     For each of the Trusts, Wilmington Trust has both contractual and statutory

obligations.

10.    Wilmington Trust's contractual duties arise from the complex and comprehensive

agreements—extensively vetted and agreed to by Wilmington Trust—that govern the formation

and operation of Indenture Trusts.

11.    Indenture Trusts typically are governed by a Trust Agreement, an Indenture, and a

Sales and Servicing Agreement ("SSA").  These agreements are referred to in this Complaint as

the "Governing Agreements."  The contractual rights and obligations of Wilmington Trust and

other parties involved in the creation of the Trusts were set forth in the Governing Agreements.

The Governing Agreements, along with the names and roles of the parties to them, are listed in

Exhibit 2 to this Complaint.

12.    As an Owner Trustee of a Delaware statutory trust, Wilmington Trust's

obligations also are governed by the Delaware Statutory Trust Act.

II.    **THE PARTIES**

A.     **IKB.**

13.    IKB AG is a commercial bank incorporated in Germany, with its main office at

Wilhelm-Boetzkes-Strasse 1, 40474 Düsseldorf, Germany.

14.    IKB S.A. is a commercial bank in liquidation, incorporated in Luxembourg, with

its main office at 21b Rue Gabriel Lippmann, L-5365 Munsbach, Luxembourg.

15.    IKB S.A. purchased 32 different securities issued by the Trusts between 2005 and

2007.

16.    IKB S.A. subsequently sold four of those securities to third-parties.  On

November 20, 2008, IKB S.A. sold the remainder of the securities to IKB AG.

3

17.     On December 4, 2008, IKB AG sold the securities it had purchased from IKB

S.A. to Rio Debt Holdings (Ireland) Limited ("Rio").  Between 2009 and 2012, Rio sold 13 of

those securities to third parties.

18.     On May 9, 2012, and on December 22, 2015, Rio assigned all claims arising from

the securities it had purchased from IKB AG back to IKB AG.

19.     In this action, Plaintiffs assert claims that accrued against Wilmington Trust

during the time IKB S.A., IKB AG or Rio owned the securities.

**B.     The Trusts.**

20.     The Trusts are fifteen Delaware statutory trusts (the "Indenture Trusts").

21.     Eight of the Trusts were created by affiliates of Delta Funding Corporation

(collectively, the "Delta Trusts").[1]  Five of the Trusts were created by affiliates of IMH Assets

Corp. (collectively, the "IMH Trusts").[2]  One of the Trusts was created by affiliates of

Countrywide (the "Countrywide Trust").[3]  One of the Trusts was created by affiliates of Morgan

Stanley (the "Morgan Stanley Trust").[4]

---

[1] Those trusts are: Renaissance Home Equity Loan Trust 2005-1 ("RAMC 2005-1");
Renaissance Home Equity Loan Trust 2005-4 ("RAMC 2005-4"); Renaissance Home Equity
Loan Trust 2006-1 ("RAMC 2006-1"); Renaissance Home Equity Loan Trust 2006-2 ("RAMC
2006-2"); Renaissance Home Equity Loan Trust 2006-3 ("RAMC 2006-3"); Renaissance Home
Equity Loan Trust 2006-4 ("RAMC 2006-4"); Renaissance Home Equity Loan Trust 2007-1
("RAMC 2007-1"); and Renaissance Home Equity Loan Trust 2007-2 ("RAMC 2007-2").
[2] Those trusts are:  IMPAC Secured Assets Corp Mortgage Pass-Through Certificates, Series
2004-3 ("IMM 2004-3"), IMPAC CMP Trust Series 2004-5 ("IMM 2004-5"), IMPAC CMP
Trust Series 2005-5 ("IMM 2005-5"); IMPAC CMB Trust Series 2005-6 ("IMM 2005-6"); and
IMPAC CMP Trust Series 2005-8 ("IMM 2005-8").
[3] CWABS Trust 2005-HYB9 ("CWHL 2005-HYB9").
[4] Saxon Asset Securities Trust 2006-3 ("SAST 2006-3").

4

C.      **Wilmington Trust.**

1.      **Wilmington Trust Company.**

22.     Wilmington Trust Corporation provides financial, wealth advisory, corporate, and institutional client services.  Wilmington Trust Company's main offices are located at 1100 North Market Street, Wilmington, Delaware 19890-0001.  The company's wealth advisory services include personal trust administration, financial planning, fiduciary, private banking, and family office services.  Additionally, it offers corporate financial services such as institutional trustee, agency, retirement planning, and administrative services.  As of May 16, 2011, Wilmington Trust Corporation operates as a wholly-owned subsidiary of M&T Bank Corporation.

23.     Wilmington Trust was the Owner Trustee for each of the fifteen Trusts.

2.      **M&T Bank Corporation.**

24.     M&T Bank Corporation is a bank holding company with main offices at One M&T Plaza, Buffalo, New York 14203.  Through its banking subsidiaries, M&T Bank Corporation provides a range of retail and commercial banking, trust and wealth management, and investment services to their customers.  As a commercial bank, M&T Bank offers a range of financial services to a base of consumers, businesses, professional clients, governmental entities, and financial institutions located in its markets.

25.     M&T Bank Corporation, as successor by merger to the Wilmington Trust Company, was the Owner Trustee for each of the fifteen Trusts.

III.    **VENUE**

26.     Venue is proper in New York County under CPLR Section 503(a) because (1) Plaintiffs designate New York County as the place of trial for this action and (2) one or more Defendants reside in New York County.

## IV.   COMPLIANCE WITH THE NO ACTION CLAUSES IS EXCUSED

27.    The agreements governing each Trust contain "no action" clauses barring investors from suing to enforce the Trust's rights unless certain conditions are first met.  Among other requirements, the no action clauses required that investors give the Indenture Trustee of each Trust notice of certain defaults and that a minimum percentage of investors demand that the Indenture Trustee sue to enforce the Trust's rights.  As discussed below, it would be absurd to require Plaintiffs to make a demand as required by the no action clauses.  *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).

28.    For each of the Trusts, the party to which Plaintiffs would be required to give notice is the Indenture Trustee of the Trust.  A central part of Plaintiffs' claims against Wilmington Trust is that it failed to take action to remedy failures on the part of each Indenture Trustee to perform their obligations to the Trusts, including by refusing to provide notice of breaches of representations and warranties regarding mortgage loans, failing to enforce repurchase obligations and failing to enforce servicer obligations to service and administer the mortgage loans in the Trusts despite its knowledge of servicers' and depositors' defaults with respect to them.  Consequently, it would be absurd to demand that the Indenture Trustees bring claims against Wilmington Trust in connection with the Trusts because doing so would require the Indenture Trustees to allege and prove their own misconduct and liability to the Trusts and could invoke indemnity obligations to them.  For the same reason, it would be absurd and contrary to the parties' intentions to require Plaintiffs to indemnify the Indenture Trustees against the costs, expenses, and liabilities incurred in a suit against Wilmington Trust.

6

## V.     OVERVIEW OF THE COMPLAINT

29.     In order to elucidate the nature and severity of Wilmington Trust's breach of duty, Plaintiffs first set out an overview of the securitization process.  That is, how the Trusts at issue came into existence, and the role of the various participants in the structure.

30.     Plaintiffs next describe the various agreements that give rise to and govern the Trusts and set forth many of Wilmington Trust's duties.  Next, we explain the contractual duties of the Indenture Trustee.  Wilmington Trust's refusal to take any action in the face of the Indenture Trustees' breaches is the foundation of Plaintiffs' claims.

31.     We then turn the nature of each of the claimed violations of duty by Wilmington Trust.  We begin by identifying, this time with the benefit of the background discussion, each of Wilmington Trust's relevant duties, and how Wilmington Trust breached each of those duties.  Next, Plaintiffs set out in detail, with illustrations from the various governing agreements and statutes, the contractual and statutory sources of the duties on which Plaintiffs' claims are based.

32.     The bulk of the Complaint is then dedicated to setting out the many defaults of other parties in the Trusts structures, in response to which Wilmington Trust was obliged to act, but did not.  We focus first on the pervasive default of the various sellers.  This includes the failure to provide complete loan files, the failure properly to transfer the mortgages to the Trusts, the violation of representations and warranties as to the quality of the mortgages and the wholesale abandonment of proper underwriting practices in creating the mortgage loans in the first instance.  And, of course, we discuss the Indenture Trustees' failure to take action in the face of those defaults and Wilmington Trust's acquiescence in that failure.

33.     This discussion of the sellers' defaults includes substantial material drawn from public investigations, other lawsuits, and settlements by sellers.

34.     We set out the defaults of the various servicers in comparable detail, again, drawing upon data revealed in public investigations, litigation, and settlements.

35.     Having provided the detailed and sordid tale of how Wilmington Trust failed to act in the light of the staggering abuses perpetrated against the Trusts by the sellers and servicers, we summarize how these allegations give rise to violations of the duties we have identified.

36.     The Complaint concludes with the pleading of the specific causes of action.

## VI.     RMBS SECURITIZATION

37.     The Trusts were created through a group of complex, inter-related agreements to facilitate the securitization of residential mortgage loans and the sale of the resulting RMBS to investors.  The securities entitled investors to a portion of the revenue stream produced by principal and interest payments made by the mortgage borrowers.  The formation and operation of the Trusts involved a number of participants.

### A.     The Participants in the Trust.

#### 1.     The Sellers.

38.     The RMBS securitization process began when a lending institution made home loans, secured by a mortgage, to borrowers.  The lender—typically called the "originator" when discussing RMBS trusts—would sell these loans in bulk to an affiliate of the investment bank arranging the securitization, typically called either a "sponsor" or a "depositor."  A depositor is a bankruptcy-remote entity set up by the sponsor.  As each sold the mortgage loans to the next party in the formation of a particular trust, the party selling the mortgage loans (typically the sponsor, depositor and/or originators, hereinafter the "Seller") made representations and warranties to the purchaser attesting to the quality and characteristics of the mortgages.  The Seller also agreed to cure, substitute, or repurchase mortgages that did not comply with those representations and warranties.

8

39.     The sponsor and depositor formed the RMBS trust.  The depositor transferred to the trust the mortgage loans and other assets and contractual rights relating to them, such as the right to enforce the representations and warranties given by the other Sellers, as well as the right to demand cure, substitution or repurchase as a remedy for violations of the representations and warranties.

40.     The trust would then issue the RMBS.  Typically, the cash flows and risks in the loan pool were segmented among different levels of investment called tranches.  Generally, cash flows from the loan pool were applied in order of seniority, going first to the most senior tranches.  In addition, losses to the loan pool due to defaults, delinquencies, foreclosure or otherwise, typically were applied in reverse order of seniority and were absorbed by the most junior tranches first.  If an individual borrower defaulted on his or her loan obligation, the trust was entitled to foreclose on the property and distribute the sale proceeds to investors according to the priority specified in the offering documents.

41.     The investment bank creating the securitization sold the securities to investors and used the proceeds (less their fees for creating the securitization) to compensate the depositor for contributing the mortgage loans and related rights to the trust.

## 2.      The Servicers.

42.     In addition to creating the trust, the sponsor and depositor appointed one or more servicers to service the mortgage loans in the trust (the "Servicer").[5]  Often, the Servicer was an affiliate of the sponsor or an originator.

43.     The Servicer administered the mortgages and properties owned by the trust for the trust's benefit.

---

[5] Some Trusts were structured with a Master Servicer that engaged sub-servicers.  The distinction is not relevant for the purposes of this Complaint.

44.     The Servicer calculated and collected the mortgage payments from the borrowers. If a borrower did not timely make the required payments to the Servicer, the Servicer was obligated to take action to mitigate or minimize the losses to the trust, including working out the delinquency, foreclosing on the property and maintaining the property pending foreclosure and selling foreclosed properties, to maximize the return on the investment to the trust and its beneficial owners—the investors.

45.     The Servicer sent the funds it collected on the mortgages and properties to the trustee, which then distributed them to the investors in accordance with the "waterfall" of payments set forth in the trust documents.

### 3.     The Loan Files.

46.     When the sponsor purchased the mortgage loans from an originator, it gained access to all of the loan files, which contained the underlying documentation that the borrower submitted in connection with his/her loan application, together with any additional information, such as appraisals and credit assessments.  The loan files ultimately were used by Servicers to service the mortgage loans.  Typically, as described below, the files, like the loans to which they related, were part of the trust estate and the trustee was obligated to ensure that key documents were not missing.

### 4.     The Trustees.

47.     The trustees of the Indenture Trusts (the Indenture Trustee and the Owner Trustee) served a key role.  Upon completion of the securitization process, the trust holds mortgage loans and contract rights, and has payment and other duties to purchasers of the securities.  Part of the trustees' role was ministerial, such as paying out distributions, and reporting on the status of payments, expenses, and losses in the mortgage pools and properties.

10

48.     The Indenture Trustee manages the mortgage loans that collateralize the securities issued by the Trust and the Owner Trustee manages the Trust in its role as an issuer of securities.

49.     More important, both trustees were the principal protection for investors and of the trusts' assets from the depredations of other participants in the trust.  Investors like Plaintiffs had no access to the underlying loan files and other documents necessary to confirm that the mortgage loans complied with the representations and warranties made to the trust and to investors.  Similarly, investors could not monitor the Servicers' conduct and performance or act independently to enforce the trusts' contractual rights.  And, of course, investors could not monitor the trustees.  Rather, it was the Owner Trustee's responsibility to protect the trust estate for the investors' benefit.

50.     The Owner Trustee was intended to be free from conflicts of interest.  It was independent of the investment bank that sponsored the securitization and created the depositor; the originators that originated the loans; and the Servicers that were often affiliated with either the sponsor or originators, or both.  Consistent with this independence, the Owner Trustee was obligated to act in the best interests of, and for the protection of, the trust and the investors who purchased the securities issued by the trust.

51.     Thus, the fundamental role of the Owner Trustee of an Indenture Trust was to ensure that there was at least one independent party, free from any conflicts of interest, to protect the trust assets and investors.

**B.      The Agreements Giving Rise to Wilmington Trust's Contractual and Statutory Duties.**

52.     Although the Governing Agreements for each of the Trusts were separate agreements that were individually negotiated and differed slightly in certain respects, the terms that are pertinent to the subject matter of this Complaint were substantially similar in all of the

11

Governing Agreements and imposed substantially the same obligations on the parties to the Governing Agreements.

53.     In addition to the Governing Agreements, there were associated agreements embodying the rights of the Trusts against Sellers including, for example, Mortgage Loan Purchase Agreements (sometimes called Purchase Agreements) ("MLPAs"), Representations and Warranties Agreements ("RWAs"), Assignment and Assumption Agreements, and Mortgage Loan Sale and Contribution Agreements (collectively, the "Loan Quality Agreements").  Part of Wilmington Trust's duties as Owner Trustee of the Trusts was enforcing the Trusts' rights under those agreements as well as the Governing Agreements.

54.     In general, the Loan Quality Agreements contained extensive representations and warranties concerning the characteristics, quality, and risk profile of the mortgage loans that the originator, sponsor, or depositor sold to the Trusts.  Typical Seller's representations and warranties included that: (1) the information in the mortgage loan schedule was true and correct in all material respects; (2) each loan complied in all material respects with all applicable local, state and federal laws and regulations at the time it was made; (3) the mortgaged properties were lawfully occupied as the principal residences of the borrowers unless specifically identified otherwise; (4) the borrower for each loan was in good standing and not in default; (5) no loan had a loan-to-value ("LTV") ratio of more than 100%; (6) each mortgaged property was the subject of a valid appraisal; and (7) each loan was originated in accordance with the underwriting guidelines of the related originator.

55.     Upon learning of material breach of the Seller's representations and warranties in the Loan Quality Agreements, the Seller was obligated to cure the breach in all material respects. If the Seller did not or could not make the loan conform to the representations and warranties

12

within a specified period of time, the Seller was obligated to either substitute the defective loan with a loan of adequate credit quality, or repurchase the defective loan at a specified purchase price (the "Repurchase Price") equal to the outstanding principal balance and all accrued but unpaid interest on the loan to be paid to the Trust.  For breaches related to a mortgage loan or acquired property already sold from the Trust (for example, as a result of foreclosure), the Seller had to pay the Trust the amount of the Repurchase Price that exceeded the net liquidation proceeds received upon the sale of the mortgage loan or acquired property.

56.     The Seller's cure, substitute, and repurchase obligations ensured that the Trust would not be damaged by the Seller's breach of its representations and warranties concerning loan qualities.  Those obligations did not require any showing that the Seller's breach of representations and warranties caused any defaults or foreclosures, or that the demanding party prove reliance on servicing and origination documents.

## VII.   WILMINGTON TRUST'S DUTIES AND OBLIGATIONS

### A.   Wilmington Trust's Contractual Obligations.

57.     As Owner Trustee, Wilmington Trust controlled the Trust.  For example, Section 2.04 of the Amended and Restated Trust Agreement for the Delta Trusts[6] appointed Wilmington Trust as "Owner Trustee" and Section 2.01 of the Amended and Restated Trust Agreement for

---

[6] Citations to the Governing Agreements for the Delta Trust are to the Governing Agreements for RAMC 2006-1.  The other Delta Trusts were issued pursuant to Governing Agreements with substantially similar language, as relevant to the allegations in this Complaint.

Table 1 of Exhibit 6 contains quotations of the contract terms discussed in this section of the Complaint taken from the Governing Agreements for RAMC 2006-1.  The remaining tables of Exhibit 6 cite the relevant provisions of the Governing Agreement for all the Trusts.

The provisions cited in Exhibit 6 are examples of provisions creating Wilmington Trust's contractual duties.  They are not the entirety of the provisions that are potentially relevant to, or breached by, Wilmington Trust's misconduct described in this Complaint.

13

the Delta Trusts provided that Wilmington Trust could "conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued."  *See* Exhibit 6 Table 1.  The Governing Agreements for the other Trusts set forth a substantially rights.  *See* Exhibit 6 Table 2.

58.     Relevant to this action, the key responsibilities of the Owner Trustee, as the entity that controlled the Trust (referred to as the "Issuer" in the Governing Agreements) were to protect the trust estate and to provide notice of defaults under the Governing Agreements.

59.     **First**, Wilmington Trust was required to protect the trust estate by ensuring that other parties to the Governing Agreements enforced the Trusts' rights under the Governing Agreements and the Loan Qualify Agreements.

60.     Section 3.06 of the Delta Indenture, entitled "Protection of Collateral," required Wilmington Trust to "take" any "action necessary or advisable to," among other things, "carry out more effectively the purposes" of the Indenture, and "cause the Issuer, the Servicer or the Master Servicer to enforce any of the rights to the Mortgage Loans."  Section 3.08 of the Delta Indenture required Wilmington Trust "punctually" to "perform and observe all of its obligations and agreements" in the Indenture and not to "permit any action to be taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Collateral."  *See* Exhibit 6 Table 1.  The Governing Agreements for the other Trusts set forth a substantially similar obligations.  *See* Exhibit 6 Table 3.

61.     Thus, for example, Wilmington Trust was obligated to ensure that the Servicer enforced the Trust's rights in servicing loans and that the Indenture Trustee enforced the Trust's

14

rights under the Loan Quality Agreements.  The scope of those rights and the Servicer's and Indenture Trustee's obligations with respect to them are discussed in the sections below.

62.    **Second**, Wilmington Trust was obligated to give prompt written notice of a default under the Indenture or the Trust Agreement.  For example, Section 3.24 of the Delta Indenture required the "Issuer" to "give the Indenture Trustee, the Securities Administrator and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust Agreement."  Similarly, Section 5.01 of the Delta Indenture required the "Issuer" to "deliver to the Indenture Trustee and the Securities Administrator, written notice in the form of an Officer's Certificate, within five days after learning of the occurrence of any event which with the giving of notice and the lapse of time would become an Event of Default under clause (iii), (iv) or (v) of the definition of "Event of Default," its status and what action the Issuer is taking or proposes to take with respect thereto."  *See* Exhibit 6 Table 1.  The Governing Agreements for the other Trusts set forth a substantially similar obligations.  *See* Exhibit 6 Table 4.

63.    The events constituting an event of default under the Indenture, as well as the Indenture Trustee's enhanced duties during events of default, are described in the following section.

### B.    Wilmington Trust's Statutory Obligations.

64.    As the Owner Trustee of a Delaware statutory trust, Wilmington Trust had obligations under the Delaware Statutory Trust Act, Del. Code Ann. tit. 12, § 3801 *et seq*.  While the Governing Agreements contain several provisions that attempt to limit the liability of Wilmington Trust and the Indenture Trustees, the Governing Agreements "may not limit or eliminate liability for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing."  Del. Code Ann. tit. 12, § 3806.  Consistent with this, the Governing Agreements contained broad exculpatory clauses intended to shield the

15

Owner Trustee from liability for the obligations of the Issuer, but they nonetheless made clear that Owner Trustee "would be liable for its own willful misconduct, gross negligence or bad faith or grossly negligent failure to act." *See, e.g.*, Delta Trust Amended and Restated Trust Agreement § 6.01.

## VIII.   THE INDENTURE TRUSTEES' DUTIES AND OBLIGATIONS UNDER THE GOVERNING AGREEMENTS

65.    Plaintiffs' claims in this action relate to Wilmington Trust's failure to protect the trust estate by ensuring that the Indenture Trustee enforced the Trusts' rights and to give the Indenture Trustee notice of defaults.  In this Section, we describe the Indenture Trustee's obligations under the Governing Agreements.

66.    In general, an Indenture Trustee's many duties under the Governing Agreements fell into two categories.  It had express, defined contractual obligations under those agreements.  However, in the event of a default, the Governing Agreements imposed on the Indenture Trustee a heightened, general duty to "use the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs."  That prudent person obligation imposed duties on the Indenture Trustee beyond those specifically enumerated in the Governing Agreements.

### A.    The Indenture Trustees Had a Duty to Take Physical Possession of Complete Mortgage Files and Enforce Related Repurchase Obligations.

67.    Each Governing Agreement sets forth a process for conveying the mortgage loans and associated assets to the Indenture Trustee.  Typically, in the Trust Agreement the depositor conveys the mortgage loans to the Trust and then, in the Indenture, the Trust conveys those assets to the Indenture Trustee to hold for the benefit of the investors.  This process is set forth in Section 3.01 ("Conveyance of Mortgage Loans") of the Delta Amended and Restated Trust Agreement and the Granting Clause of the Delta Indenture.  *See* Exhibit 7 Table 1.  The

16

Governing Agreements for the other Trusts set forth a substantially similar process. *See* Exhibit 7 Table 2.

68. In addition, Section 2.03 of the Delta Indenture ("Acceptance of Mortgage Loans by Indenture Trustee") provides that the Indenture Trustee is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of the investors. *See* Exhibit 7 Table 1. The Governing Agreements for the other Trusts set forth a substantially similar process by which the Indenture Trustee (either directly or through an agent) took possession of the loan files. *See* Exhibit 7 Table 3.

69. Section 2.1 of the Delta Mortgage Loan Sale and Contribution Agreement also lists the documents that must be contained in the loan file for each mortgage loan. *See* Exhibit 7 Table 1. The Governing Agreements for the other Trusts contained substantially similar requirements. *See* Exhibit 7 Table 4. Physical possession of these documents by the Indenture Trustee was necessary to transfer the ownership rights to the mortgage loans from the Sellers to the Trusts.

70. The Indenture Trustee had a contractual obligation under the Governing Agreements to review (or cause to be reviewed) each of the mortgage files for the mortgage loans and certify that the documentation for each of the loans was accurate and complete. The Indenture Trustee also had a common law duty to perform those ministerial acts with due care.

71. The first step in the certification process was the preparation of an initial certification acknowledging that the Indenture Trustee (or an agent acting on its behalf) had received and reviewed the two key documents for the mortgage loan: (1) the original mortgage note with a complete chain of endorsements from the originator to the Indenture Trustee; and (2) a duly executed assignment of mortgage. This is spelled out in Section 2.03 of the Delta

17

Indenture.  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts contained

substantially similar requirements.  *See* Exhibit 7 Table 5.  The final step in the certification

process was the creation of a final certification and document exception report.  This requirement

also was set for the in Section 2.03 of the Delta Indenture.  *See* Exhibit 7 Table 1.  The

Governing Agreements for the other Trusts contained substantially similar requirements.  *See*

Exhibit 7 Table 6.  If there was a defect with any mortgage file, the Indenture Trustee was

obligated to demand that the Seller cure the defect leading to the exception or repurchase or

replace the defective loans.  This obligation also is set forth in Section 2.03 of the Delta

Indenture.  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts contained

substantially similar requirements.  *See* Exhibit 7 Table 7.

> **B.**   **The Indenture Trustee Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice.**

72.   The Indenture Trustee had an obligation under the Governing Agreements to

provide notice to various parties—typically the Servicer and the depositor—of breaches of

representations and warranties regarding the mortgage loans made in the Governing Agreements

and Loan Quality Agreements.  This obligation is described in Sections 2.03 of the Delta

Servicing Agreement.  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts

contained substantially similar requirements.  *See* Exhibit 7 Table 8.

73.   Further, the Delta Trust Indenture provides that the Trust's breaches of its

obligations under the Indenture ripen into an event of default if left unremedied for thirty days.

*See* Exhibit 7 Table 9.  Finally, Section 6.05 of the Delta Trust Indenture provides that the

Indenture Trustee was required to "promptly mail to each Noteholder notice of the Event of

Default after it is actually known to" it.  *Id.*  The Governing Agreements for the other Trusts set

forth substantially similar obligations.  *See* Exhibit 7 Tables 9 and 10.

18

74.     As alleged in Section XIV of this Complaint, the Indenture Trustees failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the Governing Agreements.

**C.     The Indenture Trustee Trust Had a Duty to Exercise Due Care to Enforce Repurchase Obligations and Avoid Conflicts of Interest.**

75.     Under the Governing Agreements, the Indenture Trustee owed a fiduciary duty to investors upon the occurrence of a default as defined in each Trust's Indenture.  The Indenture Trustee's post-default fiduciary duty is described in Section 6.01 of the Delta Trust Indenture, which provides in relevant part, "If an Event of Default has occurred and is continuing . . . the Indenture Trustee . . . shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a **prudent person would exercise or use under the circumstances in the conduct of such person's own affairs**."  (Emphasis added). *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts set forth substantially similar obligations.  *See* Exhibit 7 Table 11.

76.     A prudent trustee would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.  A prudent trustee also would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from Servicers and enforced the responsible parties' obligations with respect to those breaches.  As set forth in Section X of this Complaint, the Indenture Trustee failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.     The Indenture Trustee Had a Duty to Provide Accurate Remittance Reports and Certifications Under Regulation AB.**

77.     Each Governing Agreement requires the Indenture Trustee (or its agent) to forward to rating agencies and to make available to investors monthly remittance reports

19

describing the performance of underlying loans.  For example, Section 7.05 of the Delta Trust Indenture provides that on each monthly "Payment Date" the Securities Administrator appointed by the Indenture Trustee was to report to "the Servicer, the Master Servicer, the Indenture Trustee, the Seller, the Noteholders, the Rating Agencies, Bloomberg (at 499 Park Avenue, New York, New York 10022, Attention: Mike Geller) and Intex Solutions" a number of details of the trust's performance.  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts set forth substantially similar obligations.  *See* Exhibit 7 Table 12.

78.    Under item 1121 of SEC Regulation AB, such reports must disclose information material to the financial status of the Trust such as, for example, whether there have been "[m]aterial breaches of pool asset representations or warranties or transaction covenants."  *See* 17 C.F.R. § 229.1121(a)(12).

79.    Regulation AB requires the Depositors, Servicers, and, to the extent the Trustee engages in servicing functions, the Trustee to certify on a Form 10-K filed a year after each RMBS transaction that: (i) "[p]olicies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements;" (ii) trust assets securing the loans held by the Trust had been maintained as required by the relevant transaction agreements, pool assets and related documents were safeguarded; and (iii) the remittance reports provided to investors complied with SEC rules.  *See* 17 C.F.R § 229.1122(d)(1)(i), (3)(i)(C), (4)(i) and (ii).  The Servicers and Trustee further provide a similar certification annually that covers all trusts that they service or administer.

80.    As set forth in Section VII of this Complaint, the Indenture Trustee breached its contractual duties by failing to provide accurate certifications under Regulation AB and by failing to provide notice of false certifications provided by Servicers.

E. **The Indenture Trustee Had a Duty to Address the Servicers' Failure to Meet Prudent Servicing Standards.**

81.     Each Governing Agreement requires Servicers to service the loans underlying the Trusts prudently.  For example, Section 3.01(a) of the Servicing Agreement to the Delta Trust Indenture requires the "Servicer" to "exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, in accordance with accepted mortgage servicing practices of prudent lending institutions servicing mortgage loans similar to the Mortgage Loans and giving due consideration to the Noteholders' reliance on the Servicer."  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts set forth substantially similar obligations.  *See* Exhibit 7 Table 13.

IX.     **PLAINTIFFS' CLAIMS**

A. **Wilmington Trust's Breaches of its Contractual and Statutory Duties.**

82.     Wilmington Trust was obligated to protect Plaintiffs' interests, but breached its duties as Owner Trustee in multiple ways, damaging Plaintiffs and other investors by causing the Trusts to suffer catastrophic losses.

83.     **First**, Wilmington Trust failed to enforce the parties' obligations under the Governing Agreements to ensure that the rights, title, and interest in the mortgage loans were perfected and properly conveyed to the Indenture Trustee.  The Governing Agreements imposed on the Indenture Trustee a duty to ensure that key documents for the loans were included in the mortgage files and to create an exception report identifying those mortgage loans for which the mortgage files were incomplete.  The Seller was required to substitute compliant loans for the loans with incomplete files or else repurchase the loans.  Wilmington Trust, however, despite its obligation to protect the trust estate, allowed the Indenture Trustee and Seller systematically to disregard their contractual and fiduciary duties to enforce their rights for the benefit of investors

21

to ensure that mortgage loans lacking complete mortgage files were removed from the mortgage pools underlying the securities.  If Wilmington Trust had met its contractual duties with respect to the noncompliant loans, Plaintiffs would not have incurred their very significant losses attributable to the default of many of the defective loans.

84.     **Second**, despite being aware of Sellers' breaches of representations and warranties under the Loan Quality Agreements and of defaults under the Governing Agreements, Wilmington Trust failed to provide notice of those breaches and defaults to Servicers despite being obligated to do so by the Governing Agreements and the Loan Quality Agreements. Further, Wilmington Trust failed to enforce the Trusts' rights to demand that those breaches and defaults be cured.

85.     Wilmington Trust knew that the pools of loans backing the Trusts were filled with defective mortgage loans that materially breached Seller representations and warranties.  The negative performance of the Trust collateral—including high defaults, delinquencies and foreclosures—became apparent soon after the Trusts were established and has continued unabated.  There is overwhelming evidence that links the abject performance of RMBS trusts created in the mid-2000s to systematic abandonment of underwriting guidelines, and the deficient and often fraudulent securitization practices of the sponsors.  Prominent government investigations, reports and enforcement actions; high-profile RMBS litigation by government agencies, federal banks, and institutional investors; and claims and litigation instituted by monoline insurers have repeatedly noted the "pervasive disregard" and "systemic abandonment" of underwriting guidelines in the years leading up to the financial crisis.  Voluminous complaints in those proceedings detail gross misstatements in the Trust documents of key metrics concerning the quality of the underlying loan pools, including loan-to-value ratios, owner

occupancy status, and borrower credit scores—as well as the completeness of the loan files themselves.

86.     Wilmington Trust was required to give notice of these Seller defaults of which it learned to the Servicers.  Wilmington Trust knew that the Servicers were reticent to enforce the Sellers' repurchase obligations.  The Servicer was selected by the sponsor, and therefore risked losing future business and becoming adverse to the Seller if it strictly enforced the Seller's repurchase obligations.  Indeed, Servicers often were affiliated with the Sellers because Sellers often retained the loan servicing rights for loans sold for securitization for their own servicing division.  Worse, because Sellers often had affiliates that originated mortgage loans that were sold for securitization, they were reluctant to aggressively pursue remedies for defects in others' loans lest the defective loans of their originator-affiliates be called similarly to account.

87.     Consequently, it was crucial that, upon learning of a defective loan, Wilmington Trust monitor the Servicer to ensure that the Servicer enforced the Trusts' repurchase rights against the Sellers so that the Trusts held mortgage loans of the same credit quality and characteristics as bargained for.

88.     If Wilmington Trust had provided adequate notice of such breaches and ensured the Seller's compliance with the Governing Agreements, the Seller would have been required to repurchase the mortgage loans that did not comply with the applicable underwriting guidelines and which ultimately caused a significant portion of Plaintiffs' losses.  Wilmington Trust knew, or would have known if it had met its obligations, of the representation and warranty breaches and, thus, breached its obligation to provide notice to Servicers.

89.     **Third**, the Governing Agreements required Wilmington Trust to take steps to protect investors whenever it became aware of uncured loan servicing failures.  Servicers were

23

supposed to ensure the proper servicing and administration of the mortgage loans in the Trusts

for the Trusts and those, like Plaintiffs, who had invested in them.  The Governing Agreements

required Servicers to exercise customary and "prudent" loan servicing practices in servicing the

mortgage loans.  Servicers failed to meet those standards.  Servicers regularly overcharged for

various default services provided in connection with the mortgage loans.  They also conducted

foreclosures, maintenance of foreclosed properties and foreclosure sales imprudently, and often

through self-dealing, which resulted in diminished realization from foreclosures.  Wilmington

Trust failed to take steps to address these defaults.

90.     Moreover, Wilmington Trust failed to enforce the Indenture Trustee's obligation

to enforce the Trusts' rights "as a prudent person would exercise or use under the circumstances

in the conduct of his or her own affairs" when there was a default.

91.     If Wilmington Trust had forced the Indenture Trustee to exercise its "prudent

person" obligations, the Indenture Trustee would have issued repurchase demands years ago,

and, if necessary, commenced repurchase litigation forcing Sellers to repurchase defective loans.

92.     Had Wilmington Trust forced the Indenture Trustee to meet its prudent person

obligations, billions of dollars of damages to the Trusts would have been avoided.  Rather,

Wilmington Trust allowed the Indenture Trustee to do little, and sometimes, nothing at all, to

protect the Trusts and their investors, ignoring the events of default for their own self-interested

reasons.

93.     **Fourth**, Wilmington Trust's failure to take any action, despite its obligations to

protect the trust estate and give notice of defaults was a bad faith violation of the implied

contractual covenant of good faith and fair dealing.  Wilmington cannot turn provisions intended

to limit the scope of its contractual obligations into excuses for having done nothing at all.

24

94.     By failing to perform its duties, Wilmington Trust has caused Plaintiffs to suffer damages in an amount to be proven at trial, and which Plaintiffs presently estimate to be over $168 million, plus statutory interest.  Moreover, Wilmington Trust's breaches of its contractual and statutory duties was part of a pattern of similar conduct directed at the public generally, and not just at Plaintiffs, and for that reason Plaintiffs also seek an award of punitive damages in this action.

**B.      The Trusts' Catastrophic Performance.**

95.     The Trusts had a total original principal balance of over $15 billion.  To date, the Trusts have suffered accumulated net losses of over $2.3 billion.  Moreover, as a result of defective mortgage collateral and Servicer violations, the Trusts will continue to incur substantial losses.  Exhibits 3 through 5 detail the Trusts' performance.

96.     The monthly reports on the Trust's performance show that by January 2009 the average delinquency rate for the Trusts was over 29 percent.  Later that year, the average delinquency rate topped 31 percent.  Average delinquency rates remain high today despite the recovery of the US economy:  in January 2011, the delinquency rate was still over 29 percent; it was over 27 percent in January 2013 and over 24 percent in January 2015.  Exhibit 3 shows the average delinquency rates for the Trusts over time.

97.     As a consequence of the Trusts' shockingly high delinquency rates, they have, as of the end of 2015, written off over $2.3 billion in net losses.  In January 2009, the total accumulated net loss of the Trusts was already over $340 million.  The total losses suffered by the Trusts has continued to skyrocket, reaching over $1.1 billion in January 2011, over $1.9 billion in January 2013 and over $2.2 billion in January 2015.  As of the end of 2015, the Trusts had suffered an accumulated net loss of over $2.3 billion—an accumulated net loss percentage of

25

over 16 percent.  Exhibit 4 shows the accumulated net loss for the Trusts over time.  Exhibit 5 shows that average accumulated net loss percentage for the Trusts over time.

## X.  WILMINGTON TRUST'S FAILURE TO PROTECT THE TRUST ESTATE

98.    Wilmington Trust breached its contractual duty to protect the trust estate of the Trusts as required by the Governing Agreements by failing to enforce the obligations of the Indenture Trustee, Seller, and Servicers under the Governing Agreements and failing to provide notice of defaults under those agreements in a host of ways, including the following:

### A.    The Indenture Trustee Breached Its Duty To Take Possession Of The Loan Files And Ensure Their Completeness.

#### 1.    The Harm Resulting from The Indenture Trustee's Failure to Take Possession of and Ensure the Completeness of the Loan Files.

99.    The Indenture Trustees did not perform their duties under the Governing Agreements by failing to take physical possession of many of the operative documents for the mortgage loans in the Trusts.  Indeed, there is substantial evidence showing that the Indenture Trustees accepted incomplete mortgage files without requiring the Sponsors or Originators to cure document defects or to substitute or repurchase those loans.

100.    The Indenture Trustees' failure to take physical possession of the key mortgage loan documents was not a mere technicality.  In his testimony before the House Financial Services Committee in November 2010, Professor Adam Levitin described the implications of this failure:

> If mortgages were not properly transferred in the securitization process, then mortgage-backed securities would in fact not be backed by any mortgages whatsoever.  The chain of title concerns stem from transactions that make assumptions about the resolution of unsettled law.  If those legal issues are resolved differently, then there would be a failure of the transfer of mortgages into securitization trusts.
>
> . . .

26

Recently, arguments have been raised in foreclosure litigation about whether the notes and mortgages were in fact properly transferred to the securitization trusts. This is a critical issue because the trust has standing to foreclose if, and only if, it is the mortgagee. If the notes and mortgages were not transferred to the trust, then the trust lacks standing to foreclose.

. . .

If the notes and mortgages were not properly transferred to the trusts, then the mortgage-backed securities that the investors purchased were in fact non-mortgage-backed securities. In such a case, investors would have a claim for the rescission of the MBS, meaning that the securitization would be unwound, with investors receiving back their original payments at par (possibly with interest at the judgment rate). Rescission would mean that the securitization sponsor would have the notes and mortgages on its books, meaning that the losses on the loans would be the securitization sponsor's, not the MBS investors.

*Problems in Mortgage Servicing from Modification to Foreclosure: Before S. Comm. on Banking, Housing, and Urban Affairs* (2010) (statement of Adam Levitin, Associate Professor of Law, Georgetown University Law Center).

101.    The Indenture Trustees failed to exercise due care in reviewing the mortgage files for missing, incomplete and defective documentation. If they had performed a reasonable review, it would have identified additional non-compliant mortgage loans and listed them on the final document exception report. It also would have ensured that Sellers either cured the documentation problems or repurchased or substituted another mortgage loan for the improperly documented mortgage loan within the deadlines set forth in the Governing Agreements. The Indenture Trustees had the ability to pursue repurchase claims for loans for which incomplete files were delivered up until six years after the issuance of the final exception report. They inexplicably let that period lapse without seeking repurchase of the vast majority of the affected loans. A prudent trustee would have, at a minimum, sought repurchase of all defaulted loans with incomplete mortgage files.

27

102.     It would have been obvious to a reasonably competent trustee performing its

contractual duties with due care that the original mortgage note was missing from the loan file,

or that there was a link missing in the chain of endorsements from the originator to the Indenture

Trustee, there was no duly executed assignment of the mortgage to the Indenture Trustee, or the

original lender's title policy was missing.  On occasion, Indenture Trustees did identify these

obvious defects and noted them on the final exception reports for the Trusts, but they did not

require that they be corrected.

103.     On the same basis, Indenture Trustees knew of (or failed to identify) numerous

instances where they did not receive the original mortgage note with all intervening

endorsements necessary to show an unbroken chain of endorsement from the Originator to the

Sponsor or Depositor or a lost mortgage note affidavit.  Wilmington Trust knew of the Indenture

Trustees' knowledge of instances where, (i) for loans that were MERS loans at origination, no

original mortgage; (ii) for loans that were not MERS loans at origination, no recorded

assignment of the mortgage together with all interim recorded assignments and the original

lenders original lender's title policy; and (iii) for loans that were not MERs loans, no original

mortgage with evidence of recording thereon.

**2.       The Servicers' and Master Servicers' Cover-up of the Sponsors'
Document Delivery Failures.**

104.     Among the strongest evidence of Wilmington Trust's failure to identify and

ensure that the parties to the Governing Agreements remedied missing, incomplete, and defective

loan documentation was the now notorious and wide-spread practice of servicers to attempt to

cover-up the systematic failure of depositors and sponsors properly to transfer and assign the

underlying mortgage loans to the issuing trusts.  Those servicers, including the ones listed below,

executed tens of thousands of foreclosure affidavits a month.  These were all necessarily false

because they purportedly were based on personal knowledge when instead a person without knowledge mechanically "robo-signed" the affidavit.  Many of the false affidavits lacked proper documentation including evidence of possession of the underlying mortgage note.

105.     Exhibit 2 to this Complaint identifies each of the entities disclosed to be Sponsors, Servicers and Master Servicers of the Trusts, each of which was complicit in the relevant Sponsors' and Depositors' systematic document delivery failures (as fully described below).

a)    **Bank of America, Countrywide Home Loans, Inc.,
Countrywide Home Loan Servicing, LP and Wilshire Credit
Corporation.**

106.     In 2008, Bank of America Corporation ("BAC") acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc. and Countrywide Bank, N.A. (collectively, "Countrywide").  In September 2008, BAC acquired Merrill Lynch Mortgage Capital Inc., Merrill Lynch Mortgage Lending Inc. and its affiliates (collectively "Merrill Lynch"), including Wilshire Credit Corporation ("Wilshire"). BAC/Countrywide/Merrill Lynch/Wilshire were the Servicer for five of the Trusts.  *See* Exhibit 8.

107.     Evidence of the Indenture Trustees' failure to take possession of and ensure the completeness of loan files relating to the Trusts in connection with loans serviced by BAC, Countrywide, Merrill Lynch and Wilshire includes:

108.     The Federal Reserve System, Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC") and Office of Thrift Supervision ("OTS") issued a report finding that BAC and its affiliates, including Countrywide, routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions.  The Federal Reserve Board, *Interagency Review of Foreclosure Policies and Practices* (2011),

29

http://www.federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  In the
report, the regulators noted that their review of the mortgage servicers' loan files showed that
there may be "disputes over [mortgage] note ownership or authority to foreclose." *Id.* at 6.  The
regulators also noted "concerns about the prevalence of irregularities in the documentation of
ownership [that] may cause uncertainties for investors of securitized mortgages." *Id.*

109.    As a direct result of this misconduct, in September 2010, BAC and its affiliates
had to suspend foreclosures in 23 states to allow the company to undertake a review of internal
procedures while publicly acknowledging that tens of thousands of foreclosure proceedings were
improperly filed.  Robbie Whelan, WSJ: *Bank of America Suspends Foreclosures*, Wall St. J.
(last updated Oct. 2, 2010 10:41AM) http://online.wsj.com/articles/SB1000142405274870
3859204575526491393115712.  On October 9, 2010, BAC and its affiliates' documentation
failures and lack of internal controls forced them to suspend foreclosures nationwide.  David
Streitfeld & Nelson D. Schwartz, *Largest U.S. Bank Halts Foreclosures in All States*, N.Y.
Times (Oct. 8, 2010), http://www.nytimes.com/2010/10/09/business/09mortgage.html?_r=0.

110.    In October 2010, the Texas Attorney General ordered Wilshire to stop all
foreclosures, short sales, and evictions in the state of Texas due to improprieties relating to
Wilshire's practice of using robo-signers.  *Texas attorney general asks for pause in foreclosures,*
*Austin Business Journal* (Oct. 7, 2010, 8:16 AM), http://www.bizjournals.com/austin/stories/
2010/10/04/daily51.html.  Wilshire's practices included signing thousands of documents each
month without reading them, signing affidavits without reviewing facts, notarizing documents
without the signer or before the documents were signed and filing documents that did not
correctly reflect loan payments, charges and advances.

30

111.    On April 13, 2011, the OCC filed a Consent Order finding that Bank of America, N.A. ("Bank of America"), including in its role as successor to Countrywide, engaged in fraudulent and improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon the underlying mortgage loans.  Consent Order, In re Bank of America, N.A., No. AA-EC-11-12, (Apr. 13, 2011), http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.  Bank of America stipulated to the OCC Consent Order.

112.    On August 4, 2011, the New York State Attorney General ("NYAG") moved to intervene in the June 29, 2011 settlement between Bank of America and Bank of New York Mellon, the trustee for 530 trusts created Countrywide entities.  The NYAG found that the blatant disregard for the rules governing assignment by BAC and its affiliates has caused, and is continuing to cause, serious harm to certificateholders.  As the NYAG stated in his verified pleading in *In re Bank of New York Mellon*:

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse.  Any action to foreclose requires proof of ownership of the mortgage.  This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership.  Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon.  The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, "robo-signing."

Schneiderman Verified Pleading at 11, In re Bank of New York Mellon, No. 651786/2011 (Sup. Ct. N.Y. County Aug. 5, 2011) (the "BNY Article 77 Proceeding").

113.    The NYAG further reported that the "failure of Countrywide to transfer complete mortgage loan documentation to the trusts hampered the Trusts' ability to foreclose on delinquent mortgages thereby impairing the value of the notes secured by those mortgages."  *Id.* ¶ 23.

31

114.    In 2012, BAC, including as successor to Countrywide, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of their robo-signing misconduct.  The agreement required servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* U.S. Dept. of Justice, *Press Release: Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses* (Feb. 9, 2012), http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

115.    On March 12, 2012, the U.S. Department of Housing and Urban Development ("HUD"), Office of the Inspector General issued a report of its examination of BAC's and Countrywide's and their affiliates' foreclosure process from October 1, 2008 to September 30, 2010.  *See* U.S. Department of Housing and Urban Development – Office of the Inspector General, *Bank of America Corporation Foreclosure and Claims Process Review* (2012), www.hudoig.gov/sites/default/files/Audit_Reports/2012-FW-1802.pdf.  The HUD inspector performed a review of loan or foreclosure files and determined that they were "consistently" deficient because they were missing documentation.  *Id.* at 5, 12.  HUD found that BAC relied on "foreclosure mills" and "routinely signed foreclosure documents" that falsely claimed the affiant had personal knowledge of the facts contained therein.  *Id.* at 5.  HUD also reported that BAC and Countrywide "significantly hindered" HUD's investigation by refusing to cooperate. *Id.* at 4.

116.    As a result of Countrywide's systematic failure to transfer essential mortgage documentation to securitization trusts, Phillip R. Burnaman II, an expert retained by  Deutsche

Bank in the BNY Article 77 Proceeding, issued an expert report revealing that Deutsche Bank's exception reports for Countrywide securitizations (including numerous Trusts) as of June 2011 showed 117,899 loans lacking complete documentation. Burnaman Expert Report at 50, In re Bank of N.Y. Mellon, No. 651786/2011 (Sup. Ct. N.Y. County Mar. 14, 2013).

> **b)** **GMAC Mortgage Corporation, GMAC Mortgage, LLC and Residential Funding Corporation.**

117.    GMAC Mortgage, LLC ("GMAC Mortgage") was a subsidiary of Residential Funding Corporation ("Residential Funding"). GMAC Mortgage Corporation and Residential Funding Corporation were subsidiaries of GMAC, Inc. In May of 2010, GMAC, Inc. changed its name to Ally Financial Inc. ("Ally"). In or about 2013, Ocwen acquired Ally's mortgage servicing portfolio. GMAC/Residential Funding were the Servicer for three of the Trusts. *See* Exhibit 7.

118.    Evidence of the Indenture Trustees' failure to take possession of and ensure the completeness of loan files relating to the Trusts in connection with loans serviced by GMAC Mortgage, GMAC Mortgage Corporation, Residential Funding and Ally (collectively "GMAC") includes:

119.    The Federal Reserve issued a Consent Order dated April 13, 2011 finding that GMAC failed to document mortgage loans properly and has attempted to cover-up this failure. Consent Order, In the Matter of Ally Fin. Inc., Ally Bank, Residential Capital LLC and GMAC Mortg., LLC, No. 11-020-B-HC, 11-020-BEDO (Apr. 13, 2011), https://www.fdic.gov/bank/individual/ enforcement/2011-04-77.pdf. The Federal Reserve found that GMAC:

> (a) Filed or caused to be filed in state courts and in connection with bankruptcy proceedings in federal courts numerous affidavits executed by employees of the Mortgage Servicing Companies or employees of third-party providers making various assertions, such as the ownership of the mortgage note and mortgage, the

33

amount of principal and interest due, and the fees and expenses chargeable to the
borrower, in which the affiant represented that the assertions in the affidavit were
made based on personal knowledge or based on a review by the affiant of the
relevant books and records, when, in many cases, they were not based on such
knowledge or review; (b) Filed or caused to be filed in courts in various states and
in connection with bankruptcy proceedings in federal courts or in the local land
record offices, numerous affidavits and other mortgage related documents that were
not properly notarized, including those not signed or affirmed in the presence of a
notary; [and] (c) Litigated foreclosure and bankruptcy proceedings and initiated
non-judicial foreclosures without always confirming that documentation of
ownership was in order at the appropriate time, including confirming that the
promissory note and mortgage document were properly endorsed or assigned and,
if necessary, in the possession of the appropriate party.

120.    GMAC stipulated to the issuing of the Consent Order.  *Id.*

121.    One of GMAC's robo-signers, Jeffrey Stephan, is the leader of GMAC's

document execution unit.  On December 10, 2009, in a deposition taken in a foreclosure

proceeding commenced by GMAC in Circuit Court in Palm Beach County, Florida, Stephan

testified that he robo-signed 10,000 foreclosure documents per month without reviewing them or

verifying their accuracy.  Deposition of Jeffery Stephan at 7, GMAC Mortg. LLC v. Ann M. Neu

a/k/a Ann Michelle Perez, No. 50 2008 CA 040805XXXX (Fla. Cir. Ct. Dec. 10, 2009).  Stephan

further testified under oath that the 13 individuals who reported to him similarly "do not go into

the system and verify the information as accurate" before documents are executed in connection

with foreclosures commenced by GMAC.  *Id.*

122.    An internal GMAC document containing a record of Stephan's discussions with

outside counsel was publicly released.  Paul Kiel, *Internal Doc Reveals GMAC Filed False*

*Document in Bid to Foreclose*, ProPublica (July 27, 2011, 12:07 PM),

http://www.propublica.org/article/gmac-mortgage-whistleblower-foreclosure.  The document

provides additional evidence that GMAC committed acts of forgery or otherwise filed false

documentation in foreclosure proceedings nationwide in order to cover-up its monumental

failure to deliver valid title to the trusts.  The document establishes that on April 4, 2010,

34

Stephan explained to outside counsel that GMAC sought to foreclose upon a mortgage on a property in New York City that was originated by Ameriquest Mortgage Company ("Ameriquest") and sold to a securitization trust. *Id.* The mortgage was never assigned to the trust and Ameriquest went bankrupt in 2007. *Id.* Stephan explained that GMAC wanted Ameriquest to agree to a retroactive assignment, but it was impossible to get Ameriquest to agree because it was defunct. *Id.* As Stephan put it: "The problem is we do not have signing authority—are there any other options?" *Id.*

123.     Stephan and GMAC apparently concluded that their only option was to create and file forged documentation. *Id.* On July 7, 2010, GMAC forged an assignment from Ameriquest to the relevant trust which stated that it was "effective as of" August 2005. *Id.* Stephan was purportedly the Ameriquest officer who authorized the assignment. *Id.* ProPublica, a public watchdog group, performed a review of hundreds of foreclosure cases in New York involving Ameriquest originated loans and found that GMAC had prepared many other similar forgeries. *Id.*

124.     In October 2010, the Ohio Attorney General commenced a lawsuit against GMAC alleging the loan servicer and its agents filed fraudulent foreclosure affidavits to mislead courts in hundreds of cases. *See* Compl., Ohio v. GMAC Mortg., LLC, No. 10-cv-02537 (N.D. Ohio 2010). After an extensive inquiry, the Ohio Attorney General concluded that "GMAC has caused Assignments of Mortgage to be prepared and executed by agents of GMAC that improperly purport to assign the note from MERS to the trustee and falsely claim that the GMAC employee . . . executing the Assignment has authority to assign the note on behalf of MERS." Compl. at 3 – 4, Fox v. GMAC Mortg., LLC, No. 2:10-cv-1023 (S.D. Ohio 2011).

35

125.    The Ohio Attorney General further found that GMAC conspired to specifically mislead Ohio courts noting: "The agents of GMAC prepared these affidavits in connection with Ohio foreclosures in order to mislead the courts and consumers in Ohio on such matters as, who kept the applicable records, who the holder of the note was, and the amount due to whoever the holder of the note was.  Brief for Petitioner at 10, State of Ohio v. GMAC Mortg., LLC, No. 2011-0890 (Ohio Oct. 13, 2011) (U.S. Dist. Ct. Case Nos. 3:10-cv-02537, 1:10-cv-02709).

126.    The Ohio Attorney General made it abundantly clear that Stephan's actions were not isolated incidents and instead reflected a pervasive pattern of practice within GMAC.  As the Ohio Attorney General put it: "GMAC had authority over and the right to control the actions of Stephan and benefited financially from the actions of Stephan.  The actions of Stephan . . . were part of the business plans of Ally and GMAC Mortgage."  *Id.* at 3.

127.    GMAC's misconduct has been recognized by multiple courts.  For example, GMAC was sanctioned by a Maine court in Federal National Mortgage Association v. Bradbury, for its robo-signing cover-up.  In awarding the sanctions, the Honorable Keith A. Powers wrote:

> The Court is particularly troubled by the fact that Stephan's deposition in this case is not the first time that GMAC's high volume and careless approach to affidavit signing has been exposed.  Stephan himself was deposed six months earlier, on December 10, 2009, in Florida.  His Florida testimony is consistent with the testimony given in this case: except for some limited checking of figures, he signs summary judgment affidavits without first reading them and without appearing before a notary.  Even more troubling, in addition to that Florida action, in May, 2006 another Florida court not only admonished GMAC, it sanctioned the Plaintiff lender for GMAC's affidavit signing practices.  As part of its order, the Florida court required GMAC to file a Notice of Compliance, indicating its commitment to modify its affidavit signing procedures to conform to proper practices.  The experience of this case reveals that, despite the Florida Court's order, GMAC's flagrant disregard apparently persists.  It is well past the time for such practices to end.

Federal National Mortgage Association v. Bradbury, No. BRI-RE-09-65 (Me. Dist. Ct. Sep. 24, 2010).

36

128.    As a direct result of the aforementioned blatant misconduct, in September 2010, GMAC had to suspend foreclosures in 23 states and undertake a review of internal procedures, publicly acknowledging that it systematically commenced foreclosure proceedings based on forged or otherwise improper documentation.  *See* Denise Pellegrini and Dan Campbell, *Ally's GMAC Mortgage Halts Evictions Across 23 States,* Bloomberg (Sept. 20, 2010, 3:49 PM), http://www.bloomberg.com/news/articles/2010-09-20/gmac-mortgage-halts-home-foreclosures-in-23-states-including-florida-n-y-.

129.    In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Legal Services of New York, *Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearing in Foreclosure Proceedings* (2010), http://www.lsnj.org/NewsAnnouncements/ Foreclosure/materials/LSNJReport.pdf (hereinafter "Report to the New Jersey Supreme Court").  The report was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud.  *Id* at 1.  The report concluded that "[a] great volume of national information. . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings."  The report specifically implicated GMAC.  *Id.* at 9.

130.    Thereafter, on December 20, 2010, Judge Mary C. Jacobson of the Superior Court of New Jersey issued an order to show cause to GMAC.  The order to show cause required GMAC to "show cause at a hearing scheduled for January 19, 2011, why the court should not suspend the processing of all foreclosure matters involving [the banks] and appoint a Special

37

Master to review their past and proposed foreclosure practices."  In re Residential Mortg.

Foreclosure Pleading and Document Irregularities, No. F-059553-10 (N.J. Super. Ct. Ch. Div.

Dec. 20, 2011).

131.    Additionally, in January 2011, GMAC agreed to dismiss 10,000 foreclosure

proceedings filed in the State of Maryland because they relied upon forged or false

documentation.  David Dayen, *10,000 GMAC Foreclosures Stopped in Maryland,* Shadow Proof

(Jan. 16, 2011), https://shadowproof.com/2011/01/16/10000-gmac-foreclosures-stopped-in-

maryland/.

132.    On March 12, 2012, the Office of Inspector General ("OIG") of HUD issued a

memorandum concerning its review of Ally Financials foreclosure and claims processes.  The

review was conducted in response to allegations made in the fall of 2010 that national mortgage

servicers "were engaged in widespread questionable foreclosure practices involving the use of

foreclosure 'mills' and a practice known as 'robosigning' of sworn documents in thousands of

foreclosures throughout the United States."  United States Office of Housing and Urban

Development: Office of the Inspector General, *Memorandum: Ally Financial, Inc. Foreclosure

and Claims Process Review* 1 (March 12, 2012),

https://www.hudoig.gov/sites/default/files/documents/audit-reports/2012-ph-1801.pdf.

133.    In the course of their investigations, the OIG discovered that "an affiant routinely

signed 400 affidavits per day and up to 10,000 affidavits per month, certifying that he had

personal knowledge of the facts when he did not and without reviewing the supporting

documentation referenced in them."  *Id.* at 4.  The OIG further noted that the review "was

significantly hindered by Ally's refusal to allow us to interview responsible personnel," as well

as by Ally's "failure to provide the documentation . . . requested in a timely manner."  *Id.* at 3.

38

As part of its conclusions, the OIG found that Ally Financial "did not establish an effective control environment to ensure the integrity of its foreclosure process" and that this "flawed control environment resulted in Ally's filing improper legal documents, thereby misrepresenting its claims to HUD." *Id.* at 6.

134.    Finally, in 2012, Ally Financial (formerly GMAC) was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation, and lost paperwork.  Ally Financial has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not Ally Financial, would bear the loss.  *See* U.S. Dept. of Just., *Press Release: Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses* (Feb. 9, 2012), http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

         c)      **Ocwen Loan Servicing, Litton Loan Servicing LP and Fremont Investment & Loan.**

135.    As of 2007, Litton Loan Servicing LP ("Litton") was a wholly owned subsidiary of Credit-Based Asset Servicing and Securitization LLC ("C-BASS").  Thereafter, in or around December 2007, Goldman Sachs Group Inc. ("Goldman Sachs") acquired Litton from C-BASS and integrated into it Goldman Sachs' Avelo Mortgage, L.L.C. servicing subsidiary.  From January 2009 to December 31, 2010 alone, Litton initiated over 135,000 foreclosure actions.  In or around 2011, Ocwen Loan Servicing LLC ("Ocwen") acquired Litton from Goldman Sachs.  Fremont Investment & Loan was a subsidiary of Fremont General Corporation (collectively,

"Fremont").  In May 2008, Fremont sold its mortgage servicing portfolio to Litton.  Goldman

Sachs/Avelo/Litton/Fremont/Ocwen were the Servicer for eight of the Trusts.  *See* Exhibit 7.

136.    Evidence of the Indenture Trustees' failure to take possession of and ensure the

completeness of loan files relating to the Trusts in connection with loans serviced by Litton,

Fremont and Goldman Sachs, includes:

137.    On September 1, 2011, after an investigation undertaken by the Board of

Governors of the Federal Reserve System (the "Federal Reserve"), Goldman Sachs entered into a

Consent Order that required Goldman Sachs to retain an independent consultant to review Litton

foreclosure proceedings pending at any time in 2009 or 2010 and to compensate borrowers who

suffered financial injury as a result of wrongful foreclosures.  *See* Consent Order, In re The

Goldman Sachs Group, Inc. and Goldman Sachs Bank USA, No. 11-112-B-HC, 11-12-BSM,

(Sept. 1, 2011),

http://www.federalreserve.gov/newsevents/press/enforcement/enf20110901f1.pdf.

138.    Courts have also found that C-BASS has failed to transfer proper documentation

for mortgage loans and/or that the required paperwork to transfer title was faulty, missing, or

inadequate, which at a minimum caused a delay in the foreclosure proceedings.  *See, e.g.*, *Credit-*

*Based Asset Servicing & Securitization, LLC v. Akitoye*, 2009 WL 116956, *5 – 6 (Sup. Ct.

Kings County 2009) (internal citations and quotations omitted) ("Plaintiff C-BASS offers no

evidence that it took physical possession of the note and mortgage before commencing this

action, and again, the written assignment was signed after defendant was served.  The

assignment's language purporting to give it retroactive effect, absent a prior or contemporary

delivery of the note and mortgage is insufficient to grant it standing.").

139.     Ocwen engaged in substantially similar misconduct.  In December 2013, the

Consumer Financial Protection Bureau ("CFPB"), authorities in 49 states and the District of

Columbia settled with Ocwen for $2 billion dollars.  Consent Order, CFPB v. Ocwen Financial

Corp., (D.D.C., Dec. 11, 2013), http://files.consumerfinance.gov/f/201312_cfpb_consent-

order_ocwen.pdf.  The order required Ocwen to stop robo-signing official documents and to

ensure that facts asserted in its documents are accurate and reliable and that all affidavits and

sworn statements are based on personal knowledge.  *Id.* at A-1.

140.     In December 2010, a presentation titled *Unfair, Deceptive, and Unconscionable*

*Acts in Foreclosure Cases* was given by the Florida Attorney General's office at a conference of

the Florida Association of Court Clerks and Comptrollers.  This presentation documents cases of

allegedly forged signatures, false notarizations and spurious witnesses and improper mortgage

assignments.  *See* Clarkson, et al., Office of the Attorney General: Economic Crimes Division,

*Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases* (December 2010),

https://www.scribd.com/doc/46278738/Florida-Attorney-General-Fraudclosure-Report-Unfair-

Deceptive-and-Unconscionable-Acts-in-Foreclosure-Cases.  Ocwen's robo-signing practices

were highlighted in this presentation as numerous variations of former Ocwen employee Scott

Anderson's signature appeared on mortgage assignments.  *Id.*

### d)     Midland Loan Services, Inc. and National City Home Loan Services, Inc.

141.     National City Mortgage Co. is a subsidiary of National City Corporation.  In

October 2008, PNC Financial Services Group, Inc. ("PNC") acquired National City Corporation

and its affiliates (collectively, "National City").  In November 2009, National City Mortgage

Company changed its name to PNC Mortgage, Inc.  Midland Loan Services, Inc. ("Midland") is

41

a subsidiary of PNC.  PNC/National City/Midland were the Servicer for three of the Trusts.  *See* Exhibit 7.

142.    Evidence of the Indenture Trustees' failure to take possession of and ensure the completeness of loan files relating to the Trusts in connection with loans serviced by Midland, National City and PNC, includes:

143.    On April 13, 2011, the OCC issued a Consent Order finding that PNC engaged in unsound banking practices in that it, among other things, caused affidavits to be submitted in foreclosure proceedings in which the affiant represented that the assertions were made based on a review of records, when such was not the case, and filed affidavits and other mortgage related documents that were not properly endorsed and signed.  Consent Order, In re PNC Bank, N.A., No. AA-EC-11-17 (April 13, 2011), http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47i.pdf

144.    In at least one case, PNC was found to lack standing to pursue a mortgage foreclosure, since it "could not establish that the note was physically delivered or assigned to it prior to commencement of the action."  It submitted an affidavit which did not give any factual details based upon personal knowledge and did not establish a chain of title to the note and related mortgage that plaintiff seeks to foreclose on.  Order, PNC Bank Nat'l Assoc. v. Giovanni, No. 18963/2011, (Sup. Ct. Suffolk County Apr. 30, 2013).

145.    On December 20, 2010, New Jersey Administrative Director of the Courts, Judge Grant, took the extraordinary step of issuing an administrative order requiring 24 loan servicers and RMBS trustees to file certifications demonstrating that there were no irregularities in the handling of their foreclosure proceedings.  The order was directed at, among others, PNC (and

42

therefore its servicer, National City).  The order was also directed at HSBC, because it had been involved in numerous questionable foreclosures.

<strong>e)</strong>    <u><strong>Wachovia Mortgage Corporation and Wells Fargo Bank, N.A.</strong></u>

146.    Wells Fargo Bank, N.A. (collectively with its affiliates, "Wells Fargo") acquired Wachovia Corporation, including its affiliate Wachovia Mortgage Corporation (collectively, "Wachovia") in 2008.  Wells Fargo/Wachovia were the Servicer for eight of the Trusts.  *See* Exhibit 7.

147.    Evidence of the Indenture Trustees' failure to take possession of and ensure the completeness of loan files relating to the Trusts in connection with loans serviced by Wells Fargo and Wachovia includes:

148.    One of Wells Fargo's robo-signers is a woman named Xee Moua who admitted that she executes hundreds of foreclosure documents every day without verifying the related documents.  *See* Marshall Eckblad, *"Signer" Issue Raised for Wells Fargo*, Wall St. J. (last updated Oct. 15, 2010, 12:01 AM), http://online.wsj.com/articles/SB10001424052748704361504575552192790748342.  Moua admitted she reviewed up to 500 foreclosure documents on a daily basis.  *Id.*

149.    After Moua disclosed Wells Fargo's widespread practice of filing false mortgage documents, Wells Fargo admitted that it had filed documentation in 55,000 foreclosure proceedings which had defects related to notarization and the final review of the document.  *See* Suzanne Kapner, *Wells Fargo Admits Foreclosure Problems*, Financial Times (Oct. 28, 2010), http://www.ft.com/cms/s/0/99f8c45a-e221-11df-9233-00144feabdc0.html.

150.    The Ohio Attorney General commenced an investigation in the wake of Moua's admission and asked Wells Fargo to voluntarily vacate all foreclosures based on incorrect affidavits.  *See* Michael Riley, *Ohio's Cordray Asks for Affidavits by 'Robo-Signer,'* Bloomberg

43

(Oct. 29, 2010), http://www.bloomberg.com/news/articles/2010-10-29/ohio-attorney-general-asks-for-affidavits-by-wells-fargo-robo-signer-.

151.    On April 13, 2011, the OCC issued a Consent Order finding that Wells Fargo engaged in unsound banking practices in that it, among other things, caused affidavits to be submitted in foreclosure proceedings in which the affiant represented that the assertions were made based on a review of records, when such was not the case, and litigated proceedings without making sure the promissory note was properly endorsed and signed.  *See* Consent Order, In re Wells Fargo Bank, N.A., No. AA-EC-11-19 (Apr. 13, 2011), http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47k.pdf.  Wells Fargo stipulated to the issuance of the OCC Consent Order.

152.    On December 1, 2011, the Massachusetts Attorney General commenced an action against Wells Fargo, among others, alleging "rampant violations" of state law in foreclosure proceedings.  *See* Compl., Massachusetts v. Bank of America, N.A., No. 11-cv-4363 (Mass. Super. Ct. Dec. 1, 2011).

153.    On March 12, 2012, the Office of Inspector General ("OIG") of HUD issued a memorandum concerning its review of Wells Fargo's foreclosure and claims processes.  The review was conducted in response to allegations made in the fall of 2010 that national mortgage servicers "were engaged in widespread questionable foreclosure practices involving the use of foreclosure 'mills' and a practice known as 'robosigning' of sworn documents in thousands of foreclosures throughout the United States."  *See* United States Department of Housing and Urban Development: Office of the Inspector General, *Memorandum: Wells Fargo Bank Foreclosure and Claims Process Review* 1 (March 12, 2012), https://www.hudoig.gov/sites/default/files/Audit_Reports/2012-AT-1801.pdf.

44

154.    Interviews conducted over the course of the investigation disclosed that titles were given to affiants "for the sole purpose of allowing the individual to sign documents," and that employees who notarized documents "routinely did not witness the signature of the documents and notarized up to 1,000 document per day." *Id.* at 4.  Further, the OIG noted that the review process was "significantly hindered" by Wells Fargo's reluctance to allow interviews of employees or to provide data and information in a timely manner. *Id.* at 4.  As part of its conclusions, the OIG found that Wells Fargo "did not establish an effective control environment to ensure the integrity of its foreclosure process" and that this "flawed control environment resulted in Wells Fargo's filing improper legal documents, thereby misrepresenting its claims to HUD." *Id.* at 8.

155.    Further, the complaint filed by the New York State Attorney General on February 3, 2012 ("NYAG Complaint") charges various loan servicers, including, JPMorgan, with persistent fraud and deceptive acts in connection with mortgage foreclosure proceedings. Compl., People of the State of New York v. JP Morgan Chase Bank N.A., No. 2768/2012 (Sup. Ct. Kings County Feb. 3, 2012), http://www.ag.ny.gov/sites/default/files/press-releases/2012/FINAL-SUMMONS-AND-COMPLAINT.pdf.  The NYAG complaint asserts that servicers such as Wells Fargo "have repeatedly submitted court documents containing false and misleading information that made it appear that the foreclosing party had the authority to bring a case when in fact it may not have."  N.Y. Attorney Gen., *A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks for Deceptive & Fraudulent Use of Electronic Mortgage Registry* (Feb. 3, 2012), http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-nation's-largest-banks-deceptive.

45

156.    On March 17, 2014, The Washington Post reported on a foreclosure lawsuit filed in the Southern District of New York in which an internal Wells Fargo "foreclosure manual" was filed.  *See* Danielle Douglas, *Wells Fargo Foreclosure Manual Under Fire*, Wash. Post (Mar. 17, 2014), http://www.washingtonpost.com/business/economy/wells-fargo-foreclosuremanual-under-fire/2014/03/17/25cd383c-ae00-11e3-96dc-d6ea14c099f9_story.html.  According to The Washington Post, "[t]he manual, reviewed by The Washington Post, outlines steps for obtaining the missing [endorsement] after the bank has initiated foreclosure proceedings.  It also lays out what lawyers must do in the event of a lost affidavit or if there is no documentation showing the history of who owned the loan, paperwork the bank should already have."  *Id.*

157.    Wells Fargo was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* U.S. Dept. of Just., *Press Release: Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses* (Feb. 9, 2012), available at http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

**B.      Wilmington Trust's and the Indenture Trustees' Failure To Remedy The Sellers' Pervasive Breaches Of Representations And Warranties.**

**1.      The Sellers' Representation and Warranty Breaches.**

158.    Each of the Trusts' loan pools contained a high percentage of loans that materially breached the Sellers' representations and warranties.

159.    Sellers made representations and warranties regarding many aspects of the mortgage loans, including the originators' compliance with underwriting standards and practices,

46

owner occupancy statistics, appraisal procedures, LTV and combined loan-to-value ("CLTV") ratios. For example, in the Section 3.1 of the Mortgage Loan Sale and Contribution Agreement to the Delta Trust Indenture, the originator's representations included that: each loan "was underwritten in accordance with the Originator's underwriting guidelines described in the Prospectus . . ."; all loan payments were current; that the Mortgage Loan Schedule and Prepayment Charge Schedule is true and correct as of the date given; that the mortgage loans were subject to an appraisal, the guidelines of which "would be generally acceptable to prudent mortgage lenders that regularly originate or purchase mortgage loans comparable to the Mortgage Loans for sale to prudent investors in the secondary market that invest in mortgage loans such as the Mortgage Loans". *See* Exhibit 7 Table 1. The Governing Agreements for the other Trusts set forth substantially similar terms. *See* Exhibit 7 Table 14.

160.    As noted above, each party to the Governing Agreements, including Wilmington Trust, had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sellers' obligation to repurchase or substitute the defective loan.

## 2.    The Trusts' Loans Have Experienced High Delinquency, Modification, And Loss Severity Rates.

161.    The extremely high delinquency, modification, and collateral loss rates of the mortgage loans within the Trusts are strong evidence of the Sellers' misrepresentation of the credit quality and characteristics of the mortgage loans they sold to the Trusts. As reflected by Exhibits 3 through 5, the Trusts have experienced payment problems significantly beyond what was expected for loan pools that were properly underwritten and which contained loans that actually had the characteristics the Sellers had represented and warranted.

162.    As of January 1, 2009, over 29% of the mortgage loans in the Trusts were delinquent. Average delinquency rates remain high despite the recovery of the U.S. economy:

47

in January 2011, the delinquency rate was still over 29 percent; it was over 27 percent in January

2013 and over 24 percent in January 2015.  Indeed, the delinquency rate for SAST 2006-3

peaked at **over 57 percent** in November 2009.

163.    Loan modifications to the loans in the Trusts also dramatically increased

beginning in early 2009, providing further evidence of systematic Seller breaches of

representations and warranties in the Trusts.  In general, loan modifications, which are initiated

by the Servicer, are a means of working out distressed or delinquent loans.  The Servicer agrees

to revised—typically reduced—monthly payments, typically to allow a borrower to become or

remain current or to avoid or cure a default.  Loan modifications often include changes to the

loan's interest rate, term, and/or outstanding principal.

164.    As with delinquency rates, the extent of loan modifications is indicative of

breaches of representations and warranties for at least two reasons.  First, escalating loan

modifications correlate to misstated borrower income and creditworthiness.  Second, the

Servicers' decisions to modify rather than foreclose on loans indicates that the underlying

collateral may not be adequate security to satisfy the outstanding balance, because the original

LTV ratio (or CLTV ratio) was not as represented.

165.    As a consequence of the Trusts' high delinquency rates, they have, as of the end

of 2015, written off over $2.3 billion in net losses—an accumulated net loss percentage of over

16 percent.  In January 2009, the total accumulated net loss of the Trusts already was over $340

million.  The total losses suffered by the Trusts, reached over $1.1 billion in January 2011, over

$1.9 billion in January 2013 and over $2.2 billion in January 2015.

166.    The economic downturn cannot explain the abnormally high percentage of

delinquencies, modifications, defaults, foreclosures, and losses observed in the loan pools

ultimately backing the notes.  Loan pools that were properly underwritten and contained loans with the represented characteristics would have experienced substantially fewer payment problems and substantially lower percentages of defaults, foreclosures, and delinquencies.

### 3. The RMBS Have Experienced Massive Credit Downgrades.

167.    The significant rating downgrades experienced by the RMBS issued by the Trusts are also strong evidence that the underlying loans were improperly underwritten, and that they did not have the credit risk characteristics the Sellers represented and warranted.

168.    Credit ratings are assessments about credit risk published by a rating agency.  In issuing its credit ratings for RMBS, the rating agencies consider the quality of the underlying loan collateral and creditworthiness of the borrowers to determine the likelihood that the RMBS may default.  At the time of securitization, all of the Trusts' senior tranches were rated "investment grade."

169.    However, as public disclosures revealed the Sellers' systematic underwriting and securitization abuses and the Trusts began reporting severe collateral losses, the Trusts' rating agencies drastically downgraded many of the Trusts' securities to "junk bond" status.

### 4. The Systematic Disregard Of Underwriting Standards Was Pervasive During The Relevant Period.

170.    It is now well known that during the height of the mortgage and securitization boom in the U.S. market between 2004 and 2008, originators of residential mortgage loans sold and securitized loans in violation of their stated underwriting guidelines and in breach of the representations and warranties provided to the purchasers of the loan pools.

171.    Government reports and investigations and newspaper reports have uncovered some of the pervasive abandonment of underwriting standards.  In April 2011, a U.S. Senate subcommittee issued a report on the financial crisis.  *See* Permanent Subcommittee on

49

Investigations, *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse*

(2011), http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf

?attempt=2) ("*Senate Report*").

172.    The *Senate Report* used Washington Mutual as a case study, but it concluded that

Washington Mutual was far from the only lender that sold poor quality mortgages and mortgage

backed securities that undermined U.S. financial markets.  The *Senate Report* states that

Washington Mutual "was emblematic of a host of financial institutions that knowingly

originated, sold, and securitized billions of dollars in high risk, poor quality home loans.  These

lenders were not the victims of the financial crisis; the high risk loans they issued became the

fuel that ignited the financial crisis."  *Senate Report* at 4.

173.    The Financial Crisis Inquiry Commission, which was created pursuant to the

Fraud Enforcement and Recovery Act (Public Law 111-21), detailed, among other things, the

collapse of mortgage underwriting standards and subsequent collapse of the mortgage market

and wider economy in its report released in January 2011.  *See* Financial Crisis Inquiry

Commission, *Final Report Of The National Commission Of The Causes Of The Financial And

Economic Crisis In The United States* (2011), https://www.gpo.gov/fdsys/pkg/GPO-

FCIC/pdf/GPO-FCIC.pdf ("*FCIC Report*").

174.    The *FCIC Report* concluded that there was a "systemic breakdown in

accountability and ethics."  *FCIC Report* at xxii.  "Unfortunately—as has been the case in past

speculative booms and busts—we witnessed an erosion of standards of responsibility and ethics

that exacerbated the financial crisis."  *Id.*  The *FCIC Report* found: [I]t was the collapse of the

housing bubble—fueled by low interest rates, easy and available credit, scant regulation, and

toxic mortgages—that was the spark that ignited a string of events, which led to a full-blown

50

crises in the fall of 2008.  Trillions of dollars in risky mortgages had become embedded throughout the financial system, as mortgage-related securities were packaged, repackaged, and sold to investors around the world.  *Id*. at xvi.

175.    During the housing boom, mortgage lenders focused on quantity rather than quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The *FCIC Report* found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007."  *Id*. at xxii.  Early payment default is a significant indicator of pervasive disregard for underwriting standards.  The *FCIC Report* noted that mortgage fraud "flourished in an environment of collapsing lending standards . . . ."  *Id*.

176.    Recent landmark settlements between the government and major financial institutions have further detailed the systematic and pervasive disregard of underwriting standards by lenders during the relevant time period, and have confirmed that these practices infiltrated the Trusts.  For example, on November 19, 2013, the Justice Department, along with federal and state regulators, announced a $13 billion settlement with JPMorgan—the largest settlement with a single entity in American history—to resolve federal and state civil claims arising out of the packaging, marketing, sale and issuance of RMBS offerings by JPMorgan, Bear Stearns and Washington Mutual.

177.    As part of the settlement, JPMorgan acknowledged that it regularly included loans within the securitizations that did not comply with the originator's underwriting guidelines and breached the originator's representations and warranties.  *See* U.S. Dept. of Justice, *Press Release: Justice Department, Federal and State Partners Secure Record $13 Billion Global Settlement with JPMorgan for Misleading Investors About Securities Containing Toxic*

51

*Mortgages* (Nov. 19, 2013), https://www.justice.gov/opa/pr/justice-department-federal-and-state-partners-secure-record-13-billion-global-settlement.

178.    In August of 2014, The Department of Justice announced a $16.65 billion settlement with Bank of America to resolve similar RMBS-related fraud claims against the bank and its former and current subsidiaries, including Countrywide Financial and Merrill Lynch. *See* U.S. Dept. of Justice, *Press Release: Bank of America to Pay $16.65 Billion in Historical Justice Department Settlement for Financial Fraud Leading up to and During the Financial* Crisis (Aug. 21, 2014), https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading.  In the associated statement of facts, Bank of America admitted that, in making representations regarding residential mortgage loans that the Bank originated and sold, "many of those representations or warranties were not accurate, as many of the loans were defective and/or otherwise ineligible for sale to the GSEs."  Settlement Agreement, Annex One: Bank of America Corporations Statement of Facts at 28 (August 18, 2014), https://www.justice.gov/iso/opa/resources/3392014829141150385241.pdf.

179.    More recently, on February 2, 2016, Morgan Stanley agreed to a $2.6 billion settlement with the Justice Department to resolve claims related to the bank's marketing, sale, and issuance of RMBS. *See* U.S. Dept. of Justice, *Morgan Stanley Agrees to Pay $2.6 Billion Penalty in Connection with Its Sale of Residential mortgage Back Securities* (Feb. 11, 2016), https://www.justice.gov/opa/pr/morgan-stanley-agrees-pay-26-billion-penalty-connection-its-sale-residential-mortgage-backed.  As part of the settlement, Morgan Stanley acknowledged in a detailed statement of facts that it failed to disclose to its investors that in April 2006 it had expanded its risk tolerance in evaluating loans in order to purchase and securitize "everything possible." *Id.*  Moreover, the Morgan Stanley manager of valuation and due diligence told an

52

employee in 2006 to "not mention the 'slightly higher risk tolerance' in these communications. We are running under the radar and do not want to document these types of things." *Id.*

180.    Goldman Sachs has also entered into a large settlement with the Department of Justice, announcing in April 2016 that an agreement had been reached that would require the bank to pay $5.03 billion in connection with its sale of RMBS.  *See* U.S. Dept. of Justice, *Press Release: Goldman Sachs Agrees to Pay More than $5 Billon in Connection with Its Sale of Residential Mortgage Back Securities* (April 11, 2016), https://www.justice.gov/opa/pr/goldman-sachs-agrees-pay-more-5-billion-connection-its-sale-residential-mortgage-backed.  As with the other DOJ settlements mentioned previously, Goldman Sachs agreed to a detailed statement of facts; this included an admission that, even when the results of its due diligence on samples of loans "indicated that the unsampled portions of the pools likely contained additional loans with credit exceptions, Goldman typically did not . . . identify and eliminate any additional loans with credit exceptions." *Id.*  Goldman has acknowledged that it "failed to do this even when the samples included significant numbers of loans with credit exceptions." *Id.*

181.    On July 14, 2014, the Justice Department, together with federal and state regulators, announced a $7 billion settlement with Citigroup Inc. to resolve federal and state civil claims related to Citigroup's conduct in the packaging, securitization, marketing, sale and issuance of RMBS offerings issued prior to January 1, 2009, including many securitizations substantially similar to the Trusts.  The settlement included an agreed upon statement of facts wherein Citigroup acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.  *See* U.S. Dept. of Justice, *Press Release: Justice Department, Federal and State Partners Secure Record $7 Billion Global Settlement with Citigroup for Misleading Investors About Securities Containing Toxic Mortgages* (July 14,

2014), https://www.justice.gov/opa/pr/justice-department-federal-and-state-partners-secure-record-7-billion-global-settlement.

182.     On August 21, 2014, the Justice Department, together with federal and state regulators, announced a $16.65 billion settlement with Bank of America Corporation, Bank of America Mortgage Securities, as well as their current and former subsidiaries and affiliates (collectively, "Bank of America") to resolve federal and state civil claims related to Bank of America's conduct in the packaging, securitization, marketing, sale and issuance of RMBS offerings issued prior to January 1, 2009.  The settlement included an agreed upon statement of facts wherein Bank of America acknowledged that significant percentages of the mortgage loans within the securitizations contained material defects.  *See* U.S. Dept. of Justice, *Press Release: Bank of America to Pay $16.65 Billion in Historic Justice Department Settlement for Financial Fraud Leading up to and During the Financial Crisis* (August 21, 2014), https://www.justice.gov/opa/pr/bank-america-pay-1665-billion-historic-justice-department-settlement-financial-fraud-leading.

### 5.     The Widespread Breaches of Representations and Warranties by the Same Originators That Sold Loans to the Trusts.

183.     Much like other RMBS trusts of the same vintage, the Trusts have been materially and adversely impacted by the loan origination industry's rampant underwriting failures.  The originators' systematic and pervasive sale to the Trusts of residential mortgage loans in breach of representations and warranties has been confirmed through various federal and state government investigations and published reports, news reports, and/or public and private enforcement actions that have described rampant underwriting failures throughout the period in which the Trusts were created and, more specifically, failures by the same originators whose mortgage loans were sold to the Trusts.

54

184.     For example, an executive of Clayton Holdings LLC, a due diligence provider that performed quality control audits of loan pools before they were securitized, provided a report on the results of its loan pool audits to the FDIC.  *See* Clayton All Trending Report, 10 (2006 – 2007), available at http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.  The Clayton Trending Reports made clear that the inclusion of defective mortgage loans into RMBS trusts was ubiquitous.  Indeed, the FDIC Report showed that false loan representation and warranties were being made by virtually the entire RMBS industry from January 2006 through June of 2007.

185.     A summary of the evidence as to each of the major originators of the mortgage loans that were sold into the Trusts that violated the representations and warranties in the Loan Quality Agreements is set forth below.

### a)     Countrywide Financial Corporation.

186.     Countrywide Home Loans, Inc. ("Countrywide Home Loans") originated loans that were sold into one of the Trusts.  *See* Exhibit 9.

187.     In 2008, Bank of America Corporation ("BAC") acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing LP, Countrywide Home Loans and Countrywide Bank, N.A. (collectively, "Countrywide").

188.     Countrywide's lack of adherence to its own stated underwriting practices and systemic origination of defective loans have been made public by various government investigations, news reports, and private and public enforcement actions.

189.     On July 1, 2008, NBC Nightly News reported the story of a former Countrywide regional Vice President, Mark Zachary, who was suing Countrywide, alleging that he was fired for questioning his supervisors about Countrywide's poor underwriting practices.  Zachary told of a pattern of inflating home appraisals so buyers could borrow enough to cover closing costs,

55

but leaving the borrower owing more than the house was truly worth, and of employees coaching borrowers to overstate their income to qualify for loans.  *See* Lisa Myers, *Countrywide Whistleblower Reports "Liar Loans*," NBC Nightly News (July 1, 2008), http://www.nbcnews.com/id/25465130/ns/nbc_nightly_news_with_brian_williams/t/countrywide -whistleblower-reports-liar-loans/#.Vr3g9vkrLbh.

190.     Zachary also said that the practices were not the work of a few bad actors, but were pervasive.  He stated in the report: "It comes down, I think from the very top that you get a loan done at any cost."  *Id*.  NBC News interviewed six other former Countrywide employees from different parts of the country, who described similar practices.  *Id*.

191.     In March of 2009, NBC News reported on the practices of Kourosh Partow, the manager of Countrywide's office in Alaska, related to "liar loans" in which loan applicants were not required to verify their income.  Partow called these loans an "invitation to lie" since the applicants were told that the information they provided would not be verified.  *See* Chris Hansen, *If You Had a Pulse, We Gave You a Loan*, NBC Dateline (Mar. 22, 2009), http://www.nbcnews.com/id/29827248/ns/dateline_nbc-the_hansen_files_with_chris_hansen/t/if- you-had-pulse-we-gave-you-loan/#.Vryd0rerTbg.

192.     Partow said that this practice was common and that it was "impossible" that top executives did not know about this practice.  In the report, former Countrywide senior account executive Bob Feinberg said that Countrywide was "infested" with similar practices, and that this was resulting in Countrywide underwriting loans in which borrowers were "guaranteed to fail." *Id*.

*193.*     In June 2009, the Securities and Exchange Commission filed suit against Countrywide founder and former Chief Executive Officer Angelo Mozilo, Countrywide's former

president and chief operating officer David Sambol, and Countrywide's former chief financial

officer Eric Sieracki.  Compl., SEC v. Mozilo, No. CV09-03994 (C.D. Cal.)(June 4, 2009)

(hereafter, *SEC Complaint*).  The complaint alleged that the aforementioned executives

committed fraud by representing through public disclosures that Countrywide produced "quality"

mortgages, the risks of which were managed by underwriting and surveillance, despite the fact

that Countrywide had taken on a policy of expansive, risky underwriting.  *SEC Complaint,*

¶ 6 – 7.

194.    The *SEC Complaint* did not just make general accusations concerning the risky

underwriting practices that Countrywide had adopted, but in fact cited internal e-mails from

Countrywide executives which showed that not only were Countrywide's underwriting policies

producing defective and risky loans, but that its own executives knew so.

*195.*    For example, in 2006 HSBC Bank demanded that Countrywide "buyback" certain

80/20 loans (loans in which the borrower effectively has no equity in the home being purchased).

*SEC Complaint*, ¶ 47 – 48.  In a March 28, 2006 e-mail sent by then Countrywide chief

executive officer Angelo Mozilo, Mozilo called for the implementation of new policies to "avoid

the errors of both judgment and protocol that have led to the issues that we face today caused by

the buybacks mandated by HSBC."  *SEC Complaint*, ¶ 48.  According to the *SEC Complaint*,

Mozilo went on in the same e-mail to call the 80/20 loans "toxic."  *Id.*

196.    Furthermore, in an April 13, 2006 e-mail, Mozilo stated that he "personally

observed a serious lack of compliance within our origination system as it relates to

documentation and generally a deterioration in the quality of loans originated versus the pricing

of those loan [sic]."  *SEC Complaint*, ¶ 49.

197.    The *SEC Complaint* cited multiple other e-mails in which the aforementioned Countrywide executives either remarked how risky Countrywide's underwriting practices had become or were told so other by Countrywide personnel, such as those on Countrywide's Risk Management Committee.  *See SEC Complaint*, ¶¶ 37, 40, 44, 52, 54, 55.

198.    Mozilo, Sambol, and Sieracki all settled the lawsuit with the Securities and Exchange Commission, agreeing to pay fines and disgorgements; Mozilo also agreed to be barred from ever again serving as an officer or director of a publicly traded company.  *See* Securities and Exchange Commission, *Press Release: Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Financial Penalty Against a Public Company's Senior Executive* (Oct. 15, 2010), http://www.sec.gov/news/press/2010/2010-197.htm.

199.    The *FCIC Report* reported that in 2009 and 2010, Freddie Mac "put-back" $1.9 Billion in loans from Countrywide.  *FCIC Report*, p. 225.  Also, in January 2011, Bank of America settled with both Fannie Mae and Freddie Mac concerning delinquent loans.  *Id*.  At least $2 billion of the settled amount related to claims involving repurchase obligations for breaches of representations and warranties concerning Countrywide originated loans through 2008.  *See* Bank of America, *Press Release: Bank of America Announces Fourth-Quarter Actions With Respect to Its Home Loans and Insurance Business* (January 3, 2011), http://newsroom.bankofamerica.com/press-release/corporate-and-financial-news/bank-america-announces-fourth-quarter-actions-respect-its.

200.    Additionally, the *FCIC Report* made public that Countrywide was not being transparent about its problem with fraudulent loans, reporting that Countrywide had "about 5000 internal referrals of potentially fraudulent activity in its mortgage business in 2005, 10,000 in

58

2006, and 20,000 in 2007" but "it filed only 855 SARs [suspicious activity reports] in 2005, 2,895 in 2006, and 2,621 in 2007."  *FCIC Report*, p. 162.

201.    The *Senate Report* reported that Goldman Sachs determined that 50% of a sample of loans purchased from Countrywide should be returned to the lender.  *Senate Report*, p. 486 – 487.

202.    Countrywide's origination practices have also been the focus of several private RMBS lawsuits.  In August 8, 2011, American International Group, Inc. ("AIG") and several of its affiliates filed a securities fraud action against Bank of America Corporation and several affiliated entities concerning certain Countrywide sponsored RMBS Offerings.  AIG alleged that Countrywide systemically ignored its stated underwriting guidelines and misrepresented LTV ratios, CLTV ratios and owner occupancy levels for the loans in question.  Compl. ¶ 1 – 5, AIG v. Bank of Am., No. 652199/2011, Sup. Ct. N.Y. County (Aug. 8, 2011).

203.    Countrywide's complete disregard for proper loan underwriting has spawned numerous other lawsuits.  As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files.  Public disclosure of the staggering number of loans breaching the associated representations and warranties discovered in these cases should have alerted the trustee that Countrywide loans were highly likely to have breached the associated representations and warranties.

204.    These lawsuits also include various trustee actions: *See, e.g.*, Compl. ¶ 11, Walnut Place LLC, et al. v. Countrywide Home Loans, Inc., No. 650497/2011 (Sup. Ct. N.Y. County 2011); Second Am. Compl., Knights of Columbus v. The Bank of New York Mellon, No. 651442/2011 (Sup. Ct. N.Y. County 2011); Am. Compl., Fidelity Assurance Co. v. The Bank of New York Mellon, No. 11-cv-1284 (W.D. Okla. February 8, 2013); Compl., Ret. Bd. of the

59

Policemen's Annuity and Benefit Fund of the City of Chicago v. The Bank of New York Mellon, No. 11-cv-05459 (S.D.N.Y. 2011); Am. Compl., Sterling Fed. Bank, F.S.B. v. Countrywide Fin. Corp., No. 11-cv-2012 (E.D. Ill. 2013); and Am. Complaint., Bankers Ins. Co., et al. v. Countrywide Fin. Corp., et al., No. 11-cv-07152 (M.D. Fla. August 3, 2011) (later transferred to C.D. Cal.).

**b)**    **Delta Funding Corp.**

205.    Delta Funding Corp. ("Delta") originated loans that were sold into eight of the Trusts.  *See* Exhibit 9.

206.    Delta filed for Bankruptcy on December 17, 2007.  *See* Voluntary Petition, In re Delta Financial Corporation, No. 07-BK-11880 (Bk. Del. December 17, 2007).  At least one private action highlighted how defective Delta-originated loans were.

207.    In CMFG Life Ins. Co. v. RBS Securities, a fraud action brought by RMBS certificateholders, the plaintiffs pled that it had commissioned a forensic analysis of certain securitizations, including RAMC-2004-4 and RAMC 2005-4 (both of which were completely originated by Delta).  First Amended Compl. ¶¶ 3, 103, CMFG Life Ins. Co. v. RBS Securities, No. 12-CV-00037 (W.D. Wis. March 16, 2012).  That forensic analysis found that several misrepresentations had been made about those securitizations.

208.    For example: 21.58% and 18.17% of the loans in RAMC-2004-4 and RAMC 2005-4 respectively had a LTV ratio of over 100%, even though the offering documents for those securitizations had represented that no loans had a LTV of over 100%.  *Id.* 75.  Also, owner-occupancy for the loans in those securitizations had been overstated by 5.82% and 10.62% respectively.  *Id.* ¶ 86.

60

### c)  Impac Funding Corp.

209.    Impac Funding Corp. ("Impac") originated loans that were sold into six of the

Trusts.  *See* Exhibit 9.

210.    On September 24, 2009, the Federal Deposit Insurance Corporation ("FDIC"), as

successor in interest to IndyMac Bank ("IndyMac"), filed a lawsuit against Impac in the Central

District of California.  The suit made public that in March 2008 Indymac and Impac had entered

into an agreement wherein Impac would pay $4.5 Million to settle claims relating to violations of

representations and warranties that Impac Funding had made about loans sold by it to IndyMac

in January 2006; Impac did not admit any liability as part of this agreement, however.  Compl.,

Federal Deposit Insurance Corporation v. Impac Funding Corp., No. CV-06965 (C.D. Calif.

September 24, 2009).

211.    The September 2009 suit by the FDIC alleged that Impac had failed to meet its

obligation to fully pay the $4.5 Million pursuant to the agreement.  The parties stipulated to

dismiss the case with prejudice in June 2010.

212.    Impac Mortgage Holdings, Inc. (IMH), a subsidiary of Impac Funding Corp., was

also the subject of a securities class action suit.  The Class Action Complaint plead that the Lead

Plaintiff's attorneys had conducted an investigation in which former employees of IMH were

contacted and interviewed.  The complaint contained accounts from these former employees

which detailed IMH's disregard of its underwriting guidelines.  Third Am. Class Action Compl.

¶ 45, Sheldon Pittleman v. Impac Mortgage Holdings, Inc., No. SACV07-970 (C.D. Calif.

October 27, 2008).

213.    As set forth in the Third Amended Class Action Complaint in *Pittleman*: one

former employee ("Employee #1") was an underwriting manager in charge of loan due diligence

from October 2003 until July 2006.  Employee #1's duties included performing due diligence on

61

bulk loans by conducting a sampling of each loan pool and making recommendations as to whether or not IMH should buy particular loans and/or loan portfolios, which were then resold in the secondary markets.  Employee #1 reported to Kevin Gillespie, Vice President of Underwriting and Scott Hedbon, Chief Credit Officer.  Both Gillespie and Hedbon reported to William Ashmore, Impac's President, and Gillespie and Ashmore (plus Joseph Tomkinson, IMH's CEO) were members of the Loan Committee.  After conducting due diligence on a bulk loan, Employee #1 would generate a detailed report regarding that loan pool, which included an approval or rejection recommendation.  Every report was then emailed to Employee #1's superiors, including Tomkinson and Ashmore.  *Id*. ¶¶ 46 – 47.

214.    Employee #1 stated "that when bulk loan pools did not satisfy underwriting guidelines, they were still approved by management on a regular basis, and specifically by Ashmore.  Ashmore's rationale for constantly reversing rejection recommendations was that everyone in the industry was engaging in this type of practice.  Ashmore would justify his overriding the underwriting department recommendations by stating that 'everybody is doing it' or 'if we didn't do it, someone else would.'"  *Id*. ¶ 48.  According to Employee #1, all management was looking for was a due-diligence officer to 'rubber-stamp' the loan pools, because investors in the securitized loan pools required a certain level of quality control concerning these financial instruments.  *Id*. ¶ 51.

215.    Another former employee ("Employee #2") was employed by Impac Mortgage from January 2005 through October 2007, working in the Wholesale Loan Set-up Group.  He reported that "many borrowers had credit scores that were low or did not have enough income.  He also reported that whatever loan came in, the goal was to pass it on to the next step for approval, which was underwriting."  Employee #2 further reported "that a low credit score would

62

not 'kill' the loan.  Rather, the loan would then go to the 'deal desk,' where deals were regularly made to get loans approved."  *Id*. ¶ 56.  Employee #2 also explained that Impac inflated the reported incomes of applicants in order to approve loans for which the applicant would not otherwise qualify.  *Id*, ¶ 57.

216.    A former employee ("Employee 3") worked in IMH's Quality Control from May 2004 through October 2007.  Employee 3's duties and responsibilities included checking for and investigating fraud.  Employee 3 explained "that overstating the income of applicants made everyone happy, realtors, account executives, and Impac senior management."  *Id*. ¶ 59.

217.    Employee 3 further commented that in processing 15 loans a day, there would not be enough time to check and follow the seller guides.  He confirmed that management encouraged the selling of loans to customers who should have not been eligible for Alt-A loans.  Employee 3 stated that this was accomplished because 90% of the loans done at [Impac] did not have documentation of income.  *Id*. ¶ 60.

218.    Massachusetts Mutual Life Ins. Co. ("Mass Mutual"), sued Impac regarding RMBS that Impac sponsored.  Mass Mutual conducted a forensic analysis of loans underlying an RMBS it had purchased.  The analysis revealed that 48% of the loans tested had appraisals inflated by 10% or more, and 34% of the loans tested had LTVs that were 10 or more points more than represented.  Additionally, 15.45% of the loans that had been represented to be owner occupied were determined not to be owner occupied.  *See* Compl. ¶¶ 87 – 88, 95, Massachusetts Mut. Life Ins. Co. v. Impac Funding Corp., No. ll-CV-30127 (D. Mass. May 6, 2011).

219.    As conservator for Fannie Mae and Freddie Mac, the Federal Housing Finance Agency ("FHFA") sued Bear Stearns for alleged material misstatements and omissions in certain

RMBS offering documents concerning RMBS purchased by Fannie Mae and Freddie Mac.  *See* Am. Compl., FHFA v. JP Morgan Chase & Co., No. ll-CV-6188 (S.D.N.Y. June 13, 2012).

220.    In connection with this lawsuit, the FHFA plead that a forensic review of loans backing an RMBS that contained a significant number of loans from Impac had been conducted. This review consisted of an analysis of the loan origination file for each loan, including the documents submitted by the individual borrowers in support of their loan applications, as well as an analysis of information extrinsic to each loan file, such as the borrower's motor vehicle registration documentation with pertinent information indicating a borrower's assets or residence, and other information that was available at the time of the loan application, as well as the borrower's filings in bankruptcy proceedings and other sources of information.  *Id.* ¶ 362.

221.    This forensic review analyzed 535 loan files from a group of loans.  Impac originated 14.77 % and 13.56% of the sub-group II-1 and sub-group II-2 mortgage loans, respectively, from that larger group.  The FHFA's review revealed that approximately 98% of the loans (523 out of 535) were not underwritten in accordance with the underwriting guidelines or otherwise breached the representations contained in the transaction documents.  Of the 523 loans that did not comply with the underwriting guidelines, none had sufficient compensating factors to warrant an exception.  *Id.* ¶¶ 359, 363 (fn. 23), 367.

222.    According to the Complaint, of the 535 loans reviewed, 89 loans (or 25.2 %) revealed an incorrect calculation of the borrower's debts which, when corrected, caused the debt-to-income ratio to exceed the applicable underwriting guidelines for the product type.  *Id.* ¶ 386.

### d)    People's Choice Home Loan, Inc.

223.    People's Choice Home Loan (People's Choice) was founded in 1999, and originated more than $5 billion in mortgages a year in 2004 and 2005, including an estimated $2

64

billion a year in stated income loans.  People's Choice originated loans that were sold into one of the Trusts.  *See* Exhibit 9.

224.    People's Choice filed for bankruptcy—together with parent company People's Choice Financial Corporation—in March 2007.  The company's systematic and pervasive origination of loans that breached representations and warranties concerning adherence to stated underwriting guidelines was well documented through federal investigations and reports, investor litigation, insurer lawsuits, and news media sources.

225.    For example, the OCC's "Worst Ten in the Worst Ten" list included People's Choice on their list of twenty one companies occupying the "Worst Ten" slots in the relevant metro areas, based on 2005 through 2007 loan originations as of March 29, 2009.  *See* 2008 *Worst Ten in the Worst Ten*.

226.    In March of 2009, the NBC program "Dateline" hosted a three-part series titled "Inside the Financial Fiasco," which included an investigation into People's Choice practice of issuing stated income loans.  Former Chief Operating Officer James LaLiberte provided to Dateline a list of nearly 13,000 People's Choice loans, many of which he described as "questionable," and some "possibly fraudulent."  *See* Richard Greenberg and Chris Hansen, *Inside the Financial Fiasco,* NBC News: Dateline (March 2009), http://nbcnews.to/1SpnlmM. An example on that list included a manicurist who borrowed $445,500 in 2004 after claiming a monthly income of $16,800—more than $200,000 a year.  When she later filed for bankruptcy, her submissions to the court reported her 2005 annual income as $27,092, or approximately $2,258 a month.  *Id.*

227.    LaLiberte went on to say that he ran into resistance when he attempted to implement more controls, and told Dateline that "[t]he chief appraiser once said, 'Fraud is what

65

we do.' That's how we got where we are today." *Id.* While People's Choice executives denied that such a statement had been made, another former executive—unnamed in the Dateline report—confirmed the accuracy of the statement, and told the program that he was present when the comment was made.

228.    Ellen Loiacono, an underwriter at People's Choice from 2003 to 2005, stated that problems and pressures related to origination were not limited to stated income loans, but involved full documentation applications as well. She claimed to challenge "about a third" of all loan applications, but "was overruled by company executives the vast majority of the time." *Id.* Moreover, Loiacono saw "numerous instances of falsified W-2s, tax returns, and bank statements." Describing what the report called "crude cut-and-paste jobs," Loiacono said that "[t]hey would use someone else's tax returns, and they'd just put someone else's name in them." *Id.*

229.    In 2005, amidst plans to take the company public, auditors from Deloitte were hired to conduct an "Ethical Climate Survey." LaLiberte described the findings as "very disturbing to executive management," with nearly three quarters of respondents indicating that they were expected to do as they were told "no matter what," and nearly half stating that, while they may care about ethics, "they act differently." *Id.* A third of respondents had witnessed "breaches of applicable laws and regulations," while ten percent had been asked to engage in fraudulent conduct. *Id.*

230.    Plaintiffs commissioned a review of loan level data for the mortgages pooled in the CARR 2006-NC5, CARR 2006-OPT1, and CARR 2006-RFC1 securitizations—with the last listed securitization being relevant to this action—finding that the CLTV/LTV had been materially understated by more than ten percentage points, ranging from 31% to as high as 49%

66

of the sampled loans in these securitizations.  *See* Compl. IKB International v. JP Morgan, No. 1:12-cv-04617 (S.D.N.Y, July 13, 2012).  The review further concluded that owner occupancy had been overstated by more than 10% in the CARR 2006-RFC1 securitization.

> **6.**    **The Systematic Disregard Of Prudent Securitization Standards Was Pervasive During The Relevant Period.**

231.    It is equally well documented that between 2004 and 2008, the Sellers of the residential mortgages transferred into the RMBS trusts failed to conduct adequate due diligence reviews of the mortgage pools to ensure the mortgage loans were of the same credit quality as represented and complied with federal and state law, as well as that the purported mortgaged property's appraised value was accurate.

232.    As the *FCIC Report* noted: "The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards.  Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities.  These problems appear to have been significant."  *FCIC Report* at 187.

233.    As made clear in the *FCIC Report*, in their zeal to keep the securitization machine going and at the behest of originators, RMBS sponsors and their third party due diligence providers failed to analyze adequate sample sizes of the loan pools, sometimes reviewing as little as 2% – 3% of the entire loan pools.  *FCIC Report* at 165.  Moreover, when the sponsors and their due diligence firms identified high percentages of mortgage loans in their sample reviews as deficient, sponsors pervasively "waived in" mortgage loans to preserve their business relationships with the originators or to keep the defective loans off their own books.  *Id*. at 166. Consequently, it was apparent to all players in the RMBS industry that the mortgage loans

deposited in RMBS trusts issued between 2004 and 2008 materially breached the sponsors' representations and warranties.

### C. Wilmington Trust Knew That The Trusts Were Filled With Defective Loans.

234.    There is ample evidence that by 2009 both the Indenture Trustees and Wilmington Trust knew that each of the Trusts' loan pools contained high percentages of mortgage loans that materially breached the Sellers' representations and warranties regarding their credit quality.

#### 1. Reports, Investigations and Litigation Involving the Sellers.

235.    As discussed above, since 2009 there has been a steady stream of public disclosures regarding the originators' systematic underwriting abuses and the sponsors' faulty securitization practices.  As a result of the highly publicized government investigations, reports and enforcement actions, as well as high profile RMBS litigation involving Sellers and the Trusts themselves, the Indenture Trustees, Wilmington Trust and their responsible officers knew that the Trusts' loan pools contained high percentages of mortgage loans that materially breached Seller representations and warranties.

#### 2. Wilmington Trust Tracked The Trusts' Performance.

236.    The Indenture Trustees and Wilmington Trust and their responsible officers had discovered by 2009 that the Trusts' loan pools were afflicted by severe and pervasive breaches of Seller representations and warranties by virtue of the Trusts' abject performance.  As noted above, it was evident by January 2009 that given the extremely high mortgage loan delinquency, modification, default, foreclosure and loss severity rates within the Trusts' loan pools, the mortgage loans sold to the Trusts were not as the Sellers had represented and warranted.

237.    The Indenture Trustees and Wilmington Trust were aware of these events as they monitored the Trusts' performance.  For example, the Governing Agreements required the Servicers and their agents to provide the trustees with regular reports regarding the performance

of the mortgage loans in each of the Trusts.  In addition, the Trusts published or was provided with monthly reports of the performance of the mortgage loans in each of the Trusts, which included delinquent loans, loans that had gone into foreclosure, and those which had realized losses upon the sale of their collateral.

### 3.   Wilmington Trust And Its Responsible Officers Were Aware of Notices Of Pervasive And Systematic Seller Breaches.

238.    The Indenture Trustees and Wilmington Trust and their responsible officers knew of pervasive and systematic violations of representations and warranties by those Sellers.  Based on the sheer volume of the defective mortgage loans identified in these widely-publicized breach notices, together with the systematic and pervasive faulty origination and securitization practices complained of therein, the Indenture Trustees and Wilmington Trust and their responsible officers knew that the Trusts' loan pools similarly contained high percentages of defective mortgage loans.

239.    On January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley or its affiliates issued written instructions to Deutsche Bank, U.S. Bank, and Wells Fargo, as trustees, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans.  The notices covered more than $25 billion of RMBS issued by Morgan Stanley from 2005 to 2007.  *See* Gibbs & Bruns LLP, *Press Release: Institutional Bondholders Issue Instructions To Open Investigations Of Ineligible Mortgages In Over $25 Billion Of Morgan Stanley-Issued RMBS (Jan. 31, 2012)*, http://www.gibbsbruns.com/institutional-bondholders-issue-instructions-to-three-trustees-to-open-investigations-of-ineligible-mortgages-in-over-25-billion-of-morgan-stanley-issued-rmbs-01-31-2012/.

69

240.    These and other similar notices were widely publicized, both in the mainstream media and via notices posted on the websites of attorneys for the Investors; Wilmington Trust was certainly aware of the allegations regarding the high number of ineligible mortgages. Notwithstanding, Wilmington Trust failed to act in accordance with its obligations under the Governing Agreements, to provide notice to other Parties of the ongoing breaches.

**4.     The Indenture Trustees Initiated Putback Litigation Against At Least Some of the Sellers.**

241.    Wilmington Trust and the Indenture Trustees have participated in actions to enforce putback rights for other RMBS trusts that involved the same originators, sponsors, sellers, and servicers as the Trusts at issue in this action.  Based on its involvement in those putback actions, which alleged pervasive, systemic breaches of representations and warranties, the Indenture Trustees and Wilmington Trust were aware of similarly pervasive, systemic breaches of representations and warranties in the Trusts.

242.    For example, in Wilmington Trust Company v. Morgan Stanley Mortgage Capital Holdings, Wilmington Trust, in its capacity as Trustee of Morgan Stanley Mortgage Loan Trust 2007-12, brought a putback action against Morgan Stanley Mortgage Capital Holdings, Morgan Stanley Credit Corporation, and Morgan Stanley Private Bank.  In their complaint, Wilmington Trust alleged that "many of the Mortgage Loans violated some of the most vital representations and warranties made by Morgan Stanley," and further claimed that Morgan Stanley "discovered these breaches months, and possibly years" prior to the action.  Compl. ¶¶ 2, 3, Wilmington Trust Company v. Morgan Stanley Mortgage Capital Holdings, No. 652686/2013 (Sup. Ct. N.Y. County 2013).  Wilmington Trust carried out a loan-level forensic examination of 819 mortgage loans, finding that nearly thirty percent of those loans materially violated one or more of the representations and warranties made with respect to such mortgage loans.  Id. ¶ 6.

70

243.    Wilmington Trust's involvement in these and other putback actions placed it on certain notice of pervasive and systematic breaches of representations and warranties across the RMBS industry.

**D.      The Trusts Also Suffered From Pervasive Servicer Violations.**

244.    As noted above, breaches of duty by the Servicers of the Trusts' mortgage loans not only adversely affected the value of the Trusts' individual loans, but such breaches also served as events of default that gave rise to the "prudent person" obligations imposed upon Indenture Trustees by the Governing Agreements.

245.    The Servicers' breach of their covenants is confirmed through several federal and state government investigations and published reports, well-publicized news reports, and public and private enforcement actions that have described RMBS Servicers' systematic and pervasive deviation from usual, customary, and lawful servicing practices in their administration of mortgages and, more specifically, illegal and illicit servicing activities by the same Servicers that service the loans held by the Trusts.

**1.      The Servicers.**

246.    The companies that serviced the loans in the Trusts included:  Countrywide Home Loans Servicing (five Trusts); Impac Funding Corporation (five Trusts); Saxon Funding Management (one Trust); Wells Fargo (eight Trusts); Ocwen Federal Bank FSB (eight Trusts); GMAC Mortgage Corporation (three Trusts); and Midland Loan Services (three Trusts).

247.    The Servicers' duties to the Trusts arose solely from the Governing Agreements.

**2.      The Servicers Failed To Give Notice Of Seller Breaches Of Representations And Warranties And Enforce The Sellers' Repurchase Obligations.**

248.    Under the Governing Agreements, once a Servicer learns of a breach of a representation or warranty made by a Seller in respect of the mortgage loans that materially and

71

adversely affects the value of any mortgage loan or the interests of investors in any such mortgage loan, the Servicer must notify all parties to the Governing Agreements.  Moreover, the Servicers are required to enforce the Sellers' obligation to repurchase, substitute, or cure such defective loans.

249.   In many cases, the Servicers are affiliates of the Sellers because in connection with the sale of a loan pool, the Seller secured the retention of servicing rights to loans for its servicing division.  Through this affiliation, these Servicers had actual knowledge of the Sellers' abusive underwriting and securitization practices.  Therefore, these Servicers had actual knowledge at the time of the Trusts' purchase of these loans that the Sellers included high percentages of defective loans within the loan pools.  These Servicers failed to notify parties to the Governing Agreements of the discovery of mortgages that were in violation of applicable representations and warranties at the time they were purchased by the Trusts, and failed to enforce the Sellers' repurchase obligations, despite their awareness of loans that were in violation of representations and warranties.

250.   Additionally, pursuant to the Governing Agreements, the sponsors acquired private mortgage guaranty insurance ("PMI") policies for loans that had a LTV ratio in excess of 80%.  This served as a "credit enhancement" which offered additional security to investors in the Trusts.  It also enabled rating agencies to provide a higher credit rating for the RMBS.

251.   In the aftermath of the financial crisis, Servicers have tendered claims to mortgage insurers under the PMI policies on the Trusts' behalf on defaulted loans.  The mortgage insurers, however, have often denied coverage, canceled or rescinded the mortgage insurance policies, or invoked policy exclusions for a high percentage of claims, on the ground that the originators engaged in predatory lending or systematic fraud in the underwriting of the

mortgage loans.  The Servicers failed to notify parties to the Governing Agreements that the Sellers violated representations and warranties at the time they sold loans to the Trusts.  Moreover, the Servicers failed to tender the defective, defaulted loans to the Sellers for repurchase.  Instead, the Servicers improperly charged the uninsured losses to mortgage accounts where the collateral exceeded the value of the loan.

252.    Further, as noted above, the Servicers regularly modified mortgage loans held by the Trusts.  On information and belief, the Servicers discovered through the loan modification process that specific loans breached applicable Seller representations and warranties.  Because the loan modification process requires that the Servicers scrutinize the underlying origination and mortgage loan files, along with any supplemental information provided by the borrower regarding its ability to pay, the Servicers would have discovered breaches regarding the loan characteristics, the creditworthiness of the borrower, the adequacy of the collateral, and the title status of the mortgages.  Nevertheless, the Servicers systematically failed to notify the other parties to the Governing Agreements of these breaches.

253.    As also set forth above, there has been widespread public evidence of the originators' abandonment of underwriting guidelines and the sponsors' faulty securitization practices that made the Servicers aware of material Seller breaches representations and warranties within the Trusts loan pools.  Nevertheless, the Servicers have not notified the other parties to the Governing Agreements of these Seller breaches or enforced the Sellers' repurchase obligations.

254.    Further, the Servicers have been specifically notified by monoline insurers (companies that guarantee or enhance credit of issuers) of pervasive breaches by the Sellers.  For instance, Countrywide acts as a Servicer to loans in five of the Trusts.  Countrywide has been

notified in litigation by MBIA, Ambac, FGIC, Assured Guaranty, and other mortgage and monoline insurers of pervasive and systematic breaches of representations and warranties by Countrywide entities in their capacity as originators.[7]

255.   Likewise, in MBIA Insurance Corporation v. Morgan Stanley, et al., MBIA sued Saxon Mortgage Service Inc., which services mortgage loans held by one of the Trusts.  MBIA reported in its Complaint that 93% of randomly selected loans and 98% of adversely selected loans breached representations and warranties in a Morgan Stanley securitization.  *See* Compl., MBIA Insurance Corporation v. Morgan Stanley, et al., No. 29951/10 (Sup. Ct. N.Y. County 2011).

256.   Notwithstanding their awareness of material breaches of the Servicers' representations and warranties, the Servicers have not notified the other parties to the Governing Agreements of these breaches.  Moreover, although aware of specific mortgage loans that breach applicable representations and warranties, the Servicers have failed to enforce the Seller's obligation to repurchase, substitute, or cure such defective loans as required under the Governing Agreements.

257.   The Servicers' systematic and pervasive failure to give notice of the Sellers' material breaches of representations and warranties and to enforce the Sellers' repurchase obligations have materially affected the rights of the Trusts under the Governing Agreements. The Trusts have been deprived of mortgage loans of compliant quality, or alternatively, of the Repurchase Price for the defective loans.

---

[7] *See, e.g.*, *MBIA Ins. Corp. v. Countrywide Home Loans Inc. et al.*, No. 602825/2008 (Sup. Ct. N.Y. County 2008); *Ambac Assurance Corp. v. Countrywide Home Loans Inc. et al.*, No. 651612/2010 (Sup. Ct. N.Y. County 2010); *Financial Guaranty Insurance Co. v. Countrywide Home Loans Inc. et al.*, No. 650736/2009 (Sup. Ct. N.Y. County 2009); *Syncora Guarantee Inc. v. Countrywide Home Loans Inc.*, No. 650042/2009 (Sup. Ct. N.Y. County 2009).

3.      **The Servicers Have Violated Their Prudent Servicing Obligations.**

258.    The Governing Agreements expressly require the Servicers to administer the mortgage loans for and on behalf of the investors: (1) in the same manner in which they service and administer similar mortgage loans for their own portfolios or for other third parties, giving due consideration to customary and usual standards of practice of prudent institutional mortgage lenders servicing similar loans; (2) with a view to maximizing the recoveries with respect to the mortgage loans on a net-present-value basis; and (3) without regard to, among other things, the Servicers' right to receive compensation or other fees for their services under the Governing Agreements, their obligation to make servicing advances under those agreements, and their ownership, servicing, or management for others of any other mortgage loans.

259.    Highly publicized government enforcement actions and settlements reached with the Servicers demonstrate that the Servicers have systematically and pervasively violated these prudent servicing obligations. For example, on June 7, 2010, the Federal Trade Commission ("FTC") filed a civil enforcement action against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP (f/d/b/a Countrywide Home Loans Servicing, LP), a wholly owned subsidiary of Bank of America, National Association, (collectively, "Countrywide/BAC") for their "unlawful acts and practices . . . in servicing mortgage loans." *See* Compl., Fed. Trade Comm'n v. Countrywide Home Loans, Inc., et al., No. 10-cv-04193 (C.D. Cal. June 7, 2010). In March 2008, prior to being acquired by Bank of America Corporation, Countrywide was ranked as the top mortgage servicer in the United States and had a servicing portfolio with a balance of over $1.4 trillion. In September 2009, after its acquisition of Countrywide, Bank of America was ranked as the nation's top mortgage servicer with a servicing portfolio of over $2.1 trillion. Countrywide/BAC are Servicers for ten of the Trusts. The FTC emphasized that many of the loans improperly serviced by Countrywide/BAC are the same "risky, high-cost loans that had

75

been originated or funded by Defendants' parent company, Countrywide Financial Corporation [], and its subsidiaries []." *Id.*

260.    According to the FTC, when borrowers fell behind on their payments, Countrywide/BAC imposed a number of default-related services (such as property inspections and foreclosure trustee services) "by funneling the work through panoply of Countrywide subsidiaries."  In its mortgage servicing operation, Countrywide/BAC follows a so-called "vertical integration strategy" to generate default-related fee income.  Rather than obtain default-related services directly from third-party vendors and charge borrowers for the actual cost of these services, Countrywide/BAC formed subsidiaries to act as middlemen in the default services process.  These subsidiaries exist solely to generate revenues for Countrywide/BAC and do not operate at arm's-length with Countrywide/BAC.  Countrywide/BAC and their subsidiaries— "[a]s a matter of practice"—added a substantial mark-up to their actual costs for the services and then charged the borrowers the marked-up fees.  The inflated fees were both contrary to prudent servicing standards and violated the individual mortgage contracts, which limit fees chargeable to the borrower to actual costs of the services and as are reasonable and appropriate to protect the interests of the holder of the mortgage note in the property and rights under the security instrument.

261.    Countrywide/BAC similarly breached servicing standards and mortgage contracts where borrowers sought to save their homes through a Chapter 13 bankruptcy.  According to the FTC, Countrywide/BAC made various representations to those borrowers about their mortgage loans that were false or lacked a reasonable basis, and failed to disclose to borrowers during their bankruptcy case when fees and escrow shortages and deficiencies accrued on their loans.  After the bankruptcy cases have closed and borrowers no longer have the protection of the bankruptcy

76

court, Countrywide/BAC unfairly sought to collect those amounts –including through foreclosure actions.

262.    Moreover, in February 2012, forty-nine state attorneys general and the federal government announced a historic joint $25 billion state-federal settlement with the country's five largest mortgage servicers and their affiliates for misconduct related to their origination and servicing of single family residential mortgages (the "National Mortgage Settlement"): (1) Residential Capital, LLC, Ally Financial, Inc., and GMAC Mortgage, LLC; (2) Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP, Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Mortgage Ventures, LLC, and Countrywide Bank FSB; (3) Citigroup Inc., Citibank, N.A., and CitiMortgage, Inc.; (4) J.P. Morgan Chase & Company and J.P. Morgan Chase Bank, N.A.; and (5) Wells Fargo & Company and Wells Fargo Bank, N.A. were each the subject of the state and federal investigations of these mortgage servicers.

263.    In their corresponding complaint filed on March 14, 2012, the state attorneys general and the federal government alleged that these servicers had engaged in unfair, deceptive and unlawful servicing processes, including:  (1) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (2) charging excessive or improper fees for default-related services; (3) failing to properly oversee third-party vendors involved in servicing activities on behalf of the banks; (4) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage; (5) providing borrowers false or misleading information in response to borrower complaints; and (6) failing to maintain appropriate staffing, training, and quality control systems.

264.     Also on December 20, 2010, the New Jersey Superior Court Chancery Division issued an order in In the Matter of Residential Mortgage Foreclosure Pleading and Document Irregularities, Docket No.  F-595S3N10, directing six mortgage loan lenders and servicers implicated in residential mortgage loan foreclosure irregularities to show cause why the processing of their uncontested residential foreclosure filings should not be suspended.  The servicers covered by this order—including Wells Fargo, JP Morgan Chase, and GMAC (now Ally Financial), all Servicers of the Trusts—were selected based on a public record of questionable practices.

265.     In November 2011, the New York Department of Financial Services entered into agreements with Morgan Stanley and Saxon, as well as American Home Servicing and Ocwen, which aimed to redress unlawful servicing practices.  The agreements required that any force-placed insurance be reasonably priced in relation to claims incurred and prohibited force-placing insurance with an affiliated insurer.  In addition, the agreements required a strengthening of oversight on third party vendors and imposed new obligations to conduct reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose documents practices were problematic.

266.     High profile class actions against servicers have further revealed violations of prudent servicing violations.  For example, in June 2012, nationwide class actions were brought on behalf of millions of homeowners against JPMorgan Chase Bank NA, Wells Fargo Bank, N.A., Bank of America, N.A., Citibank, N.A., and HSBC Bank Inc. who claimed that they were overcharged for force-placed insurance.  The borrowers specifically alleged that these Servicers imposed policies for force-placed insurance that were far more expensive than market rates and received hundreds of millions of dollars in clandestine commissions from the insurance

78

companies writing the policies.  The Servicers' practice of imposing expensive force-placed insurance increased the borrowers' monthly payment by a large amount.  As a result, homeowners who were already behind in payments or were facing financial difficulties went into foreclosure.  The plaintiff borrowers have also entered into several well publicized settlements with these Servicers, including settlements of $300 million settlement with JPMorgan Chase, $110 million with Citibank, $32 million with HSBC and $19.3 million with Wells Fargo.

267.    Furthermore, in April 2012, a class of homeowners commenced a class action against GMAC, targeting kickbacks paid by Balboa Insurance Co. to GMAC related to force-placed hazard insurance policies.  *See* Compl., Rothstein v. GMAC Mortgage LLC, No. 12-cv-03412 (S.D.N.Y. 2012).  GMAC settled the action in April 2014 for $6 million.  *See* Barbara Anderman, *GMAC Reaches $6M Forced-Placed Insurance Class Action Settlement,* Top Class Actions (May 14, 2014), https://topclassactions.com/lawsuit-settlements/lawsuit-news/26691-gmac-reaches-6m-force-placed-insurance-class-action-settlement/.

268.    Similarly, on December 19, 2013, the Consumer Financial Protection Bureau ("CFPB"), authorities in forty-nine states and the District of Columbia filed a proposed court order requiring the country's largest nonbank mortgage loan servicer, Ocwen and its subsidiary, Ocwen Loan Servicing, to provide $2 billion in first lien principal reduction to underwater borrowers in order to compensate for years of systematic misconduct at every stage of the mortgage servicing process.  The consent order also covered two companies previously purchased by Ocwen, Litton Loan Servicing LP ("Litton") and Homeward Residential Holdings LLC (previously known as American Home Mortgage Servicing, Inc. or "AHMSI").  According to the CFPB and attorneys general's complaint, Ocwen violated state consumer law in a number of ways, including (1) failing to timely and accurately apply payments made by borrowers and

79

failing to maintain accurate account statements; (2) charging borrowers unauthorized fees for

default-related services; (3) imposing force-placed insurance on consumers when Ocwen knew

or should have known that they already had adequate home insurance coverage; (4) providing

false or misleading information in response to borrower complaints; and (5) failing to properly

calculate borrower's eligibility for loan modification programs and improperly denying loan

modification relief to eligible borrowers.  Compl. at 12, Consumer Financial Protection Bureau

et al. v. Ocwen Financial Corporation, No. 1:13-cv-02025 (D.D.C. Dec. 11 2013).

269.    Furthermore, Ocwen was previously found to have engaged in similar servicing

misconduct: in May 2009, a Louisiana bankruptcy court judge held that "[t]his is not the first

time Ocwen has appeared before the Court for improperly administering a loan or attempting to

collect fees and costs to which it was not entitled.  The Court has been involved with six other

cases in the last four years where Ocwen either included improper fees in its claim; attempted to

collect, post-discharge, fees and costs that were undisclosed but assessed during a bankruptcy; or

attempted to foreclose on disallowed or discharged debt."  *See In re McKain*, 2009 Bankr.

LEXIS 2519, at *5–8, *10–11 (Bankr. E.D. La. May 1, 2009), rev'd on other grounds*; Ocwen*

Loan Servicing, LLC v. McKain, No. 09-3662, slip op. (E.D. La. Aug. 15, 2011).

270.    Other private litigation has also served to illustrate violations of prudent servicing

standards.  For example, Impac Funding Corporation, Servicer to five of the Trusts, was named

as an assignee defendant in Gilmor et al. v. Preferred Credit Corporation, the complaint for

which alleged violations of Missouri's Second Mortgage Loan Act: specifically, that defendants

"charged and received (and continued to charge and receive) illegal fees and costs on the loans,

together with the resulting illegal interest charges."  Notice of Removal at 41, Gilmor, et al. v.

Preferred Credit Corp., et al., No. 4:10-cv-00189 (W.D. Mo. 2010).

80

271.   Notably, Countrywide Wells Fargo, entities subject to the above-mentioned settlements, collectively service and administrate mortgage loans held by nine of the Trusts. Plaintiffs are informed and believe that these Servicers and each of the other Servicers to the Trusts have engaged in the same violations of their prudent servicing obligations in servicing and administrating the mortgage loans for the Trusts.

272.   The systematic and pervasive failure by the Servicers to observe their prudent servicing obligations has materially impaired the rights of the Trusts under the Governing Agreements: the violations have both exacerbated the Trusts' losses and have fostered uncertainty as to the timely recovery of collateral.

**4.   The Servicers Have Violated Their Foreclosure Obligations.**

273.   The Governing Agreements require the Servicers to use their best efforts, consistent with accepted servicing practices, to foreclose upon or otherwise comparably convert the ownership of properties securing mortgage loans that come into and continue in default. Moreover, the Governing Agreements require that foreclosures and liquidations of defaulted mortgages proceed forthwith and in accordance with applicable law.

274.   Highly publicized government enforcement actions and settlements reached with the Servicers similarly have revealed the Servicers have breached their foreclosure obligations. For example, in the fourth quarter of 2010, the Federal Reserve, the OCC, the FDIC, and the OTS (collectively, the "Agencies") conducted on-site reviews of foreclosure processing at fourteen federally regulated mortgage servicers, which represented more than two-thirds of the servicing market.  These servicers included Ally Bank/GMAC, Aurora, Bank of America, Citibank, EverBank, HSBC, JPMorgan Chase, MetLife, OneWest, PNC, Sovereign Bank, SunTrust, U.S. Bank, and Wells Fargo, several of which are Servicers to the Trusts.

275.    In April 2011, the Agencies issued a joint report entitled *Interagency Review of Foreclosure Policies and Practices*, summarizing the findings of their reviews and providing an overview of the potential impacts associated with instances of foreclosure processing weaknesses that occurred industrywide.  Notably, the Agencies' reviews found "critical weaknesses in each of the servicers' foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."  Based on the deficiencies identified in these reviews and the risks of additional issues as a result of weak controls and processes, the Agencies initiated formal enforcement actions against each of the fourteen servicers subject to the review to address those weaknesses and risks.  The enforcement actions detailed the weaknesses at each servicer and required each servicer, among other things, to conduct a more complete review of certain aspects of foreclosure actions that occurred between January 1, 2009 and December 31, 2010.

276.    In June 2015, four years after the Agencies ordered these fourteen servicers to clean up their poor servicing practices, the OCC found that six of those servicers—including Wells Fargo, Servicer to eight of the Trusts—were still failing to comply with the standards imposed by the federal regulator in 2011.  As a result, the OCC has restricted the servicing operations of each of these banks, reserving the harshest penalties for Wells Fargo and HSBC, who are banned from acquiring additional mortgage servicing rights until they can show compliance with the terms of the consent orders.

277.    Similarly, in the national mortgage settlement discussed earlier, the attorneys general and federal government alleged that these servicers had engaged in wrongful conduct related to foreclosures, including failing to properly identify the foreclosing party charging improper fees related to foreclosures; preparing, executing, notarizing, or presenting false and

82

misleading documents; and engaging in robo-signing.  The complaint further detailed

engagement by the servicers in unfair, deceptive, and unlawful servicing processes, including

"(a) failing to timely and accurately apply payments made by borrowers and failing to maintain

accurate account statements; (b) charging excessive or improper fees for default-related services;

(c) failure properly to oversee third party vendors involved in servicing activities; (d) imposing

force-placed insurance without properly notifying the borrowers and when borrowers already

had adequate coverage; (e) providing borrowers false or misleading information in response to

borrower complaints; and (f) failing to maintain appropriate staffing, training, and quality control

systems."  Compl. at 22, U.S. et al. v. Bank of America Corp., No. 12-cv-00361-RMC (D.D.C.

March 13, 2012).

278.    Moreover, in February 2012, the New York Attorney General sued many

prominent servicers: Wells Fargo, Bank of America, BACHLS, JPMorgan Chase Bank, and

EMC.  The New York Attorney General also named MERSCORP Inc. and its subsidiary

Mortgage Electronic Registration Systems, Inc. (collectively, "MERS"), entities created by the

lending and loan servicing industry as a private mortgage registration system to speed the

transfer mortgages among themselves to facilitate RMBS securitizations and foreclosures and to

avoid the cost of traditionally recording the mortgages with county recorders.  The New York

Attorney General's lawsuit alleged that these servicers exercised complete control over MERS

and that its mortgage database was riddled with errors and inaccuracies, thus leading to massive

amounts of foreclosure fraud.  *See* New York State Office of the Attorney General, *Press*

*Release: A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks for*

*Deceptive & Fraudulent Use of Electronic Mortgage Registry* (Feb. 3, 2012),

http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-

nation%E2%80%99s-largest-banks-deceptive.  The lawsuit further alleged that the servicers and MERS repeatedly submitted documents to courts in foreclosure proceedings that contained misleading and false information.  The New York Attorney General stated: "The banks created the MERS system as an end-run around the property recording system, to facilitate the rapid securitization and sale of mortgages.  Once the mortgages went sour, these same banks brought foreclosure proceedings en masse based on deceptive and fraudulent court submissions, seeking to take homes away from people with little regard for basic legal requirements or the rule of law."  *Id.*  The Attorney General charged the servicers with "deceptive and illegal" business practices that violated New York state laws.

279.    In addition, private litigation has exposed the Servicers' wrongful foreclosure practices For example, a homeowner from Illinois filed a federal class action suit on behalf of herself and a class of similarly situated homeowners who were at risk of losing their homes to foreclosure.  The complaint charged that Wells Fargo Home Mortgage, their mortgage servicer, failed to honor its contractual obligations under its Trial Period Plan Agreements (TPP Agreements) and thus denied them access to permanent loan modifications under the federal government's Home Affordable Modification Program ("HAMP").  Specifically, the complaint argued that "[b]y failing to live up to its end of the TPP Agreements and offer permanent modifications as required, Wells Fargo has left homeowners in limbo, threatened with the loss of their homes.  Wells Fargo is also preventing borrowers from pursuing other avenues of resolution, including using the money they are putting toward TPP Agreement trial payments to fund bankruptcy plans, relocation costs, short sales, or other means of curing their default."  *See* Compl. ¶ 34, Wigod v. Wells Fargo Bank N.A., No. 1:10-cv-02348 (N.D. Ill., 2010).

84

280.     Servicers have also frequently wrongfully foreclosed on properties owned by military servicemembers who were protected under the Servicemembers Civil Relief Act ("SCRA").  Based on a federal government complaint accusing Countrywide Home Loans Servicing LP of violating the SCRA on approximately 160 properties, Countrywide consented to pay $20 million to the victims.  Consent Order ¶ 18, United States v. BAC Home Loans Servicing, LP F/K/A Countrywide Home Loans Servicing, LP And Any Successors In Interest, No. 11-cv-04534 (C.D. Cal. May 26, 2011).

281.     The Servicers' delay in foreclosing has allowed the Servicers to charge unearned and unwarranted servicing fees, as well as unauthorized fees for default-related services, on mortgages that would have been liquidated but for the Servicers' breach of their duties. Following a two week trial, on December 19, 2014, a jury verdict was rendered against Wells Fargo in the amount of $54.8 million resolving claims brought in the class action Mazzei v. The Money Store, No. 01-cv-05694 (S.D.N.Y. Jun. 22, 2001).  The jury determined that Wells Fargo and its subsidiaries charged improper and excessive fees for default-related services.  *See* Kurt Orzeck, *Wells Fargo Owes $55M in Mortgage Late Fee Suit, Jury Says*, Law360 (Dec. 19, 2014), http://www.law360.com/articles/ 606660/wells-fargoowes-55m-in-mortgage-late-fee-suit-jury-says.

282.     On February 18, 2014, The New York Times reported that "[s]hoddy paperwork, erroneous fees and wrongful evictions—the same abuses that dogged the nation's largest banks and led to [the National Mortgage Settlement]—are now cropping up among the specialty firms that collect mortgage payments [*i.e.*, the servicers], according to dozens of foreclosure lawsuits and interviews with borrowers, federal and state regulators and housing lawyers."  Jessica Silver-Greenberg & Michael Corkery, *Loan Complaints by Homeowners Rise Once More*, New York

85

Times, http://dealbook.nytimes.com/2014/02/18/loan-complaints-by-homeowners-rise-once-more/ (last updated Feb. 18, 2013, 9:16 PM).

283.    The Servicers' systematic and pervasive violations of their foreclosure obligations have materially impaired the rights of the Trusts under the Governing Agreements in that the Trusts have incurred costs of remedying procedural errors and re-filing affidavits and other foreclosure documents.  The Trusts have also been forced to bear costs related to disputes over note ownership or authority to foreclose, and to allegations of procedural violations through the use of inaccurate affidavits and improper notarizations.  The Trusts have further incurred losses as a result of delays or other damages caused by the weaknesses in the Servicers' foreclosure processes.

### 5.    The Servicers Have Violated Their Modification Obligations.

284.    The Governing Agreements provide that the Servicers may agree to a modification of any mortgage loan only in specified circumstances.  When modifications are required to remedy predatory lending violations, the Governing Agreements require the Seller—not the Trusts or investors—to bear the costs to cure the violations, and require the Servicer to demand that the Seller pay those costs.

285.    The Servicers have breached the Governing Agreements by agreeing to modify loans held in the Trusts to settle predatory lending claims made by various attorneys general against their parent companies while breaching their obligation to demand that the offending mortgage Sellers (their parent companies) bear the costs of curing the violations, as well as the expenses reasonably incurred in enforcement of the Sellers' obligation to cure predatory mortgages.  For instance, on October 6, 2008, attorneys general in eleven states announced a landmark, $8.68 billion settlement with Countrywide Home Loans, Countrywide Financial Corporation and Full Spectrum Lending of predatory lending claims.  The settlement enabled

86

eligible subprime and pay-option mortgage borrowers whose loans were serviced by Countrywide to obtain loan modifications valued at up to $3.4 billion worth of reduced interest payments and, for certain borrowers, reduction of their principal balances.

286.    The Servicers have also breached the Governing Agreements by agreeing to modify loans held in the Trusts to settle claims by various attorneys general related to the Servicers' wrongful servicing and foreclosure practices.  For example, in meeting their payment obligations with respect to the National Mortgage Settlement, the settling servicers received credit for writing down principal of, and providing forbearance for, mortgage loans held by the Trusts.  Thus, the Servicers funded the settlement for their own wrongdoing with Trust assets.

287.    The Servicers' violations of their loan modification obligations have materially impaired the rights of the Trusts under the Governing Agreements in that the Servicers and their parent companies have been unjustly enriched to the detriment of the Trusts by using Trust collateral to settle claims that were not, and could never be, made against the Trusts.

### 6.    The Servicers Have Abused Their Servicing Advances Obligations.

288.    The Governing Agreements provide that the Servicers must advance principal and interest on a loan unless they determine that those payments cannot be recovered from the borrower.  The Servicers have abused the advanced payment provisions to enrich themselves to the detriment of the Trusts.  In particular, the Servicers have manipulated the "recoverable" designation to their advantage.  When interest rates are low, the Servicers designate severely delinquent loans as "recoverable" so that the loans will be kept in the Trusts' loan pools and the Servicers can continue to earn their servicing fees on the loans.  When interest rates are low, the cost of the advances on delinquent loans is less than the servicing fees the Servicers would forego if they removed the loan from the Trust.  When interest rates increased, and the economics reversed, the Servicers strategically switched the mortgage loans' designation from

87

"recoverable" to "unrecoverable." The switch in designation also enabled the Servicers to recoup all prior advances as a senior claim against the Trusts.

289.    The Trusts were harmed by the Servicers' manipulation of the "recoverable" designation because the Trusts incurred more interest-rate risk exposure than expected since the Servicers' recoverability designations are strategically determined as a function of interest rates, as opposed to the value of the mortgaged property as required under the Governing Agreements.

290.    The Servicers' abuse of their advancing obligations is further illustrated by their increasing use of "unrecognized forbearances." The Servicers modify delinquent mortgage loans by granting forbearances to the borrowers for extended periods of time which act to reduce the principal amounts of the mortgage loans. The forbearances allow the Servicers to lower their advanced principal payments on the loans. Nevertheless, the Servicers do not formally write down the loan balances or make any recognition on the Trusts' accounts. Thus, the mortgage loans remain in the Trusts at full value, thereby allowing the Servicers to earn full servicing fees, which are calculated as a percentage of the total principal amount of the mortgage loans in the Trusts' loan pools, although the mortgage loans are accruing interest at a lower principal amount and without the Servicers having to make any advances.

291.    The Servicers' pervasive use of unrecognized forbearances harms the Trusts since the Trusts pay higher servicing fees to the Servicers and are not informed in a timely manner about impairments to mortgage loans in the underlying loan pools.

292.    Credit Suisse estimated that, as of April 2013, unrecognized forbearances on non-agency RMBS deals issued after 2000 (first lien only) totaled around $8.3 billion.

293.    Despite the requirement that servicing advances were to be incurred only for reasonable and necessary out-of-pocket costs, the Servicers instead utilized affiliated vendors—

which marked up their charges to a level 100% or more above the market price—to provide services related to the preservation, restoration, and protection of mortgaged property, in a fraudulent, unauthorized, and deceptive effort to supplement their servicing income.

### 7.    The Servicers Provided Non-Conforming Certifications.

294.    The Servicers breached their obligations by certifying that they had fulfilled all of their obligations under Governing Agreements in all material respects, when in fact, they knew this to be false because as noted above the Servicers systematically breached the Governing Agreements in many ways.

### E.    Wilmington Trust Has Known Of Servicer Violations Plaguing The Trusts.

295.    There is ample evidence that, since early 2009, the Indenture Trustees, Wilmington Trust, and their responsible officers have known of the above-described widespread and severe failures on the part of the Servicers to observe or perform in material respects their obligations under the Governing Agreements.  Preliminarily, as discussed above, since 2009 there has been a steady stream of public disclosures regarding the Servicers' violations. Nevertheless, apart from the highly publicized government investigations, reports and enforcement actions, as well as high profile litigation involving the servicers, as explained below there is a host of additional evidence demonstrating that the Indenture Trustees, Wilmington Trust and their responsible officers knew that the Servicers materially breached their contractual obligations.

### 1.    Wilmington Trust Had Knowledge Of The Servicers' Failures Through The Monthly Servicing Reports.

296.    The Indenture Trustees and Wilmington Trust knew of the Servicers' improper servicing practices because it received servicing reports from the Servicers.  These reports alerted the Indenture Trustees and Wilmington Trust to the Trusts' early loan payment defaults,

rate of loan modifications and escalating losses and write-downs due to the poor credit quality of the loans. If Servicers had taken action to enforce the Sellers' repurchase obligations, the servicing reports would likewise have disclosed that information. The reports contained no such reference, which meant that the Servicers had taken no action.

297.     Accordingly, by reviewing the reports, the Indenture Trustees and Wilmington Trust would have been well aware of the Sellers' breaches as well as the Servicers' failure to seek remedies against the Sellers for those breaches.

298.     The reports, by reflecting information from which the Indenture Trustees and Wilmington Trust could easily deduce the Servicers' excessive fees and failure to pursue appropriate loss mitigation strategies, likewise apprised the Indenture Trustees and Wilmington Trust of the Servicers' breach of their duty to perform prudent and customary servicing practices with respect individual loans within the Trusts. The reports also informed the Indenture Trustees and Wilmington Trust of the Servicers' breach of their duty to perform prudent foreclosure by detailing the Servicers' excessive delay in foreclosing on properties securing the Trusts' loans and incurring unnecessary legal and administrative expenses due to inaccurate loan documentation. The reports further informed the Indenture Trustees and Wilmington Trust of the Servicers' breach of their duties with respect to modifying loans, including using trust funds to pay the Servicers' required borrower relief obligations under regulatory settlements, through implementation of modifications on trust-owned mortgages that shifted the costs of the settlement to the trusts and enriched the Servicers unjustly. Finally, the servicing reports disclosed the Servicers' abuse of their advancing obligations by reflecting the unnecessary and inflated expenses related to delinquent loans.

90

2.    **Wilmington Trust Knew Of Pervasive and Systematic Seller Breaches through Highly Publicized Investor Communications.**

299.    Beginning as early as 2011, widely publicized notices from investors to RMBS Trustees were published, identifying systematic servicing violations by major RMBS Servicers who also acted as Servicers for the Trusts.  Based on the systematic and pervasive practices complained of in the breach notices, the Indenture Trustees Wilmington Trust and their responsible officers knew that Servicers were engaged in the same wrongful conduct in connection with their servicing of the loans for the Trusts

300.    For example, an investor group issued instructions on January 31, 2012, to Deutsche Bank, U.S. Bank, and Wells Fargo, as trustees, to open investigations of ineligible mortgages in pools securing over $25 billion of RMBS issued by various affiliates of Morgan Stanley, and deficient servicing of those loans.  The same investor group sent a subsequent notice on September 19, 2012, to several RMBS trustees as well as Wells Fargo—as Servicer or Master Servicer—identifying breaches by Wells Fargo of specific servicing covenants in PSAs for ninety-five trusts from the Morgan Stanley-label IXIS, MSAC, and MSM and SAST shelves and 149 trusts from the Wells Fargo-label WFALT, WFMBS and WMLT shelves.

301.    While Plaintiffs are unaware of Wilmington Trust being a direct recipient of these investor communications, the fact of such communications was public knowledge, appearing both in publications from the law firm representing the investor groups, and in the mainstream media.  As such, Wilmington Trust was on notice of deficient servicing practices by some of the largest loan servicers in the industry, some of which also serviced loans in the Trusts.

**3.    Wilmington Trust Had Knowledge Of The Servicers' Failures Through Highly Publicized Government Enforcement Actions and Litigation Stemming From The Servicers' Violations.**

302.    As described above, many of the servicers for the Trusts have been the target of highly publicized government enforcement investigations, as well as extensive private litigation concerning the servicers' improper servicing and foreclosure practice.  These proceedings have encompassed the substantial majority of the servicing market, and were well known through the RMBS industry, including by the Indenture Trustees, Wilmington Trust and the other principal financial crisis-era trustees.

303.    For example, and as discussed above, the Agencies found deficiencies in the servicing and foreclosure processes of fourteen of the nation's largest servicers, and brought formal enforcement actions against those groups.  The widely-publicized joint settlement agreement—including U.S. Bank, Aurora, Bank of America, Citibank, Goldman, HSBC, JPMorgan, MetLife Bank, Morgan Stanley, PNC, Sovereign, SunTrust, U.S. Bank, and Wells Fargo, many of whom were servicers to the covered Trusts—would have made the Indenture Trustees and Wilmington Trust acutely aware of the deficiencies of these servicers, several of whom acted as Servicer or Master Servicer to the covered Trusts.

304.    In October 2010 Deutsche Bank—which serves as trustee for more than 1,000 RMBS trusts—issued a notice to all RMBS certificateholders in trusts for which Deutsche Bank served as trustee confirming Deutsche Bank's awareness of ongoing government investigations into improper servicing practices.  Deutsche Bank's notice acknowledged that it had been "widely reported in the news media" that "several major U.S. loan servicers" had "suspended certain foreclosures in some or all states" due to allegations and investigations regarding "defects in foreclosure practices, procedures and/or documentation."  In the same month, Deutsche Bank further sent an "urgent and time sensitive" memorandum to all servicers of mortgage loans

included in any RMBS trust for which Deutsche Bank acts as trustee.  In the memorandum,

Deutsche Bank discussed "an urgent issue requiring your [the servicers] immediate attention"—

specifically, the same "serious . . . defects in foreclosure practices, procedures and/or

documentation" discussed in Deutsche Bank's notice to certificateholders.

305.    The public attention attracted by government enforcement actions and litigation

stemming from servicer violations would certainly have placed the Indenture Trustees and

Wilmington Trust on notice of the pervasive and systemic servicing breaches occurring within

the RMBS community.

### 4.    Wilmington Trust Had Knowledge Of False Master Servicer and Servicer Certifications.

306.    The Indenture Trustees, Wilmington Trust and their responsible officers knew of

the Servicers' default by virtue of their receipt of certifications from the Servicers that the

Indenture Trustees and Wilmington Trust knew to be false because the Servicers were not in fact

meeting their obligations under the Governing Agreements.  As discussed above, the Servicers

breached the Governing Agreements in many ways.  The Indenture Trustees and Wilmington

Trust were aware of these breaches, and therefore knew the required Servicer certifications did

not conform because they were false.

### 5.    Wilmington Trust, The Indenture Trustees, Servicers, and Sellers Failed To Discharge Their Duties Under The Governing Agreements.

307.    Despite its knowledge of the Trusts' high default rates and poor performance,

breaches of representations and warranties made by the originators, Sellers, depositors, and

sponsors, and Servicer violations, Wilmington Trust failed to perform its duties as Owner

Trustee to protect the Trusts' assets, including their contractual rights under the Governing

Agreements.

93

a)      **Failure to Enforce the Trusts' Repurchase Rights.**

308.     As set forth above, beginning in 2009, Wilmington Trust and its responsible officers knew of deficiencies in mortgage loan files, breaches of the Sellers' representations and warranties regarding the mortgage loans' credit quality and characteristics, and the harm that these Seller violations caused to the Trust.  Wilmington Trust breached its contractual duties under the Governing Agreements by failing to take action or give notice of defaults to protect the Trusts' assets, including their contractual rights under the Governing Agreements.

b)      **Failure to Provide Notice to the Servicers of Default**

309.     As set forth above, beginning in 2009, Wilmington Trust and its responsible officers knew of failures on the part of the Servicers to perform in material respects their covenants in the Governing Agreements, including the Servicers': (1) failure to give notice to the other parties of Seller breaches of representations and warranties upon discovery of the breaches and enforce the Sellers' repurchase obligations; (2) violations of prudent servicing obligations; (3) violations of foreclosure obligations; (4) violations of loan modification obligations; (5) improper servicing advances; and (6) false certifications. These breaches by the Servicers constituted defaults as defined by the Governing Agreements.  Wilmington Trust breached its contractual duties under the Governing Agreements by failing to take action or give notice of defaults to protect the Trusts' assets, including their contractual rights under the Governing Agreements.

c)      **Failure to Provide Notice to the Certificateholders of Uncured Events of Default.**

310.     As set forth above, as early as 2009 and continuing to the Present, Wilmington Trust and its responsible officers knew of defaults under the Governing Agreements yet failed to

94

provide notice of those defaults or to protect the Trusts' assets, including their contractual rights under the Governing Agreements.

### d)        Events of Default Concerning False Servicer Certifications.

311.    The Governing Agreements obligated the Servicer to certify annually that it met its obligations under the Governing Agreements and applicable federal regulations.  For example, Section 3.09 of the Servicing Agreement to Delta Trust Indenture requires the Servicer to certify that it had "fulfilled all of its obligations under this Agreement or such other applicable agreement . . . in all material respects," and to report every material default it its performance.  *See* Exhibit 7 Table 1.  The Governing Agreements for the other Trusts set forth substantially similar obligations.  *See* Exhibit 7 Table 15.

312.    The failure to provide a conforming certification constituted a default under most of the Governing Agreements.  *See* Exhibit 7 Table 9.

313.    Wilmington Trust received certifications that it knew to be false because it knew that the Servicers were not in fact meeting their obligations under the Governing Agreements as discussed above.

### F.        Wilmington Trust and the Indenture Trustees Failed To Protect The Trusts Following The Insolvency Of Certain Servicers.

314.    Wilmington Trust failed to adequately protect the Trusts after the Servicers of certain Trusts filed for bankruptcy or otherwise became insolvent.  Under the Governing Agreements, a Servicer's insolvency or bankruptcy is an event of default requiring notification by the Trustee.  GMAC Mortgage Corporation, Servicer to loans in three of the Trusts, voluntarily filed for bankruptcy in May 2009.  *See* In Re. GMAC Mortgage LLC, 1:12-BK-12032 (Bankr. S.D.N.Y).  Wilmington Trust  failed to discharge its contractual obligations concerning the Trusts serviced by the failed entity by neglecting to provide written notice

95

regarding the Event of Default arising from the insolvency of GMAC Mortgage Corporation.

Proper notice would have enabled investors to, among other things, determine whether to take

independent or collective action to protect their interests against breaches of representations and

warranties, including against solvent responsible parties and others engaged in abusive

securitization practices.

## XI.   WILMINGTON TRUST'S FAILURE TO GIVE NOTICES OF DEFAULT

315.    Wilmington Trust breached its contractual duty to give notices of default under

the Governing Agreements.

316.    As alleged above, Wilmington Trust failed to perform its obligations under the

Governing Agreements to protect the trust estate.  Such a failure is a "default in the observance

or performance of any covenant or agreement of the Issuer made in the Indenture," and thus a

default under the Indenture.  Despite a contractual duty to do so, Wilmington Trust did not

provide the Indenture Trustee with notice of these or other defaults under the Governing

Agreements.

## XII.   DAMAGES

317.    Plaintiffs have incurred substantial damages attributable to Wilmington Trust's

breaches of its contractual and statutory duties.  In particular, the Trusts' loan pools are filled

with loans of inadequate credit quality, which increased the risk of delinquency.  As a result of

the loans' poor credit quality, the Trusts have experienced enormous delinquency rates, collateral

write-downs, and losses, and have incurred and continued to incur significant losses in

connection with Servicer violations, which have directly caused losses to Plaintiffs.  Plaintiffs'

damages caused by Wilmington Trust's violations of law will be the subject of expert testimony

for proof at trial.

## XIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Breach of Contract)

318.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

319.    The Governing Agreements are valid contracts that memorialize the issuance of securities collateralized by the Trusts, and establish Wilmington Bank's contractual duties and obligations as Owner Trustee of the Trusts and to their investors.  Each of the relevant contractual provisions is substantively similar in all of the Governing Agreements and imposes substantially similar duties and obligations on Wilmington Trust as Owner Trustee.

320.    As owners of securities issued by the Trusts, Plaintiffs were express, intended third party beneficiaries of the Governing Agreements.

### A.      Failure to Protect the Trust Estate.

321.    Wilmington Trust materially breached its contractual duties under the Governing Agreements by failing to protect the trust estate by ensuring that other parties to the Governing Agreements enforced the Trusts' rights under the Governing Agreements and the Loan Quality Agreements.  Those contractual breaches regarding which Wilmington Trust had knowledge, but failed to take any action, included:

- The Indenture Trustees' failure to: (1) take physical possession of many of the operative documents for the mortgage loans in the Trusts as required by the Governing Agreements; (2) identify missing, incomplete, and defective documents that should have been in the loan files; and (3) require Sellers either to cure the documentation problems or repurchase or substitute another mortgage loan for the improperly documented mortgage loan.

- The Sellers' failure to perform their obligations to provide complete loan files.

- The Indenture Trustees' and Servicers' failure to enforce the Trusts' rights for breaches of representations or warranties regarding the mortgage loans, and the

97

Seller's failure to observe perform their obligations to give notice of or cure such breaches.

- The Indenture Trustees' failure to enforce the Servicers' servicing and certification obligations.

**B.**    **Failure to Give Notice of Defaults Under the Governing Agreements.**

322.    Wilmington Trust materially breached its contractual duties under the Governing Agreements by failing to give notice of defaults under those agreements described above.

**C.**    **Damages.**

323.    Wilmington Trust's material breaches of the Governing Agreements have directly and proximately caused damages to the Trusts by depriving them of valuable remedies and allowed billions of dollars in Trust assets to waste away.  Wilmington Trust's inaction with respect to the Sellers has allowed the Trusts to be filled with defective mortgage loans of poor credit quality that has increased the severity of the Trusts' losses.  Similarly, had Wilmington Trust enforced the Servicers' prudent servicing obligations, the Trusts would have been able to avoid incurring unnecessary losses and expenses.  Wilmington Trust's inaction with respect to the servicing violations has exacerbated Trusts' losses.

324.    Wilmington Trust's material breaches of the Governing Agreements have injured all investors, including Plaintiffs, in that they have diminished the value of the assets owned by the Trusts and have diminished the principal and interest payments generated by those assets.

325.    Wilmington Trust's material breaches of the Governing Agreements evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to its contractual obligations to investors.  Moreover, Wilmington Trust's breaches of the Governing Agreements was part of a pattern of similar conduct directed at the public generally, and not just at Plaintiffs.

98

## SECOND CAUSE OF ACTION
### (Bad Faith Violation Of The Implied Contractual Covenant Of Good Faith And Fair Dealing)

326.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

327.    The Governing Agreements do not excuse Wilmington Trust from liability for its own willful misconduct, gross negligence or bad faith or grossly negligent failure to act.  To the extent Wilmington Trust nonetheless relies on the provisions of the Governing Agreements that purport to limit its liability, such reliance is misplaced because Wilmington Trust acted in bad faith—a violation of the implied contractual covenant of good faith and fair dealing—when Wilmington Trust (a) failed to act despite its knowledge of the rampant breaches of the Trusts' rights under the Governing Agreements and (b) failed to give notice of defaults under the Governing Agreements.

328.    Wilmington Trust's bad faith violation of the implied contractual covenant of good faith and fair dealing has injured all investors, including Plaintiffs, in that they have diminished the value of the assets owned by the Trusts and have diminished the principal and interest payments generated by those assets.

329.    Wilmington Trust's bad faith violation of the implied contractual covenant of good faith and fair dealing has evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to its contractual obligations to investors. Moreover, Wilmington Trust's bad faith violation of the implied contractual covenant of good faith and fair dealing was part of a pattern of similar conduct directed at the public generally, and not just at Plaintiffs.

## XIV.   RELIEF REQUESTED

**WHEREFORE**, Plaintiffs demand judgment as follows:

99

A.     Awarding damages in favor of Plaintiffs against Wilmington Trust for all

damages sustained as a result of Wilmington Trust's wrongdoing, in an amount to

be proven at trial, including interest thereon;

B.     Awarding Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

C.     Awarding punitive damages in favor of Plaintiffs against Wilmington Trust; and

D.     Granting any other and further relief that the Court deems just and proper.

**XV.   <u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury.

Dated: New York, New York
       May 27, 2016

**SCHLAM STONE & DOLAN LLP**

By: _____/S/_____
       Richard H.  Dolan
       John M.  Lundin
       Erik S.  Groothuis
       26 Broadway
       New York, New York 10004
       Telephone:  (212) 344-5400
       Facsimile:  (212) 344-7677
       E-mail:  rhd@schlamstone.com
       jlundin@schlamstone.com
       egroothuis@schlamstone.com

                    -and-

       John J.D.  McFerrin-Clancy
       17 State Street, 40th Floor
       New York, New York 10004
       Telephone:  (646) 771-7377
       E-mail:  jmc@mcferrin-clancy.com

       *Attorneys for Plaintiffs IKB International S.A. in*
       *Liquidation and IKB Deutsche Industriebank AG*

100

FILED: NEW YORK COUNTY CLERK 05/27/2016 01:24 PM

NYSCEF DOC. NO. 6

INDEX NO. 654444/2015

RECEIVED NYSCEF: 05/27/2016

## Exhibit 1: The Trusts

| Trust Name | Transaction Short Name | Bond Owned by Plaintiffs | CUSIP of Bond Owned by Plaintiffs |
|---|---|---|---|
| CWABS Trust 2005-HYB9 | CWHL 2005-HYB9 | CWHL 2005-HYB9 M1 | 126670KB3 |
| IMPAC Secured Assets Corp Mortgage Pass-Through Certificates, Series 2004-3 | IMM 2004-3 | IMM 2004-3 3A | 45254NHN0 |
| IMPAC CMP Trust Series 2004-5 | IMM 2004-5 | IMM 2004-5 2A | 45254NJR9 |
| IMPAC CMB Trust Series 2005-5 | IMM 2005-5 | IMM 2005-5 A1 | 45254NPU5 |
| IMPAC CMB Trust Series 2005-5 | IMM 2005-5 | IMM 2005-5 M4 | 45254NQB6 |
| IMPAC CMB Trust Series 2005-6 | IMM 2005-6 | IMM 2005-6 2A1 | 45254NQQ3 |
| IMPAC CMB Trust Series 2005-8 | IMM 2005-8 | IMM 2005-8 1A | 45254NRG4 |
| Renaissance Home Equity Loan Trust 2005-1 | RAMC 2005-1 | RAMC 2005-1 M8 | 759950FQ6 |
| Renaissance Home Equity Loan Trust 2005-4 | RAMC 2005-4 | RAMC 2005-4 M1 | 759950GB8 |
| Renaissance Home Equity Loan Trust 2005-4 | RAMC 2005-4 | RAMC 2005-4 M2 | 759950GC6 |
| Renaissance Home Equity Loan Trust 2006-1 | RAMC 2006-1 | RAMC 2006-1 M1 | 759950GZ5 |
| Renaissance Home Equity Loan Trust 2006-1 | RAMC 2006-1 | RAMC 2006-1 M2 | 759950HA9 |
| Renaissance Home Equity Loan Trust 2006-1 | RAMC 2006-1 | RAMC 2006-1 M3 | 759950HB7 |
| Renaissance Home Equity Loan Trust 2006-2 | RAMC 2006-2 | RAMC 2006-2 M2 | 759676AL3 |
| Renaissance Home Equity Loan Trust 2006-2 | RAMC 2006-2 | RAMC 2006-2 M3 | 759676AM1 |
| Renaissance Home Equity Loan Trust 2006-2 | RAMC 2006-2 | RAMC 2006-2 M4 | 759676AN9 |
| Renaissance Home Equity Loan Trust 2006-2 | RAMC 2006-2 | RAMC 2006-2 M5 | 759676AP4 |
| Renaissance Home Equity Loan Trust 2006-2 | RAMC 2006-2 | RAMC 2006-2 M6 | 759676AQ2 |
| Renaissance Home Equity Loan Trust 2006-3 | RAMC 2006-3 | RAMC 2006-3 M1 | 75971EAK2 |
| Renaissance Home Equity Loan Trust 2006-3 | RAMC 2006-3 | RAMC 2006-3 M3 | 75971EAM8 |
| Renaissance Home Equity Loan Trust 2006-3 | RAMC 2006-3 | RAMC 2006-3 M5 | 75971EAP1 |
| Renaissance Home Equity Loan Trust 2006-4 | RAMC 2006-4 | RAMC 2006-4 M2 | 75970HAL4 |
| Renaissance Home Equity Loan Trust 2006-4 | RAMC 2006-4 | RAMC 2006-4 M3 | 75970HAM2 |
| Renaissance Home Equity Loan Trust 2006-4 | RAMC 2006-4 | RAMC 2006-4 M4 | 75970HAN0 |
| Renaissance Home Equity Loan Trust 2007-1 | RAMC 2007-1 | RAMC 2007-1 M3 | 75970JAM8 |
| Renaissance Home Equity Loan Trust 2007-1 | RAMC 2007-1 | RAMC 2007-1 M4 | 75970JAN6 |
| Renaissance Home Equity Loan Trust 2007-2 | RAMC 2007-2 | RAMC 2007-2 M3 | 75970QAM2 |
| Renaissance Home Equity Loan Trust 2007-2 | RAMC 2007-2 | RAMC 2007-2 M4 | 75970QAN0 |
| Renaissance Home Equity Loan Trust 2007-2 | RAMC 2007-2 | RAMC 2007-2 M5 | 75970QAP5 |
| Renaissance Home Equity Loan Trust 2007-2 | RAMC 2007-2 | RAMC 2007-2 M8 | 75970QAS9 |
| Saxon Asset Securities Trust 2006-3 | SAST 2006-3 | SAST 2006-3 B1 | 80556AAL1 |
| Saxon Asset Securities Trust 2006-3 | SAST 2006-3 | SAST 2006-3 M4 | 80556AAH0 |

FILED: NEW YORK COUNTY CLERK 05/27/2016 01:24 PM

NYSCEF DOC. NO. 7

INDEX NO. 654444/2015

RECEIVED NYSCEF: 05/27/2016

## Exhibit 2: The Governing Agreements

| Transaction Name | PSA | Indenture | SSA | Trust Agreement |
|---|---|---|---|---|
| CWHL 2005-HYB9 | | | Sale and Servicing Agreement dated as of November 1, 2005 between Cwabs, Inc., Depositor, Cwabs Trust 2005-HYB9, Issuer, Taberna Realty Holdings Trust, Seller, Countrywide Home Loans, Inc., Countrywide Home Loans Servicing LP, Master Servicer and The Bank of New York, Indenture Trustee | Amended and Restated Trust Agreement dated as of November 30, 2005 between Cwabs, Inc., as Depositor, Wilmington Trust Company, as Owner Trustee, and The Bank of New York, as Certificate Registrar and Certificate Paying Agent |
| IMM 2004-3 | | Indenture dated as of November 30, 2005 between Cwabs Trust 2005-Hyb9, Issuer and The Bank of New York, Indenture Trustee

Indenture dated as of March 30, 2004 between IMPAC CMB Trust Series 2004-3, Issuer and Deutsche Bank National Trust Company, Indenture Trustee | | |
| IMM 2004-5 | | Indenture dated as of May 28, 2004 between IMPAC CMB Trust Series 2004-5, Issuer and Deutsche Bank National Trust Company, Indenture Trustee | Servicing Agreement dated as of May 28, 2004 between IMPAC Funding Corporation, as Master Servicer, IMPAC CMB Trust Series 2004-5, as Issuer And Deutsche Bank National Trust Company, as Indenture Trustee | Amended And Restated Trust Agreement dated as of May 28, 2004 Between IMH Assets Corp. as Depositor Wilmington Trust Company, as Owner Trustee And Deutsche Bank National Trust Company, as Certificate Registrar and Certificate Paying Agent |
| IMM 2005-5 | | Indenture dated as Of June 30, 2005 between IMPAC CMB Trust Series 2005-5, Issuer and Deutsche Bank National Trust Company, Indenture Trustee | Servicing Agreement dated as of June 30, 2005 between IMPAC Funding Corporation, as Master Servicer, IMPAC CMB Trust Series 2005-5, as Issuer and Deutsche Bank National Trust Company, as Indenture Trustee | Amended and Restated Trust Agreement dated as Of June 30, 2005 between IMH Assets Corp. as Depositor Wilmington Trust Company, as Owner Trustee and Deutsche Bank National Trust Company, as Certificate Registrar, Indenture Trustee and Certificate Paying Agent |

| Transaction Name | PSA | Indenture | SSA | Trust Agreement |
|---|---|---|---|---|
| IMM 2005-6 | | Indenture dated as of September 9, 2005 between IMPAC CMB Trust Series 2005-6, Issuer and Wells Fargo Bank, N.A., Indenture Trustee | | Amended and Restated Trust Agreement dated as of September 9, 2005 between IMH Assets Corp., as Depositor, Wilmington Trust Company, As Owner Trustee and Wells Fargo Bank, N.A., As Certificate Registrar, Indenture Trustee and Certificate Paying Agent |
| IMM 2005-8 | | Servicing Agreement dated as of November 30, 2005 between IMPAC Funding Corporation, as Master Servicer, IMPAC CMB Trust Series 2005-8, as Issuer and Deutsche Bank National Trust Company, as Indenture Trustee | Indenture dated as of November 30, 2005 between IMPAC CMB Trust Series 2005-8, Issuer and Deutsche Bank National Trust Company, Indenture Trustee | Amended and Restated Trust Agreement dated as of November 30, 2005 between IMH Assets Corp. as Depositor, Wilmington Trust Company, as Owner Trustee and Deutsche Bank National Trust Company, as Certificate Registrar, Indenture Trustee and Certificate Paying Agent |
| RAMC 2005-1 | | Indenture dated as of March 31, 2005 between Renaissance Home Equity Loan Trust 2005-1, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, National Association Securities Administrator | Servicing Agreement dated as of March 31, 2005 between Wells Fargo Bank, N.A., As Master Servicer and Securities Administrator, Ocwen Federal Bank, FSB, As Servicer, Renaissance Home Equity Loan Trust 2005-1, As Issuer, and HSBC Bank USA, National Association, As Indenture Trustee | Amended and Restated Trust Agreement dated as of March 31, 2005 between  Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., As Certificate Registrar and Certificate Paying Agent |
| RAMC 2005-4 | | Indenture dated as of December 30, 2005 between Renaissance Home Equity Loan Trust 2005-4, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of December 30, 2005 between Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2005-4, as Issuer, and HSBC Bank USA, National Association, as Indenture Trustee | Amended and Restated Trust Agreement dated as of December 30, 2005 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |

| Transaction Name | PSA | Indenture | SSA | Trust Agreement |
|---|---|---|---|---|
| RAMC 2006-1 | | Indenture dated as of March 30, 2006 between Renaissance Home Equity Loan Trust 2006-1, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of March 30, 2006 between Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2006-1, as Issuer, and HSBC Bank USA, National Association, as Indenture Trustee | Amended and Restated Trust Agreement dated as of March 30, 2006 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |
| RAMC 2006-2 | | Indenture dated as of June 29, 2006 between Renaissance Home Equity Loan Trust 2006-2 Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of June 29, 2006 between Wells Fargo Bank, N.A., as Master Servicer and, Securities Administrator Ocwen Loan Servicing, LLC as Servicer Renaissance Home Equity Loan Trust 2006-2, as Issuer, and HSBC Bank USA, National Association, as, Indenture Trustee | Amended and Restated Trust Agreement dated as of June 29, 2006 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, And Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |
| RAMC 2006-3 | | Indenture dated as of September 28, 2006 between Renaissance Home Equity Loan Trust 2006-3, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of September 28, 2006 between Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2006-3, as Issuer, and HSBC Bank USA, National Association, as, Indenture Trustee | Amended and Restated Trust Agreement dated as of September 28, 2006 between Renaissance Mortgage Acceptance Corp, as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |

| Transaction Name | PSA | Indenture | SSA | Trust Agreement |
|---|---|---|---|---|
| RAMC 2006-4 | | Indenture dated as of December 28, 2006 between Renaissance Home Equity Loan Trust 2006-4, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of December 28, 2006 between Wells Fargo Bank, N.A., as Master Servicer and, Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2006-4, as Issuer, and HSBC Bank USA, National Association, as, Indenture Trustee | Amended and Restated Trust Agreement dated as of December 28, 2006 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |
| RAMC 2007-1 | | Indenture dated as of March 29, 2007 between Renaissance Home Equity Loan Trust 2007-1, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of March 29, 2007 between Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2007-1, as Issuer, and HSBC Bank USA, National Association, as Indenture Trustee | Amended and Restated Trust Agreement dated as of March 29, 2007 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee, and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |
| RAMC 2007-2 | | Indenture dated as of June 18, 2007 between Renaissance Home Equity Loan Trust 2007-2, Issuer, HSBC Bank USA, National Association, Indenture Trustee, and Wells Fargo Bank, N.A., Securities Administrator | Servicing Agreement dated as of June 18, 2007 between Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator, Ocwen Loan Servicing, LLC, as Servicer, Renaissance Home Equity Loan Trust 2007-2, as Issuer, and HSBC Bank USA, National Association, as, Indenture Trustee | Amended and Restated Trust Agreement dated as of June 18, 2007 between Renaissance Mortgage Acceptance Corp., as Depositor, Wilmington Trust Company, as Owner Trustee and Wells Fargo Bank, N.A., as Certificate Registrar and Certificate Paying Agent |

| Transaction Name | PSA | Indenture | SSA | Trust Agreement |
|---|---|---|---|---|
| SAST 2006-3 | | Indenture, dated as of September 1, 2006 between Saxon Asset Securities Trust 2006-3, as Issuer and Deutsche Bank Trust Company Americas, as Indenture Trustee | Sale and Servicing Agreement dated as of September 1, 2006 between Saxon Asset Securities Trust 2006-3, Issuer, Saxon Asset Securities Company, Depositor, Saxon Funding Management, Inc., Master Servicer, Saxon Mortgage Services, Inc., Servicer, and Deutsche Bank Trust Company Americas, Indenture Trustee | Trust Agreement dated as of September 1, 2006 among Saxon Asset Securities Company, as Depositor, Wilmington Trust Company, as Owner Trustee and Deutsche Bank Trust Company Americas, as Administrator |

FILED: NEW YORK COUNTY CLERK 05/27/2016 01:24 PM

INDEX NO. 654444/2015
RECEIVED NYSCEF: 05/27/2016
NYSCEF DOC. NO. 8



Exhibit 3 - Wilmington Trust - Average Delinquency Rate

FILED: NEW YORK COUNTY CLERK 05/27/2016 01:24 PM
INDEX NO. 654444/2015
RECEIVED NYSCEF: 05/27/2016
NYSCEF DOC. NO. 9



Exhibit 4 – Wilmington Trust - Accumulated Net Loss

FILED: NEW YORK COUNTY CLERK 05/27/2016 01:24 PM

INDEX NO. 654444/2015
RECEIVED NYSCEF: 05/27/2016

NYSCEF DOC. NO. 10



Exhibit 5 - Wilmington Trust - Average Accumulated Net Loss Percentage

## Exhibit 6 Table 1

| Table | Topic | Relevant Provision |
|---|---|---|
| 2 | Owner Trustee Control of the Issuer | **Amended and Restated Trust Agreement Section 2.01.**  Name. The trust created hereby (the "Trust") shall be known as "Renaissance Home Equity Loan Trust 2006-1", in which name the Owner Trustee may conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued. |
| | | **Amended and Restated Trust Agreement Section 2.04.**  Appointment of Owner Trustee. The Depositor hereby appoints the Owner Trustee as trustee of the Trust effective as of the date hereof, to have all the rights, powers and duties set forth herein. |
| 3 | Owner Trustee's Obligation to Protect the Trust Estate | **Indenture Section 3.06.** Protection of Collateral. |
| | | (a) The Issuer will from time to time prepare, execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to: |
| | | (i) maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof; |
| | | (ii) perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture; |
| | | (iii) cause the Issuer, the Servicer or the Master Servicer to enforce any of the rights to the Mortgage Loans; or |
| | | (iv) preserve and defend title to the Trust and the rights of the Indenture Trustee and the Noteholders in the Trust against the claims of all persons and parties. |
| | | **Indenture Section 3.08.**  Performance of Obligations.  The Issuer will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Basic Documents and in the instruments and agreements included in the Collateral. The Issuer may contract with other Persons to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in an Officer's Certificate of the Issuer shall be deemed to be action taken by the Issuer.  The Issuer will not take any action or permit any action to be taken by others which would release any Person from any of such Person's covenants or obligations under any of the documents relating to the Mortgage Loans or under any instrument included in the Collateral, or which would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any of the documents relating to the Mortgage Loans or any such instrument, except such actions as the Servicer or the Master Servicer is expressly permitted to take in the Servicing Agreement. The Indenture Trustee and the Securities Administrator may exercise the rights of the Issuer to direct the actions of the Servicer and/or the Master Servicer pursuant to the Servicing Agreement.  The Issuer may retain an administrator and may enter into contracts with other Persons for the performance of the Issuer's obligations hereunder, and performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer. |

| Table | Topic | Relevant Provision |
|---|---|---|
| | | **Indenture Section 3.24.** Notice of Events of Default. The Issuer shall give the Indenture Trustee, the Securities Administrator and the Rating Agencies prompt written notice of each Event of Default hereunder and under the Trust Agreement. |
| | | **Indenture Section 5.01.** Events of Default. The Issuer shall deliver to the Indenture Trustee and the Securities Administrator, written notice in the form of an Officer's Certificate, within five days after learning of the occurrence of any event which with the giving of |
| 4 | Owner Trustee's Obligation to Give Notice of Defaults | notice and the lapse of time would become an Event of Default under clause (iii), (iv) or (v) of the definition of "Event of Default," its status and what action the Issuer is taking or proposes to take with respect thereto. |

2 of 2

## Exhibit 6 Table 2

| Transaction Name | Owner Trustee Control of the Issuer |
|---|---|
| CWHL 2005-HYB9 | Trust Agreement Section 2.01 |
| | Trust Agreement Section 2.04 |
| IMM 2004-3 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| IMM 2004-5 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| IMM 2005-5 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| IMM 2005-6 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| IMM 2005-8 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2005-1 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2005-4 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2006-1 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2006-2 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2006-3 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2006-4 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2007-1 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| RAMC 2007-2 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |
| SAST 2006-3 | Amended and Restated Trust Agreement Section 2.01 |
| | Amended and Restated Trust Agreement Section 2.04 |

## Exhibit 6 Table 3

| Transaction Name | Owner Trustee's Obligation to Protect the Trust Estate |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 3.05 |
| | Indenture Section 3.07 |
| IMM 2004-3 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| IMM 2004-5 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| IMM 2005-5 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| IMM 2005-6 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| IMM 2005-8 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2005-1 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2005-4 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2006-1 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2006-2 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2006-3 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2006-4 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2007-1 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| RAMC 2007-2 | Indenture Section 3.06 |
| | Indenture Section 3.08 |
| SAST 2006-3 | Indenture Section 3.05 |
| | Indenture Section 3.06 |

## Exhibit 6 Table 4

| Transaction Name | Owner Trustee's Obligation to Give Notice of Defaults |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 3.22 |
| | Indenture Section 3.23 |
| IMM 2004-3 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| IMM 2004-5 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| IMM 2005-5 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| IMM 2005-6 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| IMM 2005-8 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2005-1 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2005-4 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2006-1 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2006-2 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2006-3 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2006-4 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2007-1 | Indenture Section 5.01 |
| | Indenture Section 3.24 |
| RAMC 2007-2 | Indenture Section 5.01 |
| | Indenture Section 3.06 |
| | Indenture Section 3.11 |
| SAST 2006-3 | Indenture Section 5.01 |

## Exhibit 7 Table 1

| Table | Topic | Relevant Provision |
|---|---|---|
| 2 | Transfer of Loans to Trust/Trustee | **Amended and Restated Trust Agreement Section 3.01.** Conveyance of the Mortgage Loans. The Depositor, concurrently with the execution and delivery hereof, does hereby contribute, transfer, convey and assign to the Trust, on behalf of the Holders of the Notes and the Certificates, without recourse, all its right, title and interest in and to the Mortgage Loans, including all interest and principal received on or with respect to the Mortgage Loans after the Cut-Off Date (other than payments of principal and interest due on the Mortgage Loans on or before the Cut-Off Date). In addition, the Depositor hereby assigns to the Trust all of its right, title, and interest in, to, and under the Mortgage Loan Sale and Contribution Agreement. In addition, the Depositor hereby assigns to the Trust all of its right, title and interest in, to and under the Class N Interest Rate Cap Agreement. **Indenture Granting Clause** The Issuer hereby Grants to the Indenture Trustee at the Closing Date, as trustee for the benefit of the Holders of the Notes, all of the Issuer's right, title and interest in and to whether now existing or hereafter created by (a) the Mortgage Loans, Eligible Substitute Mortgage Loans and the proceeds thereof and all rights under the Related Documents; (b) all funds on deposit from time to time in the Collection Account allocable to the Mortgage Loans excluding any investment income from such funds; (c) all funds on deposit from time to time in the Payment Account and in all proceeds thereof; (d) all rights under (i) the Mortgage Loan Sale and Contribution Agreement as assigned to the Issuer, (ii) the Servicing Agreement, (iii) any title, hazard and primary insurance policies with respect to the Mortgaged Properties and (iv) the rights with respect to the Class N Interest Rate Cap Agreement and (e) all present and future claims, demands, causes and choses in action in respect of any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in respect of, any or all of the foregoing and all payments on or under, and all proceeds of every kind and nature whatsoever in the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, checks, deposit accounts, rights to payment of any and every kind, and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Collateral"). |
| 3 | Trustee Acceptance of Loan Files | **Indenture Section 2.03.** Acceptance of Mortgage Loans by Indenture Trustee. (a) The Indenture Trustee acknowledges receipt of, subject to the exceptions it notes pursuant to the procedures described below, the documents (or certified copies thereof) referred to in Section 2.1(b) of the Mortgage Loan Sale and Contribution Agreement, and declares that it or the Custodian holds and will continue to hold those documents and any amendments, replacements or supplements thereto and all other assets of the Trust as Indenture Trustee in trust for the use and benefit of all present and future Holders of the Notes. |

| Table | Topic | Relevant Provision |
|---|---|---|
| 4 | Loan File Contents | **Mortgage Loan Sale and Contribution Agreement Section 2.1** Sale of Mortgage Loans. (a) The Seller, concurrently with the execution and delivery of this Agreement, does hereby sell, transfer, assign, set over and otherwise convey, to the Purchaser, without recourse, (subject to Sections 2.2 and 3.1) (i) all of its right, title and interest in and to each Mortgage Loan, including the Cut-Off Date Principal Balance and all collections in respect of interest and principal received after the Cut-Off Date (other than payments in respect of accrued interest and principal due on or before March 1, 2006); (ii) property which secured such Mortgage Loan and which has been acquired by foreclosure or deed in lieu of foreclosure; (iii) its interest in any insurance policies in respect of the Mortgage Loans and (v) all proceeds of any of the foregoing. (b) In connection with such transfer, assignment and conveyance the Seller shall deliver to, and deposit with, the Indenture Trustee or the Custodian on behalf of the Indenture Trustee, on or before the Closing Date, the following documents or instruments with respect to each Mortgage Loan (the "Related Documents") and the related Mortgage Loan Schedule in computer readable format: (i) The original Mortgage Note, with all prior and intervening endorsements showing a complete chain of endorsements from the originator of the Mortgage Loan to the Person so endorsing the Mortgage Loan to the Indenture Trustee, endorsed by such Person "Pay to the order of HSBC Bank USA, National Association, as Indenture Trustee under the applicable agreement, without recourse" and signed, by facsimile or manual signature, in the name of the Seller by a Responsible Officer; (ii) For each Mortgage Loan that is not a MERS Mortgage Loan, any of: (1) the original Mortgage and related power of attorney, if any, with evidence of recording thereon, (2) (A) a copy of the Mortgage, if any, certified as a true copy of the original Mortgage by a Responsible Officer of the Seller by facsimile or manual signature or by the closing attorney or by an officer of the title insurer or agent of the title insurer that issued the related title insurance policy, in such case, if the original has been transmitted for recording until such time as the original is returned by the public recording office and (B) a copy of the related power of attorney, if any, or (3) a copy of the original recorded Mortgage and a copy of the related power of attorney, if any, certified by the public recording office. For each Mortgage Loan that is a MERS Mortgage Loan, the original Mortgage, noting the presence of the MIN of the related Mortgage Loan and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, |

| Table | Topic | Relevant Provision |
|---|---|---|
| 4 | Loan File Contents | the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded; (iii) For each Mortgage Loan, the original Assignment of Mortgage in recordable form, from the Seller in blank, or to "HSBC Bank USA, National Association, as Indenture Trustee under the applicable agreement"; (iv) The original lender's title insurance policy or a true copy thereof or, if such original lender's title insurance policy has been lost, a copy thereof certified by the appropriate title insurer to be true and complete or, if such lender's title insurance policy has not been issued as of the Closing Date, a marked up commitment (binder) to issue such policy; (v) For each Mortgage Loan that was not a MERS Mortgage Loan at its origination, all intervening assignments, if any, showing a complete chain of assignments from the originator to the Seller, including any recorded warehousing assignments, with evidence of recording thereon, or a copy thereof certified by a Responsible Officer of the Seller by facsimile or manual signature, or by the closing attorney or by an officer of the title insurer or agent of the title insurer that issued the related title insurance policy, as a true copy of the original of such intervening assignments if the original has been transmitted for recording until such time as the original is returned by the public recording office or a copy of the original recorded intervening assignments certified by the public recording office; (vi) Originals of all assumption, written assurance, substitution and modification agreements, if any; and (vii) In the case of a Cooperative Loan, the originals of the following documents or instruments: 1. The Cooperative Shares, together with a stock power in blank; 2. The executed Security Agreement; 3. The executed Proprietary Lease; 4. The executed Recognition Agreement; 5. The executed assignment of Recognition Agreement; 6. The executed UCC-1 financing statements with evidence of recording thereon which have been filed in all places required to perfect the Seller's interest in the Cooperative Shares and the Proprietary Lease; and 7. Executed UCC-3 financing statements or other appropriate UCC financing statements required by state law, evidencing a complete and unbroken line from the mortgagee to the Trustee with evidence of recording thereon (or in a form suitable for recordation). |
| 5 | Initial Loan File Certification | **Indenture Section 2.03.** Acceptance of Mortgage Loans by Indenture Trustee. (a) . . . On the Closing Date or no later than the 45th day following the Closing Date, the Indenture Trustee or the Custodian on behalf of the Indenture Trustee shall certify to the Seller, the Depositor and the Servicer (and the Indenture Trustee if the Custodian is so certifying) that it has reviewed each Mortgage File and that, as to each Mortgage Loan listed in the related Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in the certification in the form annexed hereto as Exhibit C-1 as not covered by such certification), (i) all documents constituting part of such Mortgage File required to be delivered to it pursuant to paragraphs (i) – (v) and (vii) of Section 2.1(b) of the Mortgage Loan Sale and Contribution Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and relate to such Mortgage Loan, (iii) based on its examination and only as to the foregoing, the information set forth in the Mortgage Loan Schedule which corresponds to items (ii) and (iii) of the definition of "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage File. |
| 6 | Final Loan File Certification | **Indenture Section 2.03.** Acceptance of Mortgage Loans by Indenture Trustee. (a) . . . On the 360th day following the Closing Date, the Indenture Trustee or the Custodian on behalf of the Indenture Trustee shall deliver to the Seller and the Servicer an exception report showing the documents outstanding pursuant to Section 2.1(b) of the Mortgage Loan Sale and Contribution Agreement along with a final certification annexed hereto as Exhibit C-2 updated from the previous certification issued in the form of Exhibit C-1. |

| Table | Topic | Relevant Provision |
|---|---|---|
| 7 | Trustee's Obligation to Ensure that Defects in Mortgage Files Are Cured | **Indenture Section 2.03.** Acceptance of Mortgage Loans by Indenture Trustee. (a) . . . If within such 45-day period the Indenture Trustee or the Custodian on behalf of the Indenture Trustee finds any document constituting a part of a Mortgage File not to have been executed or received or to be unrelated to the Mortgage Loans identified in said Mortgage Loan Schedule or, if in the course of its review, the Indenture Trustee or the Custodian on behalf of the Indenture Trustee determines that such Mortgage File is otherwise defective in any material respect, the Indenture Trustee or the Custodian on behalf of the Indenture Trustee shall promptly upon the conclusion of its review notify the Seller in the form of an exception report and the Seller shall have a period of ninety (90) days after such notice within which to correct or cure any such defect. |
| 8 | Trustee's Duty to Give Notice of Defective Loans | **Servicing Agreement Section 2.03.** Enforcement of Representations and Warranties. Upon discovery by the Seller, the Depositor, the Servicer, the Master Servicer or a Responsible Officer of the Indenture Trustee or the Securities Administrator of a breach of any of the representations and warranties made by the Originator in the Mortgage Loan Sale and Contribution Agreement (attached hereto as Exhibit G), which materially and adversely affects the value of, or the interests of the Trust or the Noteholders in, the related Mortgage Loan, the party discovering such breach shall give prompt written notice to the Originator. |

| Table | Topic | Relevant Provision |
|-------|-------|--------------------|
| 9 | Events of Default | **Indenture Appendix A Definitions** "Event of Default": With respect to the Indenture, any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body): (i) a failure by the Issuer to pay (a) with respect to the Offered Notes, (1) the Class Monthly Interest Amount or the Group I Principal Payment Amount or the Group II Principal Payment Amount on any Payment Date, which failure is not cured within 3 Business Days or (2) the Class Interest Carryover Shortfall, but only, with respect to clause (2), to the extent funds are available to make such payment as provided in the Indenture or (b) with respect to the Class N Notes, all interest and principal due on the Class N Notes by the Final Stated Maturity Date; or (ii) the failure by the Issuer on the Final Stated Maturity Date to reduce the Class Note Balance of any of the Notes to zero; or (iii) there occurs a default in the observance or performance of any covenant or agreement of the Issuer made in the Indenture, or any representation or warranty of the Issuer made in the Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the aggregate Note Balance of the Outstanding Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of default hereunder; or (iv) there occurs the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Issuer or any substantial part of the Trust in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the Trust, or ordering the winding-up or liquidation of the Issuer's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or (v) there occurs the commencement by the Issuer of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Issuer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Issuer to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Issuer or for any substantial part of the assets of the Trust, or the making by the Issuer of any general assignment for the benefit of creditors, or the failure by the Issuer generally to pay its debts as such debts become due, or the taking of any action by the Issuer in furtherance of any of the foregoing; or (vi) a failure of the Trust to be wholly owned by a REIT or a Qualified REIT Subsidiary. |
| 10 | Trustee's Obligation to Give Notice of Default | **Indenture Section 6.05.** Notice of Event of Default. Subject to Section 5.01, the Indenture Trustee or the Securities Administrator shall promptly mail to each Noteholder notice of the Event of Default after it is actually known to a Responsible Officer of the Indenture Trustee or the Securities Administrator, unless such Event of Default shall have been waived or cured. Except in the case of an Event of Default in payment of principal of or interest on any Note, the Indenture Trustee or the Securities Administrator may withhold the notice if and so long as it in good faith determines that withholding the notice is in the interests of Noteholders. |

| Table | Topic | Relevant Provision |
|---|---|---|
| 11 | After an Event of Default, the Trustee Must Exercise its Rights Under the Agreement as a Prudent Person Would | **Indenture Section 6.01.**  Duties of Indenture Trustee and the Securities Administrator.  (a)  If an Event of Default has occurred and is continuing, each of the Indenture Trustee and the Securities Administrator shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs. |
| 12 | Trustee's Duty to Make Distribution Statements | **Indenture Section 7.05.** Statements to Noteholders. (a) Not later than each Payment Date the Securities Administrator shall prepare a statement (the "Remittance Report") containing the information set forth below with respect to such Payment Date, which information shall be based solely upon the loan level information furnished by the Servicer and the Master Servicer, as applicable, upon which the Securities Administrator shall conclusively rely without independent verification thereof: (i) the Available Funds and the Note Rate for each Class for the related Payment Date; (ii) the aggregate amount of the payment to each Class of Notes on such Payment Date; (iii) the amount of the payment set forth in paragraph (ii) above in respect of interest, the amount thereof in respect of any Class Interest Carryover Shortfall, and the amount of any Class Interest Carryover Shortfall remaining and the amount thereof in respect of any Class N Interest Shortfall, and the amount of any Class N Interest Shortfall remaining; (iv) the amount of the payment set forth in paragraph (ii) above in respect of principal and the amount thereof in respect of the Class Principal Carryover Shortfall, and any remaining Class Principal Carryover Shortfall; (v) the amount of Excess Interest paid as principal; (vi) the aggregate amount of the Servicing Fee and the Master Servicing Fee for such Payment Date; (vii) the Pool Balance and the aggregate Principal Balance of the Mortgage Loans in each Loan Group as of the close of business on the last day of the preceding Due Period; (viii) the Class Note Balance of each Class of Notes after giving effect to payments allocated to principal; (ix) the Overcollateralization Amount and the Required Overcollateralization Amount as of the close of business on the Payment Date, after giving effect to payments of principal on such Payment Date; (x) whether a Cumulative Loss Event or a Delinquency Event has occurred and is continuing and the calculation thereof; (xi) the aggregate amount of Principal Prepayments received during the related Prepayment Period; (xii) the amount of all Curtailments that were received during the Due Period; (xiii) the principal portion of all Monthly Payments received during the Due Period; (xiv) the interest portion of all Monthly Payments received on the Mortgage Loans during the Due Period; (xv) the amount of the Monthly Advances and the Compensating Interest payment to be made on the Determination Date; (xvi) the amount to be distributed to the Certificates for the Payment Date; (xvii) the weighted average remaining term to maturity of the Mortgage Loans and the weighted average Loan Rate as of the first day of the related Due Period; (xviii) the amount of all payments or reimbursements to the Servicer pursuant to Sections 3.03(ii) and (vi) of the Servicing Agreement (as reported by the Servicer); (xix) the number of Mortgage Loans outstanding at the beginning and at the end of the related Due Period; (xx) the amount of Liquidation Loan Losses experienced during the preceding Due Period and the Cumulative Net Losses as a percentage of the Cut-Off Date Pool Balance; (xxi) as of the end of the preceding calendar month, the number and Principal Balance of Mortgage Loans which are 30-59 days delinquent; the number and Principal Balance of Mortgage Loans which are 60-89 days delinquent; the number and Principal Balance of Mortgage Loans which are 90 or more days delinquent |

| Table | Topic | Relevant Provision |
|---|---|---|
| 12 | Trustee's Duty to Make Distribution Statements | (including the number and Principal Balance of Mortgage Loans which are in foreclosure; the number and Principal Balance of Mortgage Loans in bankruptcy; and the number and Principal Balance of Mortgage Loans which are REO Property, each separately set forth) (for the avoidance of doubt, delinquencies in this clause (xxi) are measured in accordance with the OTS method); (xxii) the amounts of Applied Realized Loss Amounts for the applicable Due Period and the cumulative amount of Applied Realized Loss Amounts to date; (xxiii) the number and aggregate Principal Balance of Mortgage Loans, other than Mortgage Loans in default or imminent default, that were modified by the Servicer during the related Due Period (as reported by the Servicer) (xxiv) the amount of Basis Risk Shortfall Amount paid to each Class of Group I Notes; (xxv) any amounts received from the Cap Provider with respect to the Class N Interest Rate Cap Agreement, and the amount of Basis Risk Shortfall Amount remaining for each such Class; (xxvi) whether a Stepdown Date or Trigger Event is in effect on such Payment Date; and (xxvii) the applicable Record Dates, Interest Accrual Periods and determination dates for calculating payments for such Payment Date. (b) The Securities Administrator shall make available such report to the Servicer, the Master Servicer, the Indenture Trustee, the Seller, the Noteholders, the Rating Agencies, Bloomberg (at 499 Park Avenue, New York, New York 10022, Attention: Mike Geller) and Intex Solutions (at 35 Highland Circle, Needham, Massachusetts 02144, Attention: Harold Brennman) on the Payment Date. The Securities Administrator may fully rely upon and shall have no liability with respect to information provided by the Servicer or the Master Servicer. In the case of information furnished pursuant to subclauses (ii), (iii), (iv) and (vi) above, the amounts shall be expressed in a separate section of the report as a dollar amount for each Class for each $1,000 original dollar amount as of the related Cut-Off Date. (c) The Securities Administrator will make the Remittance Report (and, at its option, any additional files containing the same information in an alternative format) available each month to Noteholders and the parties to this Indenture via the Securities Administrator's internet website. The Securities Administrator's internet website shall initially be located at "www.ctslink.com". Assistance in using the website can be obtained by calling the Securities Administrator's customer service desk at (301) 815-6600. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Securities Administrator shall have the right to change the way Remittance Reports are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Securities Administrator shall provide timely and adequate notification to all above parties regarding any such changes. As a condition to access the Securities Administrator's internet website, the Securities Administrator may require registration and the acceptance of a disclaimer. The Securities Administrator will not be liable for the dissemination of information in accordance with this Agreement. The Securities Administrator shall also be entitled to rely on but shall not be responsible for the content or accuracy of any information provided by third parties for purposes of preparing the Remittance Report and may affix thereto any disclaimer it deems appropriate in its reasonable discretion (without suggesting liability on the part of any other party hereto). |

| Table | Topic | Relevant Provision |
|---|---|---|
| 13 | Servicer's Duties | **Servicing Agreement Section 3.01.** The Servicer. (a)  The Servicer, as independent contract servicer, shall service and administer the Mortgage Loans consistent with the terms of this Agreement. [...]  Notwithstanding anything to the contrary contained herein, the Servicer, in servicing and administering the Mortgage Loans, shall employ or cause to be employed procedures (including collection, foreclosure and REO Property management procedures) and exercise the same care that it customarily employs and exercises in servicing and administering mortgage loans for its own account, in accordance with accepted mortgage servicing practices of prudent lending institutions servicing mortgage loans similar to the Mortgage Loans and giving due consideration to the Noteholders' reliance on the Servicer.<br>**Servicing Agreement Section 3.06.** Management and Realization Upon Defaulted Mortgage Loans. [...] The Servicer shall foreclose upon or otherwise comparably convert to ownership Mortgaged Properties securing such of the Mortgage Loans as come into and continue in default when no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.02. |
| 14 | Sellers' Representations and Warranties Regarding Mortgage Loans | **Mortgage Loan Sale and Contribution Agreement Section 3.1.** Representations and Warranties . . . (c)<br>(1) The information set forth on the Mortgage Loan Schedule and the Prepayment Charge Schedule is complete, true and correct as of the dates as of which the information therein is given;<br>(12) With respect to the Mortgage Loans, as of the Cut-Off Date, all payments required to be made on each Mortgage Loan under the terms of the related Mortgage Note have been made and none of the Mortgage Loans (by Cut-Off Date Pool Balance) are 31 or more days delinquent;<br>(28) The Mortgage Loans were underwritten in accordance with the Originator's underwriting guidelines described in the Prospectus under the heading "The Seller—Loan Underwriting";<br>(37) A full appraisal on forms approved by Fannie Mae or Freddie Mac or on a report of an insured automated valuation model of the related Mortgaged Property was performed in connection with the origination of each Mortgage Loan. Each appraisal or insured automation valuation model report meets guidelines that would be generally acceptable to prudent mortgage lenders that regularly originate or purchase mortgage loans comparable to the Mortgage Loans for sale to prudent investors in the secondary market that invest in mortgage loans such as the Mortgage Loans; |

| Table | Topic | Relevant Provision |
|---|---|---|
| 15 | Servicer's Annual Certification | **Servicing Agreement Section 3.09**. Statement as to Compliance. The Servicer, the Master Servicer and the Securities Administrator will deliver or otherwise make available (and the Servicer, Master Servicer and Securities Administrator shall cause any Servicing Function Participant engaged by it to deliver) to the Depositor and the Securities Administrator, not later than March 15th of each calendar year beginning in 2007, an Officers' Certificate (an "Annual Statement of Compliance") stating, as to each signatory thereof, that (i) a review of the activities of such party during the preceding calendar year or portion thereof and of such party's performance under this Agreement or such other applicable agreement in the case of a Servicing Function Participant has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on such review, such party has fulfilled all of its obligations under this Agreement or such other applicable agreement in the case of a Servicing Function Participant in all material respects throughout such calendar year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status of cure provisions thereof. In the event the Master Servicer, the Securities Administrator, the Custodian or any Servicing Function Participant engaged by any such party is terminated, assigns its rights and obligations under, or resigns pursuant to, the terms of this Agreement, or any other applicable agreement, as the case may be, such party shall provide a report on assessment of compliance pursuant to this Section 3.09, or pursuant to such other applicable agreement, notwithstanding any such termination, assignment or resignation. Failure of the Servicer to timely comply with this Section 3.09 shall be deemed a Servicer Event of Default, and the Indenture Trustee or the Master Servicer, as applicable, may, in addition to whatever rights the Indenture Trustee or the Master Servicer, as applicable, may have under this Agreement and at law or in equity, including injunctive relief and specific performance, upon notice immediately terminate (as provided in Section 6.01(a)) all the rights and obligations of the Servicer under this Agreement and in and to the Mortgage Loans and the proceeds thereof without compensating the Servicer for the same (other than the Servicer's right to reimbursement of unreimbursed Monthly Advances and Servicing Advances and accrued and unpaid Servicing Fees in the manner provided in this Agreement). This paragraph shall supersede any other provision in this Agreement or any other agreement to the contrary. <br><br> Servicing Agreement Section 3.10 Assessments of Compliance and Attestation Reports. By March 15th of each year, commencing in March 2007, the Servicer, the Master Servicer, the Securities Administrator and the Custodian, each at its own expense, shall furnish or otherwise make available, and each such party shall cause any Servicing Function Participant engaged by it to furnish, at its own expense, to the Securities Administrator and the Depositor . . . |

## Exhibit 7 Table 2

| Transaction Name | Transfer of Loans to Trust/Trustee |
| --- | --- |
| CWHL 2005-HYB9 | Trust Agreement Section 3.01 |
| IMM 2004-3 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| IMM 2004-5 | Indenture Granting Clause |
| | Trust Agreement Section 3.01 |
| IMM 2005-5 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| IMM 2005-6 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| IMM 2005-8 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2005-1 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2005-4 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2006-1 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2006-2 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2006-3 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2006-4 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2007-1 | Indenture Granting Clause |
| | Amended and Restated Trust Agreement Section 3.01 |
| RAMC 2007-2 | Indenture Granting Clause |
| | SSA Section 2.1 |
| SAST 2006-3 | Indenture Granting Clause |

## Exhibit 7 Table 3

| Transaction Name | Trustee Acceptance of Loan Files |
| --- | --- |
| CWHL 2005-HYB9 | SSA Section 2.02 |
| IMM 2004-3 | Indenture Section 2.03 |
| IMM 2004-5 | Indenture Section 2.03 |
| IMM 2005-5 | Indenture Section 2.03 |
| IMM 2005-6 | Indenture Section 2.03 |
| IMM 2005-8 | Indenture Section 2.03 |
| RAMC 2005-1 | Indenture Section 2.03 |
| RAMC 2005-4 | Indenture Section 2.03 |
| RAMC 2006-1 | Indenture Section 2.03 |
| RAMC 2006-2 | Indenture Section 2.03 |
| RAMC 2006-3 | Indenture Section 2.03 |
| RAMC 2006-4 | Indenture Section 2.03 |
| RAMC 2007-1 | Indenture Section 2.03 |
| RAMC 2007-2 | Indenture Section 2.03 |
| SAST 2006-3 | SSA Section 2.2 |

## **Exhibit 7 Table 4**

| Transaction Name | Loan File Contents |
|---|---|
| CWHL 2005-HYB9 | Mortgage Loan Purchase Agreement Section 2.1 |
| IMM 2004-3 | Mortgage Loan Purchase Agreement Section 2.1 |
| IMM 2004-5 | Mortgage Loan Purchase Agreement Section 2.1 |
| IMM 2005-5 | Mortgage Loan Purchase Agreement Section 2.1 |
| IMM 2005-6 | Mortgage Loan Purchase Agreement Section 2.1 |
| IMM 2005-8 | Mortgage Loan Purchase Agreement Section 2.1 |
| RAMC 2005-1 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2005-4 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2006-1 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2006-2 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2006-3 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2006-4 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2007-1 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| RAMC 2007-2 | Mortgage Loan Sale and Contribution Agreement Section 2.1 |
| SAST 2006-3 | SSA Section 2.1 |

## Exhibit 7 Table 5

| Transaction Name | Initial Loan File Certification |
| --- | --- |
| CWHL 2005-HYB9 | SSA Section 2.02 |
| IMM 2004-3 | Indenture Section 2.03 |
| IMM 2004-5 | Indenture Section 2.03 |
| IMM 2005-5 | Indenture Section 2.03 |
| IMM 2005-6 | Indenture Section 2.03 |
| IMM 2005-8 | Indenture Section 2.03 |
| RAMC 2005-1 | Indenture Section 2.03 |
| RAMC 2005-4 | Indenture Section 2.03 |
| RAMC 2006-1 | Indenture Section 2.03 |
| RAMC 2006-2 | Indenture Section 2.03 |
| RAMC 2006-3 | Indenture Section 2.03 |
| RAMC 2006-4 | Indenture Section 2.03 |
| RAMC 2007-1 | Indenture Section 2.03 |
| RAMC 2007-2 | Indenture Section 2.03 |
| SAST 2006-3 | SSA Section 2.2 |

## Exhibit 7 Table 6

| Transaction Name | Final Loan File Certification |
| --- | --- |
| CWHL 2005-HYB9 | SSA Section 2.02 |
| IMM 2004-3 | Indenture Section 2.03 |
| IMM 2004-5 | Indenture Section 2.03 |
| IMM 2005-5 | Indenture Section 2.03 |
| IMM 2005-6 | Indenture Section 2.03 |
| IMM 2005-8 | Indenture Section 2.03 |
| RAMC 2005-1 | Indenture Section 2.03 |
| RAMC 2005-4 | Indenture Section 2.03 |
| RAMC 2006-1 | Indenture Section 2.03 |
| RAMC 2006-2 | Indenture Section 2.03 |
| RAMC 2006-3 | Indenture Section 2.03 |
| RAMC 2006-4 | Indenture Section 2.03 |
| RAMC 2007-1 | Indenture Section 2.03 |
| RAMC 2007-2 | Indenture Section 2.03 |
| SAST 2006-3 | SSA Section 2.2 |

## Exhibit 7 Table 7

| Transaction Name | Trustee's Obligation to Ensure that Defects in Mortgage Files Are Cured |
|---|---|
| CWHL 2005-HYB9 | SSA Section 2.02 |
| IMM 2004-3 | Indenture Section 2.03 |
| IMM 2004-5 | Indenture Section 2.03 |
| IMM 2005-5 | Indenture Section 2.03 |
| IMM 2005-6 | Indenture Section 2.03 |
| IMM 2005-8 | Indenture Section 2.03 |
| RAMC 2005-1 | Indenture Section 2.03 |
| RAMC 2005-4 | Indenture Section 2.03 |
| RAMC 2006-1 | Indenture Section 2.03 |
| RAMC 2006-2 | Indenture Section 2.03 |
| RAMC 2006-3 | Indenture Section 2.03 |
| RAMC 2006-4 | Indenture Section 2.03 |
| RAMC 2007-1 | Indenture Section 2.03 |
| RAMC 2007-2 | Indenture Section 2.03 |
| SAST 2006-3 | SSA Section 2.2 |

## Exhibit 7 Table 8

| Transaction Name | Trustee's Duty to Give Notice of Defective Loans |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 3.10 |
| IMM 2004-3 | Indenture Section 3.11 |
| IMM 2004-5 | Indenture Section 3.12 |
| IMM 2005-5 | Indenture Section 3.12 |
| IMM 2005-6 | Indenture Section 3.12 |
| IMM 2005-8 | Indenture Section 3.12 |
| RAMC 2005-1 | Servicing Agreement Section 2.03 |
| RAMC 2005-4 | Servicing Agreement Section 2.03 |
| RAMC 2006-1 | Servicing Agreement Section 2.03 |
| RAMC 2006-2 | Servicing Agreement Section 2.03 |
| RAMC 2006-3 | Servicing Agreement Section 2.03 |
| RAMC 2006-4 | Servicing Agreement Section 2.03 |
| RAMC 2007-1 | Servicing Agreement Section 2.03 |
| RAMC 2007-2 | Servicing Agreement Section 2.03 |
| SAST 2006-3 | SSA Section 2.3 |

## Exhibit 7 Table 9

| Transaction Name | Events of Default |
| --- | --- |
| CWHL 2005-HYB9 | SSA Section 6.01 |
| IMM 2004-3 | Indenture Appendix A Definitions |
| IMM 2004-5 | Indenture Appendix A Definitions |
| IMM 2005-5 | Indenture Appendix A Definitions |
| IMM 2005-6 | Indenture Appendix A Definitions |
| IMM 2005-8 | Indenture Appendix A Definitions |
| RAMC 2005-1 | Indenture Appendix A Definitions |
| RAMC 2005-4 | Indenture Appendix A Definitions |
| RAMC 2006-1 | Indenture Appendix A Definitions |
| RAMC 2006-2 | Indenture Appendix A Definitions |
| RAMC 2006-3 | Indenture Appendix A Definitions |
| RAMC 2006-4 | Indenture Appendix A Definitions |
| RAMC 2007-1 | Indenture Appendix A Definitions |
| RAMC 2007-2 | Indenture Appendix A Definitions |
| SAST 2006-3 | Indenture Section 5.01 |

## Exhibit 7 Table 10

| Transaction Name | Trustee's Obligation to Give Notice of Default |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 5.01 |
| IMM 2004-3 | Indenture Section 6.05 |
| IMM 2004-5 | Indenture Section 6.05 |
| IMM 2005-5 | Indenture Section 6.05 |
| IMM 2005-6 | Indenture Section 6.05 |
| IMM 2005-8 | Indenture Section 6.05 |
| RAMC 2005-1 | Indenture Section 6.05 |
| RAMC 2005-4 | Indenture Section 6.05 |
| RAMC 2006-1 | Indenture Section 6.05 |
| RAMC 2006-2 | Indenture Section 6.05 |
| RAMC 2006-3 | Indenture Section 6.05 |
| RAMC 2006-4 | Indenture Section 6.05 |
| RAMC 2007-1 | Indenture Section 6.05 |
| RAMC 2007-2 | Indenture Section 6.05 |
| SAST 2006-3 | Indenture Section 6.05 |

## Exhibit 7 Table 11

| Transaction Name | After an Event of Default, the Trustee Must Exercise its Rights Under the Agreement as a Prudent Person Would |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 6.01 |
| IMM 2004-3 | Indenture Section 6.01 |
| IMM 2004-5 | Indenture Section 6.01 |
| IMM 2005-5 | Indenture Section 6.01 |
| IMM 2005-6 | Indenture Section 6.01 |
| IMM 2005-8 | Indenture Section 6.01 |
| RAMC 2005-1 | Indenture Section 6.01 |
| RAMC 2005-4 | Indenture Section 6.01 |
| RAMC 2006-1 | Indenture Section 6.01 |
| RAMC 2006-2 | Indenture Section 6.01 |
| RAMC 2006-3 | Indenture Section 6.01 |
| RAMC 2006-4 | Indenture Section 6.01 |
| RAMC 2007-1 | Indenture Section 6.01 |
| RAMC 2007-2 | Indenture Section 6.01 |
| SAST 2006-3 | Indenture Section 6.01 |

## Exhibit 7 Table 12

| Transaction Name | Trustee's Duty to Make Distribution Statements |
| --- | --- |
| CWHL 2005-HYB9 | Indenture Section 7.05 |
| IMM 2004-3 | Indenture Section 7.05 |
| IMM 2004-5 | Indenture Section 7.05 |
| IMM 2005-5 | Indenture Section 7.05 |
| IMM 2005-6 | Trust Agreement Section 5.04 |
| IMM 2005-8 | Indenture Section 7.05 |
| RAMC 2005-1 | Indenture Section 7.05 |
| RAMC 2005-4 | Indenture Section 7.05 |
| RAMC 2006-1 | Indenture Section 7.05 |
| RAMC 2006-2 | Indenture Section 7.05 |
| RAMC 2006-3 | Indenture Section 7.05 |
| RAMC 2006-4 | Indenture Section 7.05 |
| RAMC 2007-1 | Indenture Section 7.05 |
| RAMC 2007-2 | Indenture Section 7.05 |
| SAST 2006-3 | SSA Section 4.5 |

## Exhibit 7 Table 13

| Transaction Name | Servicer's Duties |
|---|---|
| | SSA Section 3.01 |
| CWHL 2005-HYB9 | SSA Section 3.19 |
| | Servicing Agreement Section 3.01 |
| IMM 2004-3 | Servicing Agreement Section 3.13 |
| | Servicing Agreement Section 3.01 |
| IMM 2004-5 | Servicing Agreement Section 3.13 |
| | Servicing Agreement Section 3.01 |
| IMM 2005-5 | Servicing Agreement Section 3.13 |
| | Servicing Agreement Section 3.01 |
| IMM 2005-6 | Servicing Agreement Section 3.13 |
| | Servicing Agreement Section 3.01 |
| IMM 2005-8 | Servicing Agreement Section 3.13 |
| | Servicing Agreement Section 3.01 |
| RAMC 2005-1 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2005-4 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2006-1 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2006-2 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2006-3 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2006-4 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2007-1 | Servicing Agreement Section 3.06 |
| | Servicing Agreement Section 3.01 |
| RAMC 2007-2 | Servicing Agreement Section 3.06 |
| | SSA Section 3.1 |
| SAST 2006-3 | SSA Section 3.11 |

## Exhibit 7 Table 14

| Transaction Name | Sellers' Representations and Warranties Regarding Mortgage Loans |
|---|---|
| CWHL 2005-HYB9 | Indenture Section 3.10 |
| IMM 2004-3 | Mortgage Loan Purchase Agreement |
| IMM 2004-5 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| IMM 2005-5 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| IMM 2005-6 | Mortgage Loan Purchase Agreement |
| IMM 2005-8 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2005-1 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2005-4 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2006-1 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2006-2 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2006-3 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2006-4 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2007-1 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| RAMC 2007-2 | Mortgage Loan Sale and Contribution Agreement Section 3.1 |
| SAST 2006-3 | Mortgage Loan Purchase Agreement |

## **Exhibit 7 Table 15**

| Transaction Name | Servicer's Annual Certification |
| --- | --- |
| CWHL 2005-HYB9 | SSA Section 3.16 |
| IMM 2004-3 | SSA Section 3.16 |
| IMM 2004-5 | SSA Section 3.16 |
| IMM 2005-5 | SSA Section 3.16 |
| IMM 2005-6 | Servicing Agreement Section 3.16 |
| IMM 2005-8 | SSA Section 3.16 |
| RAMC 2005-1 | Servicing Agreement Section 3.09 |
| RAMC 2005-4 | Servicing Agreement Section 3.09 |
| RAMC 2006-1 | Servicing Agreement Section 3.09 |
| RAMC 2006-2 | Servicing Agreement Section 3.09 |
| RAMC 2006-3 | Servicing Agreement Section 3.09 |
| RAMC 2006-4 | Servicing Agreement Section 3.09 |
| RAMC 2007-1 | Servicing Agreement Section 3.09 |
| RAMC 2007-2 | Servicing Agreement Section 3.09 |
| SAST 2006-3 | SSA Section 3.16 |

## Exhibit 8

| Transaction Name | Servicers | | |
|---|---|---|---|
| CWHL 2005-HYB9 | Countrywide Home Loans Servicing LP | | |
| IMM 2004-3 | Impac Funding Corporation | Countrywide Home Loans Servicing LP | GMAC Mortgage Corporation | Midland Loan Services |
| IMM 2004-5 | Impac Funding Corporation | Countrywide Home Loans Servicing LP | GMAC Mortgage Corporation | Midland Loan Services |
| IMM 2005-5 | Impac Funding Corporation | Countrywide Home Loans Servicing LP | | |
| IMM 2005-6 | Impac Funding Corporation | | | |
| IMM 2005-8 | Impac Funding Corporation | Countrywide Home Loans Servicing LP | GMAC Mortgage Corporation | Midland Loan Services |
| RAMC 2005-1 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2005-4 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2006-1 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2006-2 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2006-3 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2006-4 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2007-1 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| RAMC 2007-2 | Wells Fargo Bank, N.A. | Ocwen Federal Bank FSB | | |
| SAST 2006-3 | Saxon Funding Management, Inc. | | | |

## **Exhibit 9**

| **Transaction Name** | | **Originators** |
|---|---|---|
| CWHL 2005-HYB9 | Impac Funding Corporation | CountryWide Home Loans, Inc. |
| IMM 2004-3 | Impac Funding Corporation | |
| IMM 2004-5 | Impac Funding Corporation | |
| IMM 2005-5 | Impac Funding Corporation | |
| IMM 2005-6 | Impac Funding Corporation | |
| IMM 2005-8 | Impac Funding Corporation | |
| RAMC 2005-1 | Delta Funding Corporation | |
| RAMC 2005-4 | Delta Funding Corporation | |
| RAMC 2006-1 | Delta Funding Corporation | |
| RAMC 2006-2 | Delta Funding Corporation | |
| RAMC 2006-3 | Delta Funding Corporation | |
| RAMC 2006-4 | Delta Funding Corporation | |
| RAMC 2007-1 | Delta Funding Corporation | |
| RAMC 2007-2 | Delta Funding Corporation | |
| SAST 2006-3 | Saxon Funding Management, Inc. | People's Choice Home Loan, Inc. |